UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

| | |
|---|---|
| AVE MARIA UNIVERSITY, | Case No. 2:13-cv-00630-JES-UAM |
| *Plaintiff*, | |
| | **PLAINTIFF AVE MARIA UNIVERSITY'S MOTION TO REOPEN AND FOR PRELIMINARY INJUNCTION** |
| v. | |
| SYLVIA BURWELL, *et al.*, | **(One Hour Oral Argument Requested)** |
| *Defendants*. | |

## INTRODUCTION

In just three months, beginning November 1, 2014, regulations issued by Defendants Health and Human Services, Department of Labor, and Internal Revenue Service (collectively "HHS") will obligate Ave Maria University to either pay for free employee access to contraceptive drugs and devices or order its insurance company to do the same ("the Mandate")—either of which would violate Ave Maria's religious beliefs. Failure to comply will expose Ave Maria to crushing fines of over $17 million annually.

Ave Maria is not alone in this coercive predicament. There are currently forty-two lawsuits pending in courts across the nation seeking protection from the Mandate for nonprofit religious organizations. Courts in thirty cases have already granted preliminary injunctive relief. *See* http://www.becketfund.org/hhsinformationcentral/. In only three cases has relief been denied, and in all three, the decision issued before the Supreme Court's ruling in *Burwell v. Hobby Lobby*. *See id*. This case, having been stayed pending *Hobby Lobby*—which addressed a for-profit company's challenge to the contraception

mandate—is among the nine still awaiting preliminary rulings. *See* Dkt. 46 (order staying case).

Now that the Supreme Court has resolved *Hobby Lobby* by holding that the mandate violates the Religious Freedom Restoration Act ("RFRA")—at least as applied to closely-held businesses—Ave Maria's entitlement to a preliminary injunction is clear. Indeed, in the *Hobby Lobby* opinion itself, the Supreme Court cited with approval the preliminary injunctive relief it previously had granted to a class of religious organizations in *Little Sisters of the Poor v. Sebelius*. *See Burwell v. Hobby Lobby Stores, Inc.*, No. 13-354, slip op. at 10 n.9 (June 30, 2014) (citing *Little Sisters* order that granted preliminary relief so that "eligible organizations be permitted to opt out of the contraceptive mandate by providing written notification of their objections to the Secretary of HHS, rather than to their insurance issuers or third-party administrators."). Just a few hours later, the Eleventh Circuit Court of Appeals ruled that, "[i]n light of the Supreme Court's decision," the religious broadcasting network Eternal Word Television Network was also entitled to injunctive relief. *Eternal Word Television Network, Inc. v. Sec'y, U.S. Dep't of Health & Human Servs.*, 2014 WL 2931940 (11th Cir. June 30, 2014). And again, just three days later, the Supreme Court ruled that the religious university Wheaton College was entitled to same relief as had been granted in *Little Sisters*. *Wheaton Coll. v. Burwell*, 134 S. Ct. 2806 (2014).

Ave Maria has now issued the same notice to HHS on which the Supreme Court predicated relief in *Little Sisters* and *Wheaton College*. Baxter Decl. [Dkt. 47-1] ¶ 2, Ex. A. Nevertheless, HHS has refused to consent to a preliminary injunction, insisting that Ave

Maria must litigate its religious liberty under the looming November 1 deadline and the threat of crushing fines for refusing to forfeit its religious beliefs. But there is no legitimate basis for distinguishing Ave Maria from the other religious objectors who have already obtained relief from the Supreme Court and Eleventh Circuit.

Moreover, as in those already-decided Supreme Court and Eleventh Circuit cases, Ave Maria is likely to prevail on the merits of its RFRA claim and faces the imminent prospect of irreparable harm to its religious liberty, its continuing existence, and the welfare of its employees if preliminary relief is not granted. In contrast, HHS can identify no legitimate harm that would result from allowing Ave Maria to litigate its claims under the protection of a preliminary injunction. HHS already granted relief to thousands of religious objectors, including Ave Maria, through a one-year "safe harbor." It has also exempted plans covering hundreds of millions of individuals from the Mandate because those plans have been "grandfathered" for reasons of convenience. And over the past several months, federal courts have granted preliminary injunctions to dozens of religious objectors whose "safe harbor" and "grandfathering" exceptions have expired.[1] Thus, there can be no harm in, or public interest against, also extending protection to Ave Maria for the duration of this lawsuit. Ave Maria is in the same position as all the other protected religious organizations and deserves the same remedy. Accordingly, Ave Maria requests the court to reopen this matter and grant it a preliminary injunction pending a decision on the merits.

---

[1]  An up-to-date listing of the various challenges to the HHS Mandate and the current status of each lawsuit is maintained by the undersigned counsel at www.becketfund.org/hhsinformationcentral.

3

**STATEMENT OF FACTS**

<u>Ave Maria</u>

Ave Maria's Catholic faith infuses everything it does: its very purpose is "[t]o educate students in the principles and truths of the Catholic Faith." *See* Towey Decl. [Dkt. 22-1] ¶¶ 9-14. The University is officially recognized as a Catholic university under the Canon Law of the Catholic Church. *Id.* ¶ 12. Its board of trustees, by requirement, are all "practicing Catholics in good standing with the Church," *Id.* ¶ 15, and approximately 90% of all full-time staff are practicing Catholics. *Id.* ¶ 17. All of Ave Maria's full-time employees must demonstrate willingness to embrace and advance the University's Catholic mission as a condition of their employment. *Id.* ¶¶ 18-19.

As one element of its faithfulness to the Catholic Church, Ave Maria holds and professes traditional Catholic teachings concerning the sanctity of life. *Id.* ¶ 34. It believes that each human being bears the image and likeness of God, and therefore that abortion ends a human life and is a grave sin. *Id.* Furthermore, Ave Maria believes that any action "specifically intended to prevent procreation"—including contraception and sterilization— is also a grave sin. *Id.* ¶ 37.

<u>The Mandate</u>

The Affordable Care Act mandates that any "group health plan" must provide coverage for certain "preventive care" without "any cost sharing." 42 U.S.C. § 300gg-13(a). Congress did not define "preventive care" but instead allowed HHS to define the term. 42 U.S.C. § 300gg-13(a)(4). HHS's definition includes all FDA-approved contraceptive methods and sterilization procedures, including abortifacient "emergency contraception"

4

such as Plan B (the "morning-after" pill) and Ella (the "week-after" pill). Verm Decl. [Dkt. 22-2], Ex. B-2 at 16.[2] Failure to provide this coverage triggers severe penalties. *See, e.g.*, 26 U.S.C. § 4980D(b)(1) ($100 per day per affected individual if coverage is incomplete); 26 U.S.C. § 4980H(c)(1) ($2000 per year per employee if coverage dropped entirely).

*"Exempt" employers.* Vast numbers of employers are exempt from the Mandate. Employers with "grandfathered" health care plans, which cover tens of millions of Americans, are exempt from the Mandate. *See* 42 U.S.C. § 18011 (2010); Verm Decl. [Dkt. 22-2], Ex. B-5 at 35; *Burwell v. Hobby Lobby*, slip op. at 11 n.10 (2014) (attached to Baxter Decl. [Dkt. 47-1] as Exhibit C) (noting that "the total number of Americans" on grandfathered plans is "substantial, and there is no legal requirement that grandfathered plans ever be phased out"). Employers with fewer than fifty employees, covering an estimated 34 million Americans, may avoid the Mandate and any penalties by not offering insurance at all. *See* 26 U.S.C. § 4980H(c)(2)(A); 26 U.S.C. § 4980D(d); Verm Decl. [Dkt. 2-22], Ex. B-6 at 39. A subset of "religious employers"—churches and religious orders— are also exempt. 78 Fed. Reg. 39870, 39874 (July 2, 2013); 45 C.F.R. § 147.131(a). These employers are all automatically exempt; they are not compelled to certify their religious beliefs to anyone, to notify their insurers, or to designate or obligate anyone else to provide contraceptive coverage.

*"Non-Exempt" Employers and EBSA Form 700.* Religious entities like Ave Maria that do not qualify for the "religious employers" exemption because they are not a church or

---

[2]    The FDA's Birth Control Guide notes that these drugs and devices may prevent "attachment (implantation)" of a fertilized egg in the uterus. Verm Decl. [Dkt. 22-2], Ex. B-2 at 16-17.

religious order sought an equivalent exemption from HHS. *See, e.g.*, Towey Decl. [Dkt. 22-1] ¶ 73. Instead, the government developed an "accommodation" for "non-exempt" religious organizations. 77 Fed. Reg. 16501 (March 21, 2012). Unlike the grandfathering and religious employer exemptions, the government said that the "accommodation" would "assur[e] that participants and beneficiaries covered under such organizations' plans receive contraceptive coverage." *Id.* at 16503.

The resulting final rule requires non-exempt religious organizations to execute and deliver EBSA Form 700 to their insurers. 78 Fed. Reg. at 39875; 45 C.F.R. § 147.131(c)(1). The government imposed the requirement to sign and deliver EBSA Form 700 as part of its effort to ensure that beneficiaries of non-exempt employers' plans "will still benefit from separate payments for contraceptive services without cost sharing or other charge." 78 Fed. Reg. at 39874. Receipt of an executed EBSA Form 700 triggers an insurer's legal obligation to make "separate payments for contraceptive services directly for plan participants and beneficiaries." *Id.* at 39875-76; *see* 45 C.F.R. § 147.131(c)(2)(i)(B). Forcing the non-exempt employer to designate the insurer in this manner ensures that employees of employers with religious objections receive these drugs "so long as they remain enrolled in the plan." *See* 45 C.F.R. § 147.131(c)(2)(i)(B).

Through its legally operative language, the Form (a) notifies the insurer of its obligation to provide payments for contraceptive services, (b) triggers the insurer's obligation to provide payments for contraceptive services, and (c) purports to make the Form "an instrument under which the plan is operated." Baxter Decl. [Dkt. 47-1] ¶ 3, Ex. B; *see also*

45 C.F.R. § 147.131(c)(2)(i)(B) ("group health insurance issuer that receives a copy of the self-certification . . . must . . . [p]rovide separate payments for any contraceptive services").

<u>Ave Maria's Religious Exercise</u>

Ave Maria's religious convictions forbid it from including contraception, sterilization, and abortifacient products in its employee healthcare plans. Towey Decl. [Dkt. 22-1] ¶ 68. In order to comply with the Mandate under the "accommodation," Ave Maria would need to execute EBSA Form 700 and deliver it to its insurer prior to November 1, 2014. *Id.* ¶¶ 55, 74-75. Delivery of the self-certification would serve as a trigger for the insurer to provide Ave Maria employees with payment for the same products and services it cannot directly provide, such that Ave Maria would still be arranging for this coverage and referring its plan participants to another entity for payment. *Id.* ¶¶ 56-57. Ave Maria's beliefs preclude it from soliciting, contracting with, or designating a third party to provide contraceptive drugs and services. *Id.* ¶ 58. From Ave Maria's perspective, arranging for coverage and forcing its insurer to provide payments for abortifacient services is no different than directly providing access. *Id.* Ave Maria would still be complicit in what it believes to be a grave moral wrong—it cannot simply outsource its conscience. *Id.*

It is also a part of Ave Maria's religious convictions to provide for the well-being and care of the employees who further its mission and make up an integral part of its community. *Id* ¶ 40. Furthermore, terminating Ave Maria's health plan would create significant hardship for its faculty and staff, *id.* ¶¶ 79-81, and would also result in serious competitive disadvantages in recruiting and retaining employees, *id.* ¶¶ 48-50. Ave Maria could also face regulatory action and lawsuits under ERISA. *Id.* ¶ 64; 29 U.S.C. § 1132.

**ARGUMENT**

In order to receive a preliminary injunction, Ave Maria need only show that

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) (emphasis omitted). These standards are easily met here.

## I.   Ave Maria is Likely to Succeed on the Merits of its Claims.

The Supreme Court's recent decision in *Burwell v. Hobby Lobby* establishes that Ave Maria is likely to succeed on the merits of its RFRA claims. *Hobby Lobby* confirms both that the Mandate imposes a substantial burden on Ave Maria's religious exercise and that the government failed to carry its burdens under strict scrutiny.

### A. The Mandate Imposes a Substantial Burden on Ave Maria's Religious Exercise.

The Mandate forces Ave Maria to make a choice: it must either (a) violate its beliefs by purchasing a plan that provides morally objectionable services to its employees; (b) violate its beliefs by executing and delivering EBSA Form 700, making it morally complicit in the provision of objectionable services, or (c) violate the law and be subject to up to $17 million in fines per year.

Even before the Supreme Court's *Hobby Lobby* decision, this kind of direct government coercion to engage in an activity forbidden by one's religion constituted an obvious

substantial burden under binding circuit precedent. A law imposes a substantial burden on religion where it "requires participation in an activity prohibited by religion." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004).[3] Here, the Mandate requires Ave Maria's participation in the contraceptive delivery system by forcing Ave Maria to execute and deliver EBSA Form 700. If Ave Maria delivered its self-certification to its insurer, Ave Maria would be obligating the insurer to deliver morally objectionable services, drugs, and devices to its employees. 45 C.F.R. § 147.131(c)(2)(i)(B).

The government has argued that signing the Form should not burden Ave Maria's religion because the action of signing the form is a "*de minimis*" burden on Ave Maria, and because the burden on Ave Maria is too attenuated to the actual use of contraceptive coverage. Def's Mot. to Dismiss or for Summ. Judgment, Dkt. 30 at 10-18. After *Hobby Lobby*, however, it is crystal clear that the government's view of RFRA has been squarely considered and conclusively rejected. As in *Hobby Lobby*, because "the contraceptive mandate forces [Ave Maria] to pay an enormous sum of money . . . if [it] insist[s] on providing insurance coverage in accordance with [its] religious beliefs, the mandate clearly imposes a substantial burden on those beliefs." *Hobby Lobby*, slip op. at 38.

---

[3]   *Midrash* addressed RFRA's companion law—the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc—which uses a nearly identical standard. *See Knight v. Thompson*, 723 F.3d 1275, 1282 (11th Cir. 2013). The government has thus far ignored binding circuit precedent on the meaning of "substantial burden." *See, e.g.*, Dkt. 30, failing to cite *Midrash* or any other Eleventh Circuit precedent.

Defendants argue that the regulations require "virtually nothing" of Ave Maria, and that they certainly do not require it to change its behavior "in any way." Dkt. 30 at 11, 23. Not true. For Ave Maria, signing the Form will set in motion a delivery of contraceptive products and services to which it strenuously objects. EBSA Form 700 is not innocuous; rather it is a legally operative form that triggers the insurer's obligations to pay for contraceptive services. For Ave Maria, the act of triggering the provision of these services makes it complicit with evil. Ave Maria cannot designate, authorize, obligate, or incentivize another party to provide the same drugs that it cannot provide itself. Towey Decl. [Dkt. 22-1] ¶ 56-58.

The government's position that the Form does not impose a substantial burden amounts to a dismissal of Ave Maria's religious beliefs, an argument foreclosed by *Hobby Lobby*. There, the Supreme Court rejected the government's argument "that the connection between what the objecting parties must do" and "the end that they find to be morally wrong" was "too attenuated." *Hobby Lobby*, slip op. at 35. The Court explained that it would not second-guess the religious plaintiffs' sincere answer to a "difficult and important question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating commission of an immoral act by another." *Id.* at 36; *see also Eternal Word Television Network v. Burwell*, 2014 WL 2931940, at *1 (11th Cir. June 30, 2014) (Pryor, J., concurring) ("It is neither our duty nor the duty of the United States to tell the [plaintiff] that its undisputed belief is flawed."). The Court criticized the government for "[a]rrogating the authority to provide a national binding answer to this religious and

10

philosophical question" that would "in effect tell the plaintiffs that their beliefs are flawed." *Hobby Lobby*, slip op. at 36-37. The Court noted that the government's approach "dodges the question that RFRA presents" and "instead addresses a very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable)." *Id.* at 36.[4]

The Supreme Court's analysis is directly applicable here. It is undisputed that Ave Maria believes, as a religious matter, that it may not sign the Form. As in *Hobby Lobby*, Ave Maria believes the compliance "demanded by the HHS regulations lies on the forbidden side of the line, and it is not for [the government] to say that [its] religious beliefs are mistaken or insubstantial." *Id.* at 37. As in *Hobby Lobby*, that religious belief implicates an "important question of religion and moral philosophy," and it is for Ave Maria, not the government, to decide "the circumstances under which it is wrong for a person to perform an act" that enables or facilitates "the commission of an immoral act by another." *Id.* at 36. As the Supreme Court explained, this Court's "'narrow function . . . in this context is to determine' whether the line drawn reflects 'an honest conviction,' . . . and there is no dispute that it does." *Id.* at 37-38 (citations omitted).

---

[4]    The Court also noted that this "too attenuated" argument "is not easy to square with" the exemption for religious employers. *Hobby Lobby*, slip op. at 35 n.33. If the harm truly were "too attenuated," there would have been no reason for the government to exempt "religious employers" at all. But the government did exempt "religious employers," specifically because of their religious objection, *see id.* at 36 n.33, and without requiring them to sign and deliver EBSA Form 700, 45 C.F.R. § 147.131(a). The exemption for religious employers "would be hard to understand if the plaintiffs' objections here were not substantial." *Hobby Lobby*, slip op. at 36 n.33; *cf. id.* at 3 (Kennedy J., concurring) ("RFRA is inconsistent with the insistence of an agency such as HHS on distinguishing between different religious believers—burdening one while accommodating the other—when it may treat both equally by offering both of them the same accommodation.").

The government's argument that signing the form is a *de minimis* burden ignores the $17 million in fines that Ave Maria must face—proportionally the same fines that Hobby Lobby faced—if it acts in accordance with its beliefs. As the Supreme Court held, "[i]f these consequences do not amount to a substantial burden, it is hard to see what would." *Hobby Lobby*, slip op. at 2.

### B. *Hobby Lobby, Wheaton College*, and *Eternal Word Television Network* confirm that Ave Maria should receive an injunction.

Although the Supreme Court in *Hobby Lobby* considered the "accommodation" as a less restrictive means of achieving the government's claimed goals, all nine justices were clear that the Court was not presented with a religious objection to complying with the accommodation. Slip op. at 44 (Opinion of the Court); *id.* at 30 (Ginsburg, J., dissenting). In so doing, the Supreme Court was quite careful to acknowledge its order in *Little Sisters v. Sebelius*. *See* slip op. at 44 n.39; *see also* slip op. at 10 n.9. And since *Hobby Lobby*, both the Eleventh Circuit and the Supreme Court have entered injunctions pending appeal that mirror the Supreme Court injunction in *Little Sisters*. *See Eternal Word Television Network*, 2014 WL 2931940; *Wheaton*, 134 S. Ct. 2806. The government has never explained how these injunctions harm its interests in any way. There is no reason to believe the government needs any more notice of Ave Maria's objections than it received from Wheaton College, Eternal Word Television Network, or the Little Sisters of the Poor.

### C. The Mandate Cannot Satisfy Strict Scrutiny.

Because the Mandate substantially burdens Ave Maria's religious exercise, "the burden [of strict scrutiny] is placed squarely on the [g]overnment." *Gonzalez v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (citing RFRA at 42 U.S.C.

§ 2000bb-1(b)). Under RFRA, a burdened party "is entitled to an exemption" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Hobby Lobby*, slip op. at 5-6 (quoting 42 U.S.C. § 2000bb-1(b)). Further, *Hobby Lobby* makes clear that this analysis must be conducted with respect "to the person—the particular claimant." *Id.* at 39 (quoting *O Centro*, 546 U.S. at 430-31); *see also Korte v. Sebelius*, 735 F.3d 654, 685 (7th Cir. 2013) ("In other words, under RFRA's version of strict scrutiny, the government must establish a compelling and specific justification for burdening *these* claimants." (emphasis in original)). The government bears the burden on strict scrutiny, even at the preliminary injunction stage. *O Centro*, 546 U.S. at 429. No court to reach strict scrutiny has held that the Mandate can withstand it. This case is no different.

*Compelling Interest*. The government has identified its compelling interests in imposing the Mandate as "public health" and "gender equality." Dkt. No. 30 at 18-19. But the Court in *Hobby Lobby* rejected those interests as being "couched in very broad terms," whereas RFRA requires a "more focused" inquiry that "loo[ks] beyond broadly formulated interests." *Hobby Lobby*, slip op. at 39 (citing *O Centro*, 546 U.S. at 430-431). Specifically, RFRA requires " 'requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened.' " *Hobby Lobby*, slip op. at 39 (quoting *O Centro*, 546 U.S. at 430-31). In *O Centro*, even the government's obviously compelling interest in enforcing the nation's drug

13

laws faltered when applied to the specific circumstances of that case. *Id*. Here, RFRA "requires [the court] . . . to look to the marginal interest in enforcing the contraceptive mandate in [this] case[]." *Hobby Lobby*, slip op. at 39. (citing *O Centro*, 546 U.S. at 431).

The government cannot explain why application of *this* Mandate to *this* religious organization is necessary. In fact, it has essentially admitted that it has no interest in enforcing the Mandate against Ave Maria. Specifically, the government has made a regulatory finding that a complete exemption for houses of worship "does not undermine the governmental interests furthered by the contraceptive coverage requirement" because "[h]ouses of worship . . . are more likely than other employers to employ people of the same faith who share the same objection." 78 Fed. Reg. at 39874. But Ave Maria—whose guiding purpose as a Canon-recognized Catholic university is "[t]o educate students in the principles and truths of the Catholic Faith," Towey Decl. [Dkt. 22-1] ¶¶ 9-10, 12, 14—occupies precisely the same position—it also is far "more likely than other employers to employ people of the same faith who share the same objection." Its board of trustees are required to be "practicing Catholics in good standing with the Church" whose "public writings and statements exhibit faithful adherence" to the Church. *Id*. ¶ 15. Approximately 90% of all full-time staff are practicing Catholics. *Id*. ¶ 17. The University President "personally interview[s] *all* candidates recommended for full-time employment—even if the prospective employee is not Catholic—to ensure they will embrace and advance the University's Catholic mission." *Id*. ¶ 18. In the past, he has vetoed recommendations to hire based on his personal conclusion that "the particular candidates would be incompatible with the University's Catholic mission." *Id*. ¶ 19. Finally, at the University's annual mass

held at the beginning of each school year, "all professors who teach disciplines pertaining to faith and morals must make a public Profession of Faith and take an Oath of Fidelity, in the presence of the Ordinary [of the Diocese of Venice]." *Id.* ¶ 22. The University president himself was required to make such public declarations at his inauguration, *id.* ¶ 23, all as part of the University's wide-ranging effort to ensure that Ave Maria remains true to the mission and teachings of the Catholic Church, including Church teachings concerning the sanctity of life and the purpose of procreation. *Id.* ¶¶ 34, 37; *see generally, id.* ¶¶ 9-33. If exempting houses of worship does not interfere with the government's alleged compelling interests because houses of worship are "more likely than other employers" to hire co-religionists, then an exemption for Ave Maria—which carefully screens for employees who will exemplify and promote its religious views—certainly cannot interfere with the government's interests either. The government simply cannot bear its burden of proof "*to the person*" as demanded by RFRA. *O Centro*, 546 U.S. at 430-31 (emphasis added).

This conclusion is bolstered by Congress's treatment of the preventive services mandate in the Affordable Care Act. The statutory text indicates that the Mandate was less important to Congress than other goals. The Act did not expressly include contraceptive coverage; it left the determination of which women's preventive services should be included to HHS. *Hobby Lobby,* slip op. at 8-9. Further, Congress specified that, whatever those preventive services might entail, grandfathered plans covering millions of Americans would not have to comply. *Id.* at 39-40; 42 U.S.C. § 18011. As the unanimous Supreme Court has stated, "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church*

*of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (internal citation omitted). Applying that rule to the Mandate, the government's interests "cannot be compelling because the [Mandate] presently does not apply to tens of millions of people." *Accord Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1143 (10th Cir. 2013); *Korte*, 735 F.3d at 686; *Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208, 1222 (D.C. Cir. 2013); *see also Hobby Lobby*, slip op. at 39-40 ("As we have noted, many employees . . . may have no contraceptive coverage without cost sharing at all.").[5]

Even more damning to the government's case, Congress saw fit to override the grandfathering exemption for those requirements of the Affordable Care Act that it deemed most important—but the Mandate was not among them. "Grandfathered plans are required 'to comply with a subset of the Affordable Care Act's health reform provisions' that provide what HHS has described as 'particularly significant protections.'" *Hobby Lobby*, slip op. at 40 (quoting 75 Fed. Reg. 34538-01, 34540 (2010)); *see also* 42 U.S.C. § 18011(a)(4) (listing exceptions to grandfathering). "***But the contraceptive mandate is expressly excluded from this subset***." *Hobby Lobby*, slip op. at 40 (emphasis added) (citing 75 Fed. Reg. 34540 (2010) ("[G]randfathered health plans are not required to comply with certain other requirements of the Affordable Care Act; for example, the requirement that preventive health services be covered without any cost sharing.")). Where a statute has

---

[5]   Defendants have asserted that, over time, employers will switch out of their "grandfathered" plans. Dkt. 30 at 21. But in *Hobby Lobby* the Supreme Court emphasized that "there is no legal requirement that grandfathered plans ever be phased out." *Hobby Lobby*, slip op. at 11 n.10.

expressly refused to treat a provision as even "particularly significant," the government should be foreclosed from arguing that its interest in that provision is compelling.

*Least Restrictive Means*. Since the government cannot meet its burden under the compelling interest prong, the Court need not address the least restrictive means prong of RFRA. But even if it does, the government cannot meet its burden there either.

"The least-restrictive-means standard is exceptionally demanding." *Hobby Lobby*, slip op. at 40 (citing *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997)). It is not enough to show that a proposed less restrictive means is merely less "convenien[t]" or "efficien[t]." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534, 2540 (2014). Rather, the government must show that the proposed means is not "viable," *Hobby Lobby*, slip op. at 41, based on a showing of actual evidence, *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816, 826 (2000). In sum, "the government must demonstrate that alternative measures . . . would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 134 S. Ct. at 2540.

Here, there are many ways Defendants could "promote public health and gender equality, almost all of them less burdensome on religious liberty." *Korte v. Sebelius*, 735 F.3d 654, 686 (7th Cir. 2013). As the Supreme Court recognized in *Hobby Lobby*, "[t]he most straightforward way of doing this would be for the Government to assume the cost of providing" such contraceptives directly. *Hobby Lobby*, slip op. at 41. One obvious way to do this would be simply to allow any employee who wants contraceptive coverage to purchase a policy with that coverage on the government-run exchanges. Considering Ave Maria's religious hiring requirements and the quality of its insurance plan, the government

is highly unlikely to show that such employees even exist, but if they do, the government-run exchanges presumably provide coverage the government deems sufficient. And if the government believes coverage on the government exchanges is too expensive, it is of course entirely free to subsidize those policies for any such employee, as it already does for employees whose employer-provided coverage is considered unaffordable or considered inadequate. *See* 26 U.S.C. § 36B(c)(2)(C)(i)-(ii) (employee not ineligible for tax credit where "the employee's required contribution [to an employer plan] exceeds 9.5 percent of the applicable taxpayer's household income" or the employer plan fails "minimum value" by covering "less than 60 percent" of the costs of covered benefits); *see also* 42 U.S.C. § 18071(f)(2) (applying same metric to cost-sharing subsidies).

Alternatively, the government already spends hundreds of millions a year through Title X of the Public Health Service Act to "[p]rovide a broad range of acceptable and effective medically approved family planning methods . . . and services." 42 C.F.R. § 59.5(a)(1).[6] There is no legitimate reason why the government could not use a pre-existing program like this to redress genuine economic barriers to contraceptive access. *See*, *e.g.*, 42 C.F.R. § 59.5(a)(7) (providing family-planning services for "persons from a low-income family"); *see also*, *e.g.*, *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1299 (D. Colo. 2012) (noting programs like Title X and the government's lack of proof that providing contraceptives would "entail logistical and administrative obstacles defeating the ultimate purpose of

---

[6]   *See also*, *e.g.*, RTI International, *Title X Family Planning Annual Report: 2011 National Summary* 1 (2013), http://www.hhs.gov/opa/pdfs/fpar-2011-national-summary.pdf ("In fiscal year 2011, the [Title X] program received approximately $299.4 million in funding.").

providing no-cost preventive health care coverage to women"), *aff'd*, 542 F. App'x 706 (10th Cir. 2013).

Other less restrictive means could include providing a tax credit to employees who purchase contraceptives with their own funds or empowering willing actors—for instance, physicians, pharmaceutical companies, or various public interest groups—to deliver the drugs and sponsor education about them.

The government cannot credibly object to accepting any of these proposals on the ground that they would impose new costs on the government or require changes to existing programs. The so-called accommodation was itself a change to an existing regulatory program, created as a potential less restrictive means that imposed "new" costs on the government. *See* 78 Fed. Reg. at 39884 (providing for issuers to be reimbursed costs plus "a margin to ensure that [they] receive appropriate compensation for providing the contraceptive coverage" for employees of religious organizations eligible for the accommodation); *see also* 45 C.F.R. § 156.50(d)(3).

Further, *Hobby Lobby* itself directly forecloses any argument that an acceptable less restrictive means cannot require increased expenses or "establishing new government programs . . . or fundamentally altering existing ones." Dkt. 30 at 23-24. There, the Court stated: "[W]e see nothing in RFRA that supports this argument, and drawing the line between the 'creation of an entirely new program' and the modification of an existing program (which RFRA surely allows) would be fraught with problems." *Hobby Lobby*, slip op. at 42. The Court also noted that while "cost may be an important factor in the least-restrictive-means analysis," RFRA "may in some circumstances require the Government

to expend additional funds to accommodate citizens' religious beliefs." *Id.* at 42-43. Indeed, the Court emphasized that "[i]f, as HHS tells us, providing all women with cost-free access to all FDA-approved methods of contraception is a Government interest of the highest order, it is hard to understand HHS's argument that it cannot be required under RFRA to pay *anything* in order to achieve this important goal." *Id.* at 41-42. "It seems likely . . . that the cost of providing the forms of contraceptives at issue in these cases (if not all FDA-approved contraceptives) would be minor when compared with the overall cost of ACA." *Id.* at 41. That is particularly true in Ave Maria's case, given the undisputedly religious nature of the institution and its hiring practices.

Finally, while *Hobby Lobby* found that the "accommodation" was a less restrictive means than being directly forced to provide and pay for objectionable coverage, nothing in *Hobby Lobby* blessed the accommodation as *the* least restrictive means. To the contrary, the Supreme Court was clear that it did not "decide today whether [the accommodation] complies with RFRA for purposes of all religious claims," and it disclaimed even being "permitted to address" the accommodation's viability. *Hobby Lobby*, slip op. at 44 & n.40. There, "the plaintiffs ha[d] not criticized [the accommodation] with a specific objection that has been considered in detail by the courts in this litigation." *Hobby Lobby*, slip op. at 3 (Kennedy, J., concurring). The opposite is true here. Furthermore, if the Supreme Court had ruled otherwise, then surely it would not have expressly *reaffirmed* its decision to grant emergency relief to the Little Sisters of the Poor. *Hobby Lobby*, slip op. at 10  n.9  (citing *Little Sisters*, 134 S. Ct. 1022). The Little Sisters challenged the same accommodation as Ave Maria. *Id.* And just days after the *Hobby Lobby* decision, the Supreme Court once

again granted extraordinary relief to another religious ministry—this time, Wheaton College—which also presented the same claim as Ave Maria does here. *Wheaton*, 134 S. Ct. at 2808.

In sum, there is no reason to think that the existing accommodation is *the* least restrictive means for truly accommodating religious organizations with objections to providing contraceptive services, and it is the government's burden to prove that none of the other proposed less restrictive means are not viable. For all the aforementioned reasons, it is unlikely to meet this burden.

**D.  The Mandate Violates the Religion Clauses.**

The Mandate violates the First Amendment's Religion Clauses because it impermissibly discriminates among religious institutions engaged in the same religious exercise. Some favored "religious employers" are exempt from the Mandate and the Form requirement. Yet others like Ave Maria, who wish to engage in the exact same religious exercise as "religious employers," are forced to comply or pay massive penalties.

As noted *supra*, the Government's only reason for distinguishing between exempt churches and non-exempt religious non-profits like Ave Maria is its assumption that churches are "more likely" to hire employees that share their faith. 78 Fed. Reg. at 39874. But the same could be said with respect to Ave Maria, where approximately 90% of full-time employees are practicing Catholics, Towey Decl. [Dkt. 22-1] ¶ 17, and all full-time employees are required to embrace and advance the University's Catholic mission as a condition of their employment. *Id*. ¶¶ 18-19. Indeed, in parallel litigation, the government has conceded there is "no evidence" to support Defendants' speculation that employees of

religious organizations like Wheaton "are more likely not to object to the use of contraceptives." *See* Baxter Decl. ¶ 5, Ex. D at 34:9-24.

When the government adopts a rule that makes "explicit and deliberate distinctions between different religious organizations," it must meet strict scrutiny. *Larson v. Valente*, 456 U.S. 228, 246-47 & n.23 (1982). The Mandate—which gives exemptions to some religious organizations but not to others engaged in the exact same religious exercise— cannot do so.

In *Larson*, the Supreme Court invalidated a Minnesota law that imposed disclosure requirements on religious organizations that did not "receive[ ] more than half of their total contributions from members or affiliated organizations." 456 U.S. at 231-32. The law thus exempted established, self-supported churches, while targeting churches that relied on outside donations. *Id*. at 246 n.23. This was an "explicit and deliberate distinction[]" between different religious organizations," one that failed strict scrutiny and violated the Establishment Clause. *Id*. at 246 n.23, 255.

The distinction drawn among religious organizations here is even less defensible than in *Larson*. Rather than creating its own criteria for the religious employer exemption, HHS borrowed the strict rules that the IRS uses for the completely unrelated purpose of determining which religious organizations are exempt from reporting their income. Only religious organizations that are institutional churches or are controlled by an institutional church qualify for this narrow IRS exemption. *See* 26 C.F.R. § 1.6033-2 (stating that exempt religious organizations should, *inter alia*, have officers "appoint[ed] or remove[ed]" by a church). And under the IRS rules, an exempt organization must not

"normally receive[] more than 50 percent of its support" from non-church sources—a qualification that closely parallels the criteria condemned in *Larson*. *Compare* 26 C.F.R. § 1.6033-2(h)(2)-(4) with *Larson*, 456 U.S. at 230 (law "impos[ed] … requirements upon only those religious organizations that solicit more than fifty per cent of their funds from nonmembers").

These rules dramatically disadvantage universities like Ave Maria, who share the exact same religious beliefs and seek to engage in the exact same religious exercise as tens of thousands of exempt churches. For religious and historical reasons, although they remain closely associated with the Roman Catholic Church, Catholic colleges like Ave Maria University are unlikely to have the kinds of close financial and administrative ties to formal a church that the IRS reporting rules require. The IRS's strict rules may be justified in the income-reporting context, but they are completely unjustified as a limitation on the exercise of religious liberty, as Defendants seek to use them here. The Mandate thus engages in "discrimination . . . expressly based on the degree of religiosity of the institution and the extent to which that religiosity affects its operations[.]" *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (McConnell, J.) (applying *Larson* to invalidate distinction between "sectarian" and "pervasively sectarian" organizations). Because, for the reasons set forth in Part I.C above, the government cannot satisfy strict scrutiny, this discrimination violates the Religion Clauses.

**II. The Other Preliminary Injunction Factors are Satisfied.**

*Irreparable Injury*. Without an injunction, Ave Maria will suffer injury to its free exercise interest. "[I]t is well established that [the] loss of the First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006) (quotation omitted). The analysis is identical for RFRA, since "RFRA protects First Amendment free-exercise rights[.]" *Korte*, 735 F.3d at 666.

*Balance of Harms*. The measure of the third factor is whether "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party." *Siegel*, 234 F.3d at 1176. Ave Maria will lose First Amendment freedoms and face ruinous fines without an injunction. The government can point to no damage that will occur to *it* under an injunction.

*Public Interest*. In a RFRA case, "there is a strong public interest in the free exercise of religion even where that interest may conflict with" another statutory scheme. *O Centro Espirita v. Ashcroft*, 389 F.3d 973, 1010 (10th Cir. 2004) (en banc), *aff'd* 546 U.S. 418 (2006). Simply put, "[t]he public has no interest in enforcing an unconstitutional [regulation]." *KH Outdoor*, 458 F.3d at 1272.

**CONCLUSION**

Ave Maria respectfully requests that the Court reopen this matter and enter a preliminary injunction against defendants during the pendency of this lawsuit, enjoining them from enforcing the substantive requirements imposed in 42 U.S.C. § 300gg-13 (a)(4) and from assessing penalties, fines, or taking any other enforcement actions for

24

noncompliance related thereto, including those found in 26 U.S.C. §§ 4980D, 4980H, and

29 U.S.C. §§ 1132, 1185d, against Ave Maria and its group health plan issuer.


Dated: July 30, 2014                              Respectfully submitted,

                                                   /s/ *Eric S. Baxter*
                                                  Eric S. Baxter (admitted *pro hac vice*)
                                                  Diana M. Verm (admitted *pro hac vice*)
                                                  THE BECKET FUND FOR RELIGIOUS LIBERTY
                                                  3000 K St. NW, Ste. 220
                                                  Washington, DC 20007
                                                  Tel.:    (202) 955-0095
                                                  Fax:     (202) 955-0090
                                                  Email:  *ebaxter@gmail.com*

                                                  Louis D. D'Agostino
                                                  Florida Bar No. 776890
                                                  CHEFFY PASSIDOMO
                                                  821 Fifth Ave. South
                                                  Naples, FL 23104
                                                  Tel.:    (239) 261-9300
                                                  Fax:     (239) 261-9782
                                                  Email:  *lddagostino@napleslaw.com*

                                                  *Counsel for Plaintiff Ave Maria University*
                                                  5050 Ave Maria Blvd.
                                                  Ave Maria, FL 34142



## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2014, *Plaintiff Ave Maria University's Motion To Reopen and for Preliminary Injunction* was served on all counsel of record via the Court's electronic filing system.


                                                   /s/ *Eric S. Baxter*
                                                  Eric S. Baxter