# Exhibit A

| | |
|---|---|
| AVE MARIA UNIVERSITY, | Case No. 2:13-cv-00630-JES-UAM |
| *Plaintiff*, | |
| | **SECOND DECLARATION OF** |
| v. | **H. JAMES TOWEY** |
| | **IN SUPPORT OF** |
| SYLVIA BURWELL, *et al.*, | **PLAINTIFF'S MOTION** |
| *Defendants*. | **FOR PRELIMINARY INJUNCTION** |

1.   My name is H. James Towey. I am over the age of 18 and have personal knowledge of the contents of this declaration. I am currently the President of Ave Maria University and have served in that position since July 1, 2011.

2.   I am personally a devout Catholic, and one of my roles as President is to ensure that Ave Maria University remains true to the teachings of the Catholic Church.

3.   In 1985, I became personal friends with Blessed Mother Teresa of Calcutta and served as her legal counsel in the United States during the last twelve years of her life. I was a full-time volunteer for her for two years, living with her order of priests in their seminary in Tijuana, Mexico, and caring for the dying in her home for people with AIDS in Washington, D.C. I was a member of the official delegations sent by the President of the United States for both Mother Teresa's funeral in Calcutta in 1997, and her beatification at St. Peter's Basilica in 2003.

4.   At Mother Teresa's urging, I founded Aging with Dignity, a non-profit organization that helps families plan for and discuss end-of-life care. Aging with Dignity has become

the nation's leading advocate for the rights of those facing serious illness and remains headquartered in Tallahassee, Florida.

5.   In my career, I have served as the legislative director and legal counsel to the Chairman of the United States Senate Appropriations Committee, as a cabinet member in the Florida governor's office, as director of the White House Office of Faith-Based and Community Initiatives, and as a college president at two different universities.

6.   Because I am currently an employee of Ave Maria University, my family and I receive our health insurance through the University. I make this affidavit not only as the University president, but as a participant in its healthcare plan, and as the husband and father of other plan participants.

7.   If Ave Maria were forced to drop its insurance plan, it would create a crisis for me not only in my professional life, but also in my personal life.

8.   If, on the other hand, Ave Maria continues to follow its religious beliefs by refusing to offer health insurance that covers contraception, sterilization, and abortion-causing drugs and devices, it will face more than $17 million in annual fines. Such fines likely would force Ave Maria to close its doors and cease operating.

**I.   Ave Maria University's History and Catholic Identity**

9.   Ave Maria University is a vibrant university located in beautiful southwest Florida. It is an academic institution that pledges faithfulness to the teachings of the Catholic Church and is committed to offering one of the finest classical liberal arts curricula available, as well as opportunities for specialized study in all of the sciences, social sciences, and humanities.

10. Founded in 2003, the University is already known for its exceptional academics, faithfulness to the magisterium of the Catholic Church, dedicated faculty and caring staff, and a unique educational philosophy that strives to develop the whole person.

11. Ave Maria was founded specifically to build an institution of Catholic higher education that would be faithful to the authoritative teachings of the Catholic Church in matters of both faith and morals. Today, Ave Maria is a thriving academic community that educates just over 1,000 students.

12. Faith is central to the University's identity and educational mission. It is established as a Catholic university according to the guidelines of the Code of Canon Law and adheres to the Apostolic Constitution *Ex Corde Ecclesiae* of Pope John Paul II, which is the relevant law of the Catholic Church for Catholic colleges and universities.

13. The University's faithfulness to the Catholic Church is evident in its bylaws, trustees, faculty, students, curriculum, and campus life.

14. Article I, § 1, of its bylaws states that the University's purpose is "[t]o educate students in the principles and truths of the Catholic Faith, including dogmatic, moral and social teachings, as expressed in Sacred Tradition, Sacred Scripture, and the living Magisterium of the Catholic Church." A true and correct copy of the cited portions of the University's Bylaws is attached as <u>Exhibit A-1</u>.

15. In pursuit of this purpose, the bylaws require that all trustees be "practicing Catholics in good standing with the Church" and that "their public statements and writings exhibit faithful adherence to the Magisterium." <u>Exhibit A-1</u>, Bylaws Art. III, § 4. Trustees

can be removed "for cause" for "[d]isavowal of any magisterial teaching of the Catholic Church." <u>Exhibit A-1</u>, Bylaws Art. III, § 8.

16.  The Board of Trustees, in turn, through the Faculty Handbook, intends that at least 75% of full-time faculty be practicing Catholics. A true and correct copy of the cited portions of the Faculty Handbook is attached as <u>Exhibit A-2</u>.

17.  Approximately 90% of all full-time employees are practicing Catholics.

18.  As president of the University, I personally interview *all* candidates recommended for full-time employment—even if the prospective employee is not Catholic—to ensure they will embrace and advance the University's Catholic mission.

19.  On occasion, I have vetoed recommendations to hire based on my conclusion that employment of the particular candidates would be incompatible with the University's Catholic mission.

20.  The local Ordinary—the Bishop of the Diocese of Venice of Florida—is an ex-officio member of the University's Board of Trustees and is assigned to oversee conformance with Church teaching.

21.  Professors of a theological discipline at the University must apply for and receive a "*mandatum*" from the Ordinary after interviewing with him to ensure authentic Catholic teaching.

22.  All professors who teach disciplines pertaining to faith or morals must make a public Profession of Faith and take an Oath of Fidelity, in the presence of the Ordinary, at the University's annual Mass at the beginning of each academic year.

23.  I was also required to make the Profession of Faith and to take the Oath when I was inaugurated as the University's second president on October 7, 2011.

24.  With respect to students, the University endeavors to produce faithful Catholic educators, leaders, and mentors and to equip them to bring the truths of the faith into all areas of culture.

25.  To achieve this goal, the University challenges its faculty to explicate the truths of the faith, and measure against them the evolving societal propositions or practices in every arena, including politics, business, and the arts.

26.  The University's required core curriculum includes twelve credits of Catholic theology—courses permeated with influences of the Catholic intellectual tradition.

27.  The only graduate programs offered are a Master's and Doctoral program in theology.

28.  Approximately 85% of University students are practicing Catholics, and in my experience, nearly all of them are drawn to Ave Maria specifically because of its faithfulness to the Catholic Church.

29.  In January 2013 and again in January 2014, several hundred of the University's students traveled to Washington, D.C. to participate in the March for Life.

30.  In May 2013 and again in May 2014, a group of students traveled with me to Calcutta, India, to work in the missions of Mother Teresa as a way to promote Catholic social teaching and the call to service.

31.  Hundreds of students each year volunteer in impoverished communities near the University through the University's Service Learning Office, again as a means to live Catholic social teaching.

32.  On campus, most of the six residence halls have a chapel with the Blessed Sacrament reposed there. There are three Masses a day at the campus Oratory, and there is perpetual Eucharist adoration on campus on weekdays when classes are in session.

33.  In sum, as reflected in the University's mission statement, a deep devotion to the Catholic faith is woven throughout every aspect of the University:

> Founded in fidelity to Christ and His Church in response to the call of Vatican II for greater lay witness in contemporary society, Ave Maria University exists to further teaching, research, and learning at the undergraduate and graduate levels in the abiding tradition of Catholic thought in both national and international settings. The University takes as its mission the sponsorship of a liberal arts education curriculum dedicated, as articulated in the apostolic constitution *Ex Corde Ecclesiae*, to the advancement of human culture, the promotion of dialogue between faith and reason, the formation of men and women in the intellectual and moral virtues of the Catholic faith, and to the development of professional and pre-professional programs in response to local and societal needs. As an institution committed to Catholic principles, the University recognizes the importance of creating and maintaining an environment in which faith informs the life of the community and takes expression in all its programs. The University recognizes the central and indispensable role of the Ordinary of the Diocese of Venice in promoting and assisting in the preservation and strengthening of the University's Catholic identity.

## II.  Ave Maria's Beliefs and Teachings on Contraception, Sterilization, and Abortion

34.  As one element of its faithfulness to the Catholic tradition, the University holds and actively professes traditional Christian teachings on the sanctity of life. It believes and teaches that each human being bears the image and likeness of God, and therefore that all human life is sacred and precious from the moment of conception. The University therefore

believes and teaches that abortion, including through a post-conception contraceptive, ends a human life and is a grave sin.

35. The University's religious beliefs also include traditional Christian teaching on the nature and purpose of human sexuality. In particular, the University believes, in accordance with Pope Paul VI's 1968 encyclical *Humanae Vitae*, that human sexuality has two primary purposes: to "most closely unit[e] husband and wife" and "for the generation of new lives."

36. Accordingly, the University believes and actively professes, with the Catholic Church, that "[t]o use this divine gift destroying, even if only partially, its meaning and its purpose is to contradict the nature both of man and of woman and of their most intimate relationship, and therefore it is to contradict also the plan of God and His Will."

37. Therefore, the University believes and teaches that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means"—including contraception and sterilization—is a grave sin.

38. The University cannot participate in any scheme (including providing access to health insurance) to facilitate access to artificial contraception, sterilization, or abortion, or related education and counseling, without violating its deeply held beliefs, even if those items were paid for by an insurer or third party administrator and not by the University. The University particularly cannot conduct actions that may lead others to do evil, or to think that the University has condoned evil. *See* Catechism of the Catholic Church Nos. 2284, 2286 (instructing Catholic institutions to avoid "scandal" and defining "scandal" as

"an attitude or behavior which leads another to do evil"; scandal can be caused "by laws or institutions").

39. Furthermore, the University subscribes to authoritative Catholic teaching about the proper nature and aims of health care and medical treatment. For instance, the University believes, in accordance with Pope John Paul II's 1995 encyclical *Evangelium Vitae*, that "'[c]ausing death' can never be considered a form of medical treatment," but rather "runs completely counter to the health-care profession, which is meant to be an impassioned and unflinching affirmation of life."

## III. Ave Maria's Healthcare Plan and Plan Participants

40. As part of its commitment to Catholic education, and in accordance with Catholic social teaching, Ave Maria University promotes the well-being and health of its employees.

41. Over the years, the University has striven to provide its employees with health coverage superior to coverage generally available at Catholic peer institutions.

42. Moreover, as part of its religious commitment to the authoritative teachings of the Catholic Church, the University's insurance policies have never covered drugs, devices, services or procedures inconsistent with its faith. A true and correct copy of relevant portions of the University's current benefits booklet is attached as Exhibit A-3.

43. In particular, the University has taken great pains through the years to ensure that its health care plan does not cover contraception, sterilization, or any form of abortion.

44. The University has approximately 160 employees. It has 468 participants (employees, spouses, and age-appropriate dependents) on its healthcare plan. It expends approximately $1.3 million annually in order to subsidize its healthcare plan.

8

45.   Ave Maria's employees choose to work at the University because they either share its religious beliefs and/or commit to help the University further its mission. The University would violate their implicit trust in the organization and detrimentally alter its relationship with them if it were to violate its religious beliefs regarding contraception, sterilization, or abortion.

46.   I have been informed that Ave Maria's healthcare plan does not meet the definition of a "grandfathered" plan within the meaning of the Affordable Care Act.

47.   Ave Maria wishes to continue providing high-quality, affordable health benefits for its employees. Doing so is consistent with the University's religious commitment to support its faculty and staff and their families.

48.   If Ave Maria had to terminate its healthcare plan and stop offering health benefits, it would be a serious hardship on most faculty and staff and their families, including myself and my family.

49.   If Ave Maria had to terminate the Plan and stop offering health benefits, it would suffer serious competitive disadvantages in recruiting and retaining faculty and staff.

50.   If Ave Maria had to terminate the Plan and stop offering health benefits, it is inevitable that, due to the loss of competitive advantage, the quality of its programs and instruction would suffer.

## IV.  The Mandate and Its Impact on Ave Maria

51.   Regulations (the "Mandate") issued by the Defendants under the national healthcare law require Ave Maria to provide access to contraception, sterilization, and abortion-causing drugs such as Plan B, Ella, and certain IUDs, in violation of its religious

beliefs. The Mandate also forces Ave Maria to provide access to education and counseling concerning abortion, which directly conflicts with its religious beliefs and teachings.

52. Providing these drugs, services, counseling, and education is incompatible and irreconcilable with Ave Maria's religious beliefs, express messages, and speech.

53. I am aware of the Mandate's exemption provision for religious employers. Ave Maria cannot qualify for this exemption because it is not an organization described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code. Specifically, it is not a church, an integrated auxiliary of a church, a convention or association of churches, or a religious order.

54. Because Ave Maria does not qualify for an exemption to the Mandate, we sincerely hoped the Defendants would decide to broaden the exemption to cover religious institutions like Ave Maria. However, they did not do so.

55. Instead, Defendants adopted an "accommodation" that still requires Ave Maria to play a central role in facilitating access to contraception, sterilization, and abortion-causing drugs and devices by—among other things—executing a form that would cause its insurer to make them available on Ave Maria's behalf.

56. By executing such a form, Ave Maria would be allowing its healthcare plan to used for an immoral purpose, in violation of its religious beliefs.

57. Delivery of the form would trigger an obligation to begin providing Ave Maria employees with payment coverage for contraception, sterilization, abortion-causing drugs and devices, and related education and counseling. Ave Maria would be arranging for this coverage to be "outsourced" to another entity.

58. Ave Maria's religious beliefs preclude it from soliciting, contracting with, causing, or designating a third party to provide the objectionable drugs and services. From Ave Maria's perspective, forcing its insurer to provide free access to abortifacient services is no different than directly providing that access. Ave Maria would still be complicit in what it believes to be a grave moral wrong. Ave Maria cannot simply outsource its conscience. It cannot allow its plan to be used for facilitating access to contraception, sterilization, or abortion-causing drugs and devices.

59. Ave Maria will be subject to enforcement under the Mandate—enforcement that includes fines, other regulatory penalties, and potential lawsuits—starting on November 1, 2014. The only way Ave Maria could avoid those harsh consequences would be to publicly abandon its faith commitments and violate its religious convictions. This is no choice at all, because Ave Maria's faith is central to its identity, its mission, and its very existence.

60. If Ave Maria chooses to violate the law by ceasing to offer employee health insurance altogether then it will be penalized with fines of $2000 per full-time employee per year, or more than $300,000 every year.

61. Although the government postponed implementing the annual fine of $2000 per employee for organizations that drop their insurance altogether, the postponement was only for one year, until 2015.

62. If Ave Maria continues to offer insurance, but refuses to provide access to contraception, sterilization, abortifacient drugs and devices, and related education and counseling, it will face tax penalties of $100 per day "for each individual to whom such

failure relates." 26 U.S.C. § 4980D(b)(1). This would come to more than $17,000,000 per year for its 468 plan participants.

63. Fines of this magnitude would be devastating for any college, but they would be particularly devastating for a small liberal arts college like Ave Maria.

64. I understand that Ave Maria could also face regulatory action and lawsuits under ERISA for failing to comply with the Mandate.

65. The Mandate imposes a burden on Ave Maria's employee recruitment and retention efforts by creating uncertainty as to whether Ave Maria will be able to offer health benefits beyond 2014.

66. The Mandate places Ave Maria at a competitive disadvantage in its efforts to recruit and retain employees.

67. The Mandate forces Ave Maria to choose between, on the one hand, violating its religious beliefs, and, on the other hand, incurring substantial fines and terminating its employee health benefits.

68. Ave Maria wants to continue to provide high-quality health benefits for its employees. It has no objections to providing any of the mandated preventive services, except a small handful that violate its religious beliefs. It asks only to be permitted to follow its beliefs by continuing to refuse to provide access to contraception, sterilization, and abortifacients.

69. Ave Maria does not have a real choice in this matter. Its religious beliefs are deep, longstanding, and sincere. It simply cannot participate in any scheme to facilitate access to

artificial contraception, sterilization, or abortion, or related education and counseling, without violating its deeply held religious beliefs.

70.  Similarly, the University cannot provide information or guidance to its employees about other locations at which they can access artificial contraception, sterilization, abortion, or related education and counseling, without violating its deeply held religious beliefs.

71.  The University relies on donations from the public in order to make tuition affordable to its students. Donors who give to the University do so with an understanding of its mission and with the assurance that the University will continue to follow and transmit reliable Catholic teachings on faith and morals.

72.  The University cannot use donated funds for purposes known to be morally repugnant to its donors and in ways that violate the implicit trust of the purpose of their donations.

73.  The University has raised its objections to the Mandate with HHS directly in public comments filed on September 29, 2011, and April 5, 2013. A true and complete copy of Ave Maria's comments are attached as Exhibits A-4 and A-5.

### V. The Need for Immediate Action

74. After Ave Maria filed its complaint in this court, it amended its insurance plan to run from November 1 of each year.

75. The Mandate will take effect against Ave Maria beginning on November 1, 2014.

76. Each year, Ave Maria works with its insurer to set the terms of its insurance plan for the upcoming year. The process is time consuming: Ave Maria's staff must negotiate and work with the insurer on plan changes and on the production and distribution of plan materials and employee health benefit cards. This process typically takes Ave Maria several months.

77. If relief is not granted before November 1, 2014, Ave Maria would be forced to drop its insurance to avoid violating its religious beliefs or start incurring fines.

78. Denial of relief thus will force Ave Maria to choose between its religious beliefs and the prospect of crippling fines, regulatory penalties, and lawsuits.

79. The consequences for Ave Maria's employees if it terminates its healthcare plan would be severe. If my family's insurance plan is cancelled, we will be forced to seek expensive individual policies on the private market.

80. We are not alone. As Ave Maria confronts the looming deadline, I have been approached repeatedly by employees who have expressed fears for themselves and their families about what would happen if Ave Maria is forced to stop offering health insurance.

81. Not being covered by Ave Maria's insurance would create serious hardship for many. Our employees include persons battling cancer and persons with dependents who require repeated medical interventions. Several Ave Maria employees or their spouses give birth each year and utilize their health plans to offset the high costs of delivery. For these employees in particular, seeking insurance on the health insurance exchanges would present a significant burden.

82. Choosing to incur the fines would ultimately lead to the same results, except that Ave Maria would be forced to terminate not only its healthcare plan, but all of its operations.

83. Ave Maria should not be forced to terminate either its generous healthcare plan or its operations simply because it cannot provide access to contraception, sterilization, abortifacients, and related education and counseling.

84. I hope Ave Maria will not have to make that choice. I hope that we will have relief from the Mandate prior to November 1, 2014.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 12, 2014 in Ave Maria, Florida.

H. James Towey

15

# Exhibit A-1

# BYLAWS

## OF

## AVE MARIA UNIVERSITY, INC.

### (A Florida Not-for-Profit University)

### As Adopted October 10, 2002*

## ARTICLE I

## MISSION

**Section 1.**

A.    Ave Maria University (the "University") is organized and shall operate exclusively for charitable, religious, scientific and educational purposes, including for such purposes, the making of distributions to organizations that qualify as exempt organizations under §501(c)(3) of the Internal Revenue Code of 1986, as amended, or corresponding section of any future federal tax code ("Code").   The essential character of the Ave Maria University shall at all times be maintained as a Catholic institution of higher learning which operates consistently with *Ex Corde Ecclesiae,* it being the stated intention and desire of the Trustees of the University that the University shall retain in perpetuity its identity as such an institution.   With such essential character in mind, the purposes of the University include the following:

### Mission Statement

Founded in fidelity to Christ and His Church in response to the call of Vatican II for greater lay witness in contemporary society, Ave Maria University exists to further teaching, research, and learning at the undergraduate and graduate levels in the abiding tradition of Catholic thought in both national and international settings. The University takes as its mission the sponsorship of a liberal arts education curriculum dedicated, as articulated in the apostolic constitution Ex Corde Ecclesiae, to the advancement of human culture, the promotion of dialogue between faith and reason, the formation of men and women in the intellectual and moral virtues of the Catholic faith, and to the development of professional and pre-professional programs in response to local and societal needs. As an institution committed to Catholic principles, the University recognizes the importance of creating and maintaining an environment in which faith informs the life of the community and takes expression in all its programs. The University recognizes the central and indispensable role of the Ordinary of the Diocese of Venice in promoting and assisting in the preservation and strengthening of the University's Catholic identity.

*Bylaws first amendment made on February 21, 2003; second amendment made on November 7, 2003; and third amendment made on November 4, 2004; fourth amendment made on August 9, 2006; fifth amendment made on November 10, 2006; sixth amendment made on June 7, 2007; seventh amendment made on November 6, 2007; eighth amendment made on June 6, 2008; ninth amendment made on June 9, 2009; tenth amendment made on November 10, 2009; eleventh amendment made on February 19, 2010; twelfth amendment made on November 5, 2010; thirteenth amendment made on June 7, 2011; fourteenth amendment made on November 4, 2011.

# Purpose

1. To educate students in the principles and truths of the Catholic Faith, including dogmatic, moral and social teachings, as expressed in Sacred Tradition, Sacred Scripture, and the living Magisterium of the Catholic Church, as well as in the great tradition of liberal learning and in such other subjects of study as the trustees of the University may determine according to local and societal needs and professional opportunities, and to develop in these students appropriate professionals skills, all so as thereby to prepare them to inform their own lives and the society in which they live and work with Catholic truth and to develop their full vocations, whether religious, priestly, or lay.

2. To sponsor a curriculum of study that acknowledges the central role of theology and philosophy in learning and that is in harmony with and supportive of the truths of the Catholic faith as expressed in tradition, scripture and the magisterial teaching of the Catholic Church.

3. To sponsor a curriculum of study that acknowledges the central role of a Catholic liberal arts core curriculum vis-à-vis professional programs. As approved by the faculty, the core curriculum, or curricula if different degrees are offered, must in each case cover 50% of the requirement for graduation, including language requirement if applicable.

4. To serve the common good and train its students to serve the common good, as elaborated in the moral and social teachings of the Catholic Church.

5. To build a community among the faculty, administration, students, alumni and staff based on the inherent dignity of every human being, a dignity based on our creation in the image and likeness of God and raised to a new level by our redemption in Jesus Christ, and striving for excellence in all academic and spiritual endeavors.

6. To confer degrees and honors, as are customarily conferred by other universities or colleges.

7. To admit students without regard to race, color, religion, national or ethnic origin, sex, age, veteran status or physical disability, and shall not discriminate on these

*Bylaws first amendment made on February 21, 2003; second amendment made on November 7, 2003; and third amendment made on November 4, 2004; fourth amendment made on August 9, 2006; fifth amendment made on November 10, 2006; sixth amendment made on June 7, 2007; seventh amendment made on November 6, 2007; eighth amendment made on June 6, 2008; ninth amendment made on June 9, 2009; tenth amendment made on November 10, 2009; eleventh amendment made on February 19, 2010; twelfth amendment made on November 5, 2010; thirteenth amendment made on June 7, 2011; fourteenth amendment made on November 4, 2011.

.

purposes or to such organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.

**Section 4.** <u>Powers</u>.  The University shall have such powers as are now or may hereafter be granted by Florida Statutes and the common law of the State of Florida.

## ARTICLE II

## OFFICES

The principal office of the University in the State of Florida shall be located in County of Collier. The University may have such other offices, either within or without the State of Florida, as the Board of Trustees may determine or as the affairs of the University may require from time to time.

The University shall have and continuously maintain in the State of Florida a registered office, and a registered agent whose office is identical with such registered office, as required by the Florida Not for Profit Corporation Act (Chapter 617 of the Florida Statutes, the "Act").  The registered office may be, but need not be, identical with the principal office in the State of Florida, and the address of the registered office may be changed by the Board of Trustees.

## ARTICLE III

## BOARD OF TRUSTEES

**Section 1.**  <u>General Powers of Trustees</u>.   All powers for the governance of the University shall be vested in a Board of Trustees. The Board of Trustees shall exercise all rights and shall be subject to all obligations required of Trustees (directors) under the Florida Statutes.

**Section 2.**  <u>Original Board of Trustees</u>. The Original Board of Trustees shall consist of no fewer than three (3) Trustees all of whom shall be appointed by the Incorporator. Prior to the end of its first term in office the Original Board of Trustees shall appoint no fewer than nine (9) new additional Trustees. Thereafter, the Board of Trustees shall consist of no fewer than twelve (12) or more than thirty (30) Trustees as shall from time to time be fixed by resolution of the Board of Trustees adopted at a regular or special meeting of the Board of Trustees.

-4-

*Bylaws first amendment made on February 21, 2003; second amendment made on November 7, 2003; and third amendment made on November 4, 2004; fourth amendment made on August 9, 2006; fifth amendment made on November 10, 2006; sixth amendment made on June 7, 2007; seventh amendment made on November 6, 2007; eighth amendment made on June 6, 2008; ninth amendment made on June 9, 2009; tenth amendment made on November 10, 2009; eleventh amendment made on February 19, 2010; twelfth amendment made on November 5, 2010; thirteenth amendment made on June 7, 2011; fourteenth amendment made on November 4, 2011.

.

**Section 3.** *Ex Officio* **Members of the Board**. The following persons shall be *ex officio* Trustees of the University:

A.      Chancellor of the University
B.      President of the University

**Section 4.  Qualifications for Trustees**.  Trustees shall be practicing Catholics in good standing with Church and shall have in their public statements and writings exhibit faithful adherence to the Magisterium.

**Section 5. Ordinary of the Diocese**.  The Ordinary of the Diocese of Venice shall be a non-voting *ex officio* member of the Board of Trustees.

**Section 6.  Election and Terms of Trustees**.   Trustees other than *ex officio* Trustees, may be elected at any regularly scheduled meeting of the Board of Trustees upon the recommendation of the Nominating Committee.  Except for *ex officio* Trustees, the term of each Trustee shall be four (4) years. Trustees may be reelected as Trustee upon the expiration of their expiring term.  Trustees shall not be eligible for re-election beyond an aggregate of three terms, unless the Board of Trustees waives such limitation with respect to any Trustee proposed for an additional term or terms.  Trustees shall serve an initial term of one year.  Thereafter if the Board so approves, the newly elected Trustee or Trustees shall serve an additional three years to complete the first full term.

**Section 7. Leave of Absence**. The Trustees may grant a leave to a Trustee, provided however, that no more than three (3) Trustees may be serving as Trustee under a leave of absence.

**Section 8. Removal of Trustees**.   A Trustee may be removed for cause, if in the determination of the Board, his or her removal is required for the welfare of the University. Among the causes justifying such removal are:

(i)      Failure to attend three consecutive regular meetings of the Board;
(ii)     Making statements disparaging the University either in public or which become public;
(iii)    Breach of the fiduciary duty of loyalty to the University such as by releasing confidential information to third parties;
(iv)    Personal conduct which causes scandal;
(v)     Disavowal of any magisterial teaching of the Catholic Church; or
(vi)    Any other act or omission detrimental to the welfare of the University.

-5-

*Bylaws first amendment made on February 21, 2003; second amendment made on November 7, 2003; and third amendment made on November 4, 2004; fourth amendment made on August 9, 2006; fifth amendment made on November 10, 2006; sixth amendment made on June 7, 2007; seventh amendment made on November 6, 2007; eighth amendment made on June 6, 2008; ninth amendment made on June 9, 2009; tenth amendment made on November 10, 2009; eleventh amendment made on February 19, 2010; twelfth amendment made on November 5, 2010; thirteenth amendment made on June 7, 2011; fourteenth amendment made on November 4, 2011.

.

4

# Exhibit A-2



# Ave Maria University
# Faculty Handbook
# Issued for the
# 2013-2014 Academic Year

**(excerpts)**

...

# Article 4:  FACULTY APPOINTMENTS

## § 1: PRINCIPLES FOR FACULTY APPOINTMENTS

a) Ave Maria University seeks to appoint high quality faculty and foster an environment in which a community of professors and students (*Ex corde Ecclesiae*, 1) can devote itself to teaching, learning, and to the advancement of research and other scholarly activities while growing in faithfulness to the authority, teaching, and wisdom of the Catholic Church.

b) As such, it is the intent of Ave Maria University to appoint new faculty members that demonstrate significant promise of improving and strengthening the overall quality of the faculty and of advancing the mission and philosophy of Ave Maria University.

c) Central to this mission and philosophy is the commitment of educating the whole person in the Catholic liberal arts tradition; consideration thus should be given both to the candidates' expertise within their particular disciplines, and to the candidates' anticipated value to the general education component of the curriculum and the overall effort of the university community.

d) Catholic faculty are expected to be in full communion with the Church and actively faithful to Catholic doctrine and morals in their teaching and research activities (see *Ex corde Ecclesiae*, 27).

e) In addition, as a condition for initial and continuing appointments, Catholic members of the faculty are expected to confirm that they will not teach or act in opposition to the Catholic faith as defined by the consistent teaching of both the ordinary and extraordinary Magisterium.

f) Faculty members teaching in the areas of theology shall formally make the Profession of Faith and Oath of Fidelity, in accordance with Canon Law (canon 833).

g) Non-Catholic faculty are expected to have profound respect for Catholic doctrine and morals in their research and teaching, to be exemplary in the probity of life, and respectful of the distinctive Catholic nature of the University.

h) In keeping with the University's nature and mission, the guidelines of *Ex corde Ecclesiae* (Art. 2, no. 4), and consistent with applicable federal, state, and local law, the majority of faculty should be Catholic, with the required majority being at least seventy-five (75) percent of full-time faculty for the entire faculty and at least fifty (50) percent of full-time faculty within any given department.  Any exceptions due to operational necessity must be approved by the Board of Trustees.

i) In accord with the common pursuit of truth and its dissemination, faculty are expected to treat one another, as well as other university personnel and students, with professional courtesy and Christian charity: "It must not be forgotten that reason too needs to be sustained in all its searching by trusting dialogue and sincere friendship" (*Fides et Ratio*, 33).

j) The selection of academic staff is primarily the prerogative of the faculty. However, the power to appoint faculty rests with the President. Therefore, the faculty and the administration share responsibility for the hiring process.

...

*Approved by the Board of Trustees, 7 June 2013.*

# Exhibit A-3



# 2013-2014 Benefits



   

Medical Plan Year | November 1, 2013 – October 31, 2014
All Other Benefits Plan Year | January 1, 2014 – December 31, 2014

# Introduction

Ave Maria University is pleased to offer our employees an exceptional benefit program. Through Ave Maria you are eligible to elect Medical, Dental, Vision and Voluntary Life Insurance, and at no expense you are provided Life and Accidental Death and Dismemberment, Short-Term Disability, Long-Term Disability, and Adoption Assistance. These benefits are designed to protect you and your family while you're employed with Ave Maria University.

It is very important to think about the needs of your family when making decisions about your benefits. We encourage you to read the following materials about benefits, your contribution, and the coverage it provides carefully, and share with your dependents.



**Notice to all Plan Enrollees**

**The organization that sponsors or arranges your health plan has certified that it qualifies for a temporary safe harbor with respect to the Federal requirement to cover contraceptive services without cost sharing. During this period, coverage under your health plan will not include coverage of contraceptive medications, devices, appliances, or other Health Care Services when provided for contraception.**

<u>**Please Note:**</u> All of the benefit descriptions in this booklet are a summary and you should refer to the Summary Plan Description or full Benefit Summaries for complete details of coverage.

# Exhibit A-4



September 29, 2011

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attn: CMS-9992-IFC2
P.O. Box 8010
Baltimore, MD 21244-8010

    **Re:**    *Interim Final Rules on Preventive Services, File Code CMS-9992-IFC2:*
           The Legal Necessity for Comprehensive Exemptions for All Religious Objections
           to Providing, Participating in or Paying for Health Insurance Coverage of
           Abortion, Abortifacients, Contraception, Sterilization, and Counseling and
           Information Regarding the Same

Dear Sir or Madam,

      The Alliance Defense Fund writes on behalf of The Center for the Advancement of Catholic Higher Education, a division of The Cardinal Newman Society; Aquinas College in Nashville, Tennessee; Ave Maria University in Ave Maria, Florida; Benedictine College in Atchison, Kansas; Catholic Distance University in Hamilton, Virginia; Christendom College in Front Royal, Virginia; the College of Saint Mary Magdalen in Warner, New Hampshire; the College of Saint Thomas More in Fort Worth, Texas; DeSales University in Center Valley, Pennsylvania; the Franciscan University of Steubenville in Steubenville, Ohio; Holy Apostles College and Seminary in Cromwell, Connecticut; John Paul the Great Catholic University in San Diego, California; Mount St. Mary's University in Emmitsburg, Maryland; St. Gregory's University in Shawnee, Oklahoma; Thomas Aquinas College in Santa Paula, California; Thomas More College of Liberal Arts in Merrimack, New Hampshire; the University of Mary in Bismarck, North Dakota; the University of St. Thomas in Houston, Texas; Wyoming Catholic College in Lander, Wyoming; Most Rev. Thomas J. Curry, Auxiliary Bishop of Los Angeles; and the Society of Catholic Social Scientists.

      These parties are gravely concerned about the illegal violations of religious freedom implicated in the interim final rule on preventive services, 76 Fed. Reg. 46621 (Aug. 3, 2011). That rule's mandate that all health plans cover "contraception" (including but not limited to drugs that can cause the demise of embryos both after and before uterine implantation), as well as sterilization, and associated patient education and counseling (hereinafter "the Mandate"), poses a direct violation of the rights of entities and individuals not to participate in such activities to which they have a religious objection.

The Mandate blatantly violates the right to religious freedom protected throughout federal law, including under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. 2000bb-1(c), and the First and Fourteenth Amendments to the U.S. Constitution. The Mandate's existing "religious exemption" is insulting in its diminishment of what constitutes a "religious group," a definition that may be further limited at the discretion of the Health Resources and Services Administration (HRSA). And regardless of the exemption's exact scope, it would not save the Mandate from its illegal violation of the rights of any entity or individual that is not exempted.

No federal rule has defined being "religious" as narrowly and discriminatorily as the Mandate appears to do, and no regulation has ever so directly proposed to violate plain statutory and constitutional religious freedoms.

Entities such as Catholic Colleges and Universities have a legal right not to be required to offer or pay for health insurance coverage that includes practices to which they have a religious or moral objection, and not to be forced to choose between offering such coverage, paying a fine, or offering no coverage at all. Other employers, too, whether operating for profit or not, have the same right not to have their religious and moral beliefs burdened. Insurance companies have a right not to be forced to offer such coverage. And individuals have the same right not to be forced to enroll in or purchase coverage as the result of the Mandate's imposition on all available plans. Federal law simply prohibits the federal government from violating the religious and moral beliefs of *any* of these stakeholders.

For this reason we urge HHS (and the Departments of Labor and of the Treasury that jointly issued the interim final rule) to exempt *all* stakeholders with a religious or moral objection to "contraceptives" (including abortifacients as well as non-abortifacient mechanisms of action), sterilization, and related education and counseling, from having to *provide*, *offer*, *pay for* or in any way participate in health insurance that includes such coverage. The right to religious freedom requires no less.

### **Interest of the Commenting Parties**

The Center for the Advancement of Catholic Higher Education is a division of The Cardinal Newman Society, a nonprofit organization established in 1993 for religious and educational purposes to help renew and strengthen the Catholic identity of Catholic Colleges and Universities. The Center supports mission-centered teaching, policies and programs at Catholic Colleges and Universities, according to the spirit and letter of the Vatican constitution on Catholic higher education, *Ex corde Ecclesiae*. The Center is located at Mount St. Mary's University in Emmitsburg, Maryland, and The Cardinal Newman Society's office is located in Manassas, Virginia.

Aquinas College in Nashville, Tennessee, is a Catholic college founded in 1961 and governed by the Dominican Sisters of the Congregation of Saint Cecilia, a Catholic religious congregation of sisters in the Order of St. Dominic.

Ave Maria University in Ave Maria, Florida, was founded in 2003 by Catholic lay people as a religious university committed to Catholic teaching and values.

Benedictine College in Atchison, Kansas, is a Catholic college established in 1971 and affiliated with Mount St. Scholastica Monastery and St. Benedict's Abbey, Catholic religious communities of monks and sisters in the Order of St. Benedict.

Catholic Distance University in Hamilton, Virginia, is a Catholic, degree-granting online university founded in 1983. The board of trustees is chaired by Most Rev. Paul Loverde, Bishop of Arlington, and includes three additional bishops.

Christendom College in Front Royal, Virginia, is a Catholic college founded in 1977 by Catholic lay people to provide a faithful Catholic education.

The College of Saint Mary Magdalen in Warner, New Hampshire, is a Catholic college founded in 1973 by Catholic lay people to provide a faithful Catholic education.

The College of Saint Thomas More in Fort Worth, Texas, is a Catholic college founded in 1981 by Catholic lay people to provide a faithful Catholic education.

DeSales University in Center Valley, Pennsylvania, is a Catholic university founded in 1965 and affiliated with the Oblates of Saint Francis de Sales, a Catholic religious congregation of priests and brothers.

The Franciscan University of Steubenville in Steubenville, Ohio, is a Catholic university founded in 1946 and governed by the Third Order Regular of Saint Francis, a Catholic religious order of friars.

Holy Apostles College and Seminary in Cromwell, Connecticut, is a Catholic college for lay students and a seminary for men preparing for the priesthood. It was founded in 1972 and is affiliated with the Society of the Missionaries of the Holy Apostles, a Catholic religious society of priests and brothers.

John Paul the Great Catholic University in San Diego, California, is a Catholic university founded in 2003 by Catholic lay people to provide a faithful Catholic education.

Mount St. Mary's University in Emmitsburg, Maryland, is a Catholic university for lay students and a seminary for men preparing for the priesthood. It was founded in 1808 and includes four bishops on its Board of Trustees.

St. Gregory's University in Shawnee, Oklahoma, is a Catholic university founded in 1875 and affiliated with St. Gregory's Abbey, a Catholic religious community of monks.

Thomas Aquinas College in Santa Paula, California, is a Catholic college founded in 1971 by Catholic lay people to provide a faithful Catholic education.

Thomas More College of Liberal Arts in Merrimack, New Hampshire, is a Catholic college founded in 1978 by Catholic lay people to provide a faithful Catholic education.

The University of Mary in Bismarck, North Dakota, is a Catholic university founded in 1955 and affiliated with the Benedictine Sisters of the Annunciation, a Catholic religious community of sisters in the Order of St. Benedict.

The University of St. Thomas in Houston, Texas, is a Catholic university founded in 1947 and affiliated with the Congregation of St. Basil, a Catholic religious congregation of priests and brothers.

Wyoming Catholic College in Lander, Wyoming, is a Catholic college founded in 2005 founded by lay Catholics in association with the Bishop of Cheyenne, who is *ex officio* chairman of the board of trustees, to provide a faithful Catholic education.

Most Rev. Thomas J. Curry is Auxiliary Bishop of the Archdiocese of Los Angeles.

The Society of Catholic Social Scientists, founded in 1992, is an association of Catholic scholars, professors, researchers, practitioners, and writers that combines objective scholarly analysis in the social sciences with fidelity to Catholic teaching. Members are Catholics who demonstrate fidelity to Catholic teaching and a reasonable knowledge of and interest in deepening their understanding of the Catholic Church's social teachings. The Society's office is located at the Franciscan University of Steubenville in Steubenville, Ohio.

These parties on whose behalf this comment is submitted hold firmly to the teachings and practices of the Roman Catholic Church. All institutions are religious entities and religious employers under federal law.

Sterilization, abortion and artificial means of preventing pregnancy are gravely sinful according to the clear teachings of the Catholic Church. These are summarized authoritatively in the *Catechism of the Catholic Church*:

2270  Human life must be respected and protected absolutely from the moment of conception. From the first moment of his existence, a human being must be recognized as having the rights of a person—among which is the inviolable right of every innocent being to life.

Before I formed you in the womb I knew you, and before you were born I consecrated you. [*Jer.* 1:5]

> My frame was not hidden from you, when I was being made in
> secret, intricately wrought in the depths of the earth. [*Ps.* 139:15]

2271   Since the first century the Church has affirmed the moral evil of every
procured abortion. This teaching has not changed and remains unchangeable.
Direct abortion, that is to say, abortion willed either as an end or a means, is
gravely contrary to the moral law:

> You shall not kill the embryo by abortion and shall not cause the
> newborn to perish. [*Didache* 2, 2: *SCh* 248, 148]

> God, the Lord of life, has entrusted to men the noble mission of
> safeguarding life, and men must carry it out in a manner worthy of
> themselves. Life must be protected with the utmost care from the
> moment of conception: abortion and infanticide are abominable
> crimes. [*Gaudium et Spes* 51 § 3]

2272   Formal cooperation in an abortion constitutes a grave offense. The Church
attaches the canonical penalty of excommunication to this crime against human
life. "A person who procures a completed abortion incurs excommunication *latae
sententiae*," "by the very commission of the offense," and subject to the
conditions provided by Canon Law. …

2370   Periodic continence, that is, the methods of birth regulation based on self-
observation and the use of infertile periods, is in conformity with the objective
criteria of morality. These methods respect the bodies of the spouses, encourage
tenderness between them, and favor the education of an authentic freedom. In
contrast, "every action which, whether in anticipation of the conjugal act, or in its
accomplishment, or in the development of its natural consequences, proposes,
whether as an end or as a means, to render procreation impossible" is intrinsically
evil:

> Thus the innate language that expresses the total reciprocal self-
> giving of husband and wife is overlaid, through contraception, by
> an objectively contradictory language, namely, that of not giving
> oneself totally to the other. This leads not only to a positive refusal
> to be open to life but also to a falsification of the inner truth of
> conjugal love, which is called upon to give itself in personal
> totality.... the difference, both anthropological and moral, between
> contraception and recourse to the rhythm of the cycle . . . involves
> in the final analysis two irreconcilable concepts of the human
> person and of human sexuality. [*Familiaris Consortium* 32]

In Catholic teaching, abortion (which includes human embryos from their
fertilization/conception) is as much a violation of justice as it is a violation of morality.  The

Catholic Church teaches the equal right to life of all persons, a right that is fundamental to a free society:

> As far as the right to life is concerned, every innocent human being is absolutely equal to all others. This equality is the basis of all authentic social relationships which, to be truly such, can only be founded on truth and justice, recognizing and protecting every man and woman as a person and not as an object to be used. Before the moral norm which prohibits the direct taking of the life of an innocent human being "there are no privileges or exceptions for anyone. It makes no difference whether one is the master of the world or the 'poorest of the poor' on the face of the earth. Before the demands of morality we are all absolutely equal." [*Evangelium Vitae* 57]

Catholic Colleges and Universities are committed to these teachings according to the very nature of Catholic higher education. That nature is defined by the Catholic Church's apostolic constitution *Ex corde Ecclesiae* and the United States Catholic bishops' *Application of Ex corde Ecclesiae for the United States*, which are binding under the Church's Canon Law for all institutions of higher learning not directly controlled or chartered by the Vatican.

*Ex corde Ecclesiae* cites four essential characteristics of the Catholic College or University, one of which is "Fidelity to the Christian message in conformity with the magisterium [the teaching office] of the Church." (Para. 13.) In the *Application of Ex corde Ecclesiae for the United States*, the United States Catholic bishops cite particular expectations of Catholic Colleges and Universities, including the following which relate to the provision of health insurance benefits to employees and students:

[1.] Commitment to be faithful to the teachings of the Catholic Church;

[2.] Commitment to Catholic ideals, principles and attitudes in carrying out research, teaching and all other university activities, including activities of officially-recognized student and faculty organizations and associations, and with due regard for academic freedom and the conscience of every individual;

[3.] Commitment to serve others, particularly the poor, underprivileged and vulnerable members of society;

[4.] Commitment of witness of the Catholic faith by Catholic administrators and teachers, especially those teaching the theological disciplines, and acknowledgment and respect on the part of non-Catholic teachers and administrators of the university's Catholic identity and mission; …

[5.]    Commitment to provide personal services (health care, counseling and guidance) to students, as well as administration and faculty, in conformity with the Church's ethical and religious teaching and directives;[1] and

[6.]    Commitment to create a campus culture and environment that is expressive and supportive of a Catholic way of life.

With regard to health insurance, all of the parties on whose behalf this document is submitted understand the Catholic mission in higher education to include the commitment to:

- provide adequate benefits to full-time employees, including health insurance, to ensure their well-being and physical health;

- ensure that students are protected financially and physically by adequate health insurance coverage;

- conform to Catholic teaching in all official actions and commitments, including the provision of health insurance coverage;

- encourage moral behavior among employees and students, according to the teachings of the Catholic Church; and

- promote a campus environment that is morally and physically healthy for students, including the expectation that students do not engage in sexual activity outside of marriage.

### The Mandate Is Illegal

The Mandate, with its inadequate "exemption," violates multiple federal laws, including the Religious Freedom Restoration Act, the First and Fourteenth Amendments to the U.S. Constitution, the Administrative Procedures Act, and the Patient Protection and Affordable Care Act ("PPACA") itself.

- *The Mandate Violates RFRA*

The Mandate is an unquestionable violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. 2000bb-1(c). That federal statute authorizes judicial relief against the federal government if it "substantially burden[s] a person's exercise of religion," unless "it demonstrates that application of the burden to the person (1) is in furtherance of a compelling

---

[1] The United States Conference of Catholic Bishops has approved *Ethical and Religious Directives for Catholic Health Care Services* (2009) which note, "The first right of the human person, the right to life, entails a right to the means for the proper development of life, such as adequate health care." Also, "the biblical mandate to care for the poor requires us to express this in concrete action at all levels of Catholic health care. …In Catholic institutions, particular attention should be given to the health care needs of the poor, the uninsured, and the underinsured."

governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." To the extent that the Mandate imposes a burden on the religious or moral objections of *anyone*, it is illegal and enjoinable under RFRA.

The Mandate, particularly in operation with PPACA, imposes burdens that violate RFRA on a large swath of persons and entities if HRSA determines them to be unprotected by the narrow and discretionary "religious exemption." Individuals are required to enroll in health insurance. Employers are required to provide or contribute to health insurance. Some state laws require private colleges to provide health insurance coverage to their students, while some Christian colleges provide such coverage out of their own religious duty. And religious insurance providers cannot operate without providing insurance. All such plans, under the Mandate, must include religiously and morally objectionable items that substantially burden the beliefs of providers, issuers, payers and the insured.

The only exceptions to this requirement are plans "grandfathered" under PPACA, or employers who meet the Mandate's "religious exemption." But whether an employer's plan is grandfathered is now out of the employer's hands. An entity whose employee plan is not presently grandfathered cannot now obtain that status. And PPACA lists a host of plan-changes that trigger the loss of grandfathered status, and that will inevitably occur to nearly all plans. The lack of grandfathered status results in the full force of the Mandate's religious freedom violations.

Likewise the Mandate's "religious exemption" is, as many commenters have pointed out, potentially so narrow as to be not only nearly inconsequential but insulting to religious entities, in particular to Catholic Colleges and Universities. First, the exemption only applies to "religious employers." 76 Fed. Reg. at 46626. This omits a variety of stakeholders who are compelled to violate their beliefs under the Mandate. It is unclear whether the exemption would apply to religious colleges and universities in their provision of health plans to *non-employees*, such as to students. The exemption does not protect individuals, such as students, who may be forced to enroll in or contribute to plans that cover services in violation of their religious beliefs. The exemption does not protect insurers and insurance companies, who either have a religious objection to providing certain coverage, or who sell morally acceptable plans to customers who have such an objection. It is unclear whether the exemption, even if met, applies to anything but the "requirement to cover *contraceptive services*," *id.* (emphasis added). Therefore the exemption might, due to its lack of clarity, still compel the provision of other components of the Mandate: sterilization, as well as counseling and education about all of the objectionable practices in the Mandate.

Second, because the exemption is merely permissive—providing that HRSA "may," *id.*, (or, one supposes, might not) exempt such entities—any religious entity's hope for an exemption appears to be subject to the whim of HRSA bureaucrats. This is certainly not reassuring to Catholic Colleges and Universities, especially based on suggestions made in the interim final rule's own summary. In that text, the rule indicates that one reason it was rushed to finalization prior to the notice and comment period was precisely to ensure that collegiate women would have access to "contraception," abortifacients, sterilization and the like as quickly and as freely

as possible. *Id.* at 46624. This inherently threatens the prospects of any college or university that is subject to the discretion of HRSA in deciding whether or not HHS will break the laws described below by mandating that entities provide health plans that cover practices to which they have a religious or moral objection. Moreover, the rule's summary also indicates that its religious "exemption" is intended to *merely* cover "the unique relationship between a house of worship and its employees in ministerial positions." *Id.* at 46623. This interpretation could render the already tiny "exemption" so microscopic as to impose the Mandate even on churches themselves, with regards to employees not deemed "ministerial."

Third, considering the heart of the Mandate's definition of a "religious employer," it is exceedingly narrow. It defines an entity as not "religious" if it does not (1) have as its purpose the inculcation of religious values; *or* (2) if it does not primarily hire persons who share the organization's religious tenets; *or* (3) if it does not primarily serve persons who share those tenets; *or* (4) it is not a nonprofit as described in sections 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code. *Id.* at 46626. Fail any one of these elements, and an entity fails the entire test. Taking the last requirement first, it appears to declare to be religious employers *only* entities that are themselves "churches, their integrated auxiliaries, and conventions or associations of churches," or "the exclusively religious activities of any religious order." Many Catholic or religious colleges and universities, not to mention vast other kinds of religious employers, are not themselves churches or religious orders, or the "exclusive" or "integrated" activities thereof. HRSA may choose to interpret the last requirement to categorically omit many Catholic Colleges and Universities from this exemption and subject them to the full illegal force of the Mandate. Further, many Catholic Colleges and Universities do not limit their student body (persons they serve) to Catholics and do not hire only Catholics, even if service and hiring of such persons is an important focus of their work. The Mandate does not define "religious tenets" so as to specify to what extent students or hires must "share" them. Nor is it clear what the Mandate means, or what HRSA may interpret it to mean, that "the" purpose of a qualifying entity must be "the inculcation of religious values." How catechetical and heavy-handed must such "inculcation" be in the eyes of HRSA? Many Catholic Colleges and Universities, while they exist to promote the Catholic faith from a posture that adheres to Catholic teaching, do so in a way that invites students to consider and discuss views in a non-impositional manner.

Thus the Mandate's "religious exemption" appears to allow HRSA the discretion to omit most if not all Catholic Colleges and Universities and most other religious employers. HRSA could apparently decide that Jesus Christ himself would fail this test, since He did not choose to heal or offer forgiveness only to existing Christians.

As a result of imposing its requirements on so many entities and individuals, the Mandate violates RFRA. The Mandate cannot possibly satisfy the "strict scrutiny" test imposed by RFRA. The government has no compelling interest in the wholly unprecedented action of imposing a national mandate that all health plans cover abortifacients, contraception, sterilization, and information thereon. Congress did not even propose that such an interest exists, because it did not require HHS to mandate these contraception-related items—it allowed preventive care to be defined to omit them all. Nor is there any compelling interest in failing to exempt religious and

moral objectors. Moreover, there is obviously a less restrictive alternative to burdening any objecting college, employer, insurer, entity, or individual's religious objection to these practices: the federal government could, if the political will existed, simply provide women with these things itself, rather than forcing objecting entities and persons to do so.[2] Furthermore, the federal government cannot possibly show that the women who get health insurance from religious entities could not otherwise obtain contraception apart from the application of this Mandate to religious and moral objectors. As a result, the Mandate is blatantly illegal under federal statute and is subject to injunctive and other appropriate relief in federal court.

- *The Mandate Violates the U.S. Constitution*

The Mandate is also a violation of a variety of protections guaranteed by the First and Fourteenth Amendments of the United States Constitution. Just a few of those ways are mentioned here. The Mandate engages in illegal religious discrimination in violation of the free exercise and establishment clauses of the First Amendment, because it is inherently targeted against employers who do not offer such coverage on religious grounds, and Catholics in particular. The Mandate's religious employer "exemption" is worded almost the same as the ACLU's version of a similar provision in California that it intended to be so narrow as to not include organizations such as Catholic service entities.[3] The Mandate's actual effect in overwhelmingly harming objecting entities betrays its discriminatory character. *See Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 532, 535 (1993).

The Mandate has been imposed according to a system of individualized assessments and exemptions rendering them unconstitutional under *Employment Division v. Smith*, 494 U.S. 872, 884 (1990). These include the Mandate itself that was imposed as a discretionary matter in the first place, the system's exemptions for grandfathered plans, the narrow religious employer exemption test and each of its specific requirements, and HRSA's discretion to apply that test. The Mandate also proposes to unconstitutionally entangle the federal government in questions over whether an entity's "inculcation purpose," its hiring, and its service focus are (in effect) "religious enough," and to discriminate between entities on this basis, rendering some sufficiently religious for an exemption but not others.

HRSA's discretion over the exemptions for specific entities renders the Mandate unconstitutionally vague under the Fourteenth Amendment because it gives unfettered discretion to HRSA and therefore risks discriminatory enforcement. And by compelling the coverage of education, counseling and information about and in favor of the Mandate's objectionable

---

[2] Of course, no such political will exists, which is why the Departments have attempted to impose this illegal Mandate by regulation rather than by statute. Since 1997, at least 21 bills have been introduced in Congress to mandate prescription contraceptive coverage in private health plans. No committee or subcommittee of Congress has ever reported out any of these bills.

[3] ACLU Press Release, "ACLU Applauds CA Supreme Court Decision Promoting Women's Health and Ending Gender Discrimination in Insurance Coverage" (Mar. 1, 2004) ("The ACLU crafted the statutory exemption [at issue]….") (available at http://www.aclu.org/reproductivefreedom/aclu-applauds-ca-supreme-court-decision-promoting-womens-health-and-ending-gend).

practices, the Mandate violates the freedom of speech, religion and expressive association of objecting entities and individuals, as protected by the First Amendment.

- *The Mandate Violates the APA and Federal Laws Against Abortion Mandates*

The Mandate also violates the Administrative Procedures Act. 5 U.S.C. § 706 authorizes a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." As described above, the Mandate is not in accordance with law. Furthermore, the Mandate violates the APA for giving the public no prior notice and opportunity to comment *before* its finalization, and for not—despite the Mandate's claim—having a "public interest" basis for doing so. 76 Fed. Reg. at 46624.

In addition, because the Mandate includes drugs that cause early abortions, including after an embryo's uterine implantation, it violates various federal laws against requiring the same. The Mandate includes whatever drug or device the FDA has chosen or will choose in the future to name as a "contraceptive," regardless of whether it actually and merely prevents conception. Already the FDA has approved in this category an abortion drug, ulipristal (HRP 2000, or Ella), which can cause abortions after an embryo implants in the womb (and therefore is a first trimester abortion by any definition) and is a close analogue to the abortion drug RU-486 (mifepristone).[4] Moreover, a variety of "contraceptives" function in part to prevent an already conceived embryo from implanting in the womb, including but not limited to IUDs. These abortifacient effects are not contraceptive at all, despite the attempt by pro-abortion-choice advocates to unscientifically change the definition of when a human life begins from conception-fertilization to implantation.

By compelling coverage of present and future abortion and abortifacient drugs, the Mandate violates: the Weldon Amendment prohibiting any federal program from requiring entities to provide coverage for abortion[5]; PPACA § 1303(b)(1)(A) prohibiting the preventive services Mandate from requiring coverage of abortion; PPACA § 1303(c)(1) providing that PPACA does not preempt state laws regarding abortion coverage, and several of which restrict abortion coverage in various health plans; and President Obama's public assurances in conjunction with Executive Order 13535, 75 Fed. Reg. 15599, that PPACA would not be construed so as to require coverage of abortion.

Flying in the face of all these provisions, the Mandate has written the FDA a blank check to define any abortion drug as a "contraceptive," such as it has already done with "Ella," and thereby mandate its coverage in all health insurance plans.

---

[4] See A. Tarantal, et al., "Effects of Two Antiprogestins on Early Pregnancy in the Long-Tailed Macaque (Macaca fascicularis)," 54 Contraception 107-115 (1996), at 114 ("studies with mifepristone and HRP 2000 have shown both antiprogestins to have roughly comparable activity in terminating pregnancy when administered during the early stages of gestation"); G. Bernagiano & H. von Hertzen, "Towards more effective emergency contraception?", 375 The Lancet 527-28 (Feb. 13, 2010), at 527 ("Ulipristal has similar biological effects to mifepristone, the antiprogestin used in medical abortion").
[5] See Consolidated Appropriations Act, 2010, Pub. L. 111-117, Div. D, § 508(d) (Dec. 16, 2009).

### <u>The Final Rule Must Exempt All Religious or Moral Objectors of Any Status</u>

As a result of the requirements of RFRA, the U.S. Constitution, and other laws discussed above, and the Mandate's violations of the same, the Departments of HHS, Labor and the Treasury are legally required to

(1) omit all drugs that can cause the demise of conceived human embryos, including but not limited to "Ella," from the scope of what the Mandate requires for anyone; and

(2) provide a blanket, non-discretionary exemption from the Mandate for any employer, issuer, payer, individual, or entity who in his or its own determination has any religious or moral objection to providing, issuing, enrolling in, participating in, paying for or otherwise facilitating or cooperating in coverage of any required practice or of any required provision of information.

Yours truly,

Kevin Theriot, Senior Counsel
Matthew S. Bowman, Legal Counsel
Alliance Defense Fund

for

The Center for the Advancement of Catholic Higher Education, of The Cardinal Newman Society

Aquinas College in Nashville, Tennessee

Ave Maria University in Ave Maria, Florida

Benedictine College in Atchison, Kansas

Catholic Distance University in Hamilton, Virginia

Christendom College in Front Royal, Virginia

College of Saint Mary Magdalen in Warner, New Hampshire

College of Saint Thomas More in Fort Worth, Texas

DeSales University in Center Valley, Pennsylvania

Franciscan University of Steubenville in Steubenville, Ohio

Holy Apostles College and Seminary in Cromwell, Connecticut

John Paul the Great Catholic University in San Diego, California

Mount St. Mary's University, Emmitsburg, Maryland

St. Gregory's University in Shawnee, Oklahoma

Thomas Aquinas College in Santa Paula, California

Thomas More College of Liberal Arts in Merrimack, New Hampshire

University of Mary in Bismarck, North Dakota

University of St. Thomas in Houston, Texas

Wyoming Catholic College in Lander, Wyoming

Most Rev. Thomas J. Curry, Auxiliary Bishop of Los Angeles

Society of Catholic Social Scientists

# Exhibit A-5



April 5, 2013

<u>**Submitted Electronically**</u>

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attn: CMS–9968–P
P.O. Box 8013
Baltimore, MD 21244-1850

  **Re:**   *Comment on Notice of Proposed Rulemaking, File Code CMS–9968–P:*
      The Legal Necessity for Comprehensive Exemptions for All Religious Objections
      from the PPACA Mandate to Provide, Participate in or Pay for Health Insurance
      Coverage of Abortion, Abortifacients, Contraception, Sterilization and
      Counseling and Information Regarding the Same

Dear Sir or Madam,

    Alliance Defending Freedom writes this comment on behalf of The Center for the
Advancement of Catholic Higher Education in Emmitsburg, Maryland, a division of The
Cardinal Newman Society headquartered in Manassas, Virginia; Aquinas College in Nashville,
Tennessee; Assumption College in Worcester, Massachusetts; Ave Maria University in Ave
Maria, Florida; Benedictine College in Atchison, Kansas; Catholic Distance University in
Hamilton, Virginia; Christendom College in Front Royal, Virginia; the College of Saint Mary
Magdalen in Warner, New Hampshire; the College of Saints John Fisher and Thomas More in
Fort Worth, Texas; Holy Apostles College and Seminary in Cromwell, Connecticut; the Ignatius-
Angelicum Liberal Studies Program, an online college program headquartered in San Francisco,
California; The Fellowship of Catholic Scholars in Bronx, New York; The Institute for the
Psychological Sciences in Arlington, Virginia; John Paul the Great Catholic University in San
Diego, California; the Mexican American Catholic College in San Antonio, Texas; Mount St.
Mary's University in Emmitsburg, Maryland; St. Gregory's University in Shawnee, Oklahoma;
Thomas Aquinas College in Santa Paula, California; Thomas More College of Liberal Arts in
Merrimack, New Hampshire; the University of Mary in Bismarck, North Dakota; the University
of St. Thomas in Houston, Texas; Wyoming Catholic College in Lander, Wyoming; and the
Society of Catholic Social Scientists, headquartered in Steubenville, Ohio.

    These entities are gravely concerned about the illegal violations of religious freedom that
continue to be implicated in the notice of proposed rulemaking ("NPRM"), 78 Fed. Reg. 8,456
(Feb. 6, 2013). That proposal, and the underlying mandate it defends (finalized at 77 Fed. Reg.
8,725 (Feb. 15, 2012)) (hereinafter "the Mandate") illegally require religious objectors to issue
health plans that cause coverage of "contraception" (including but not limited to drugs that can

cause the demise of embryos both before and after uterine implantation, hereinafter, abortion-inducing drugs or abortifacients), as well as sterilization, and associated patient education and counseling. The Mandate poses a direct violation of the rights of entities and individuals not to participate in such activities to which they have a religious objection. The NPRM, far from alleviating this violation, promises to perpetuate it.

The Mandate and suggested "accommodations" in the NPRM blatantly violate the right to religious freedom protected throughout federal law, including under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. 2000bb-1(c), and the First Amendment to the U.S. Constitution. The NPRM's refusal to expand the Mandate's exemption beyond houses of worship is offensive because it drastically minimizes what counts as a religious employer. Applying the Mandate to *any* entity or individual possessing a religious objection is illegal.

No other federal rule has so narrowly and discriminatorily defined what it means to exercise religious conscience, and no regulation has ever so directly violated plain statutory and constitutional religious freedoms. The NPRM does nothing to change that fact.

Entities such as Catholic Colleges and Universities, and indeed any religiously objecting employer, have a legal right not to be required to facilitate, cause, offer or pay for health insurance coverage that includes practices to which they have a religious or moral objection. Religiously objecting entities of any kind have a right not to be forced to choose between causing such coverage, paying a fine and suffering lawsuits, or offering no coverage at all. Whether operating for profit or not, all employers with religious beliefs have the same right under RFRA to *not* have their religious and moral beliefs burdened by the federal government. Likewise, insurance companies have a right not to be forced to offer such coverage. Individuals have the same right not to be forced to enroll in or purchase objectionable coverage. Federal law simply prohibits the federal government from violating the religious and moral beliefs of *any* of these stakeholders.

The Mandate offers no explanation of how it conforms to RFRA. It also makes no concession to the already thirteen federal court decisions lost by the Departments of Health and Human Services, Treasury and Labor against this Mandate. To the extent the Mandate commands any religious objector to facilitate coverage in violation of that stakeholder's beliefs, it imposes a substantial burden on those beliefs. Those burdens, in turn, cannot possibly be the least restrictive means to satisfy the alleged compelling interest of universal free birth control. The federal government could achieve its goal by, among other methods, directly subsidizing the coverage itself (if the political will existed to do so), instead of by compelling the participation of objecting employers. Yet there can be no serious claim that the Mandate is supported by a compelling interest when Congress and the Departments already exempt scores of millions of women from this Mandate for secular reasons. These reasons include exemption of "grandfathered" plans not directly subject to the Mandate. A government content to leave those women without the Mandate's "benefits" cannot possibly claim a compelling interest to burden religious employers. Such underinclusiveness also shows that the Mandate is not "generally applicable," and therefore it violates the Free Exercise Clause of the First Amendment in addition to violating RFRA.

The NPRM does not propose to solve any of these problems. It refuses to exempt all employers with religious beliefs as RFRA requires, and it admits that the Departments refuse to expand the exemption beyond houses of worship. The NPRM proposes to merely "accommodate" free exercise of religion, and to do that merely for nonprofits. Yet it would still force nonprofits to provide plans that specifically cause and enable the objectionable coverage. The NPRM claims that such items will be paid for by the insurer, but this is irrelevant to the fact that employers object not merely to *paying*, but to a variety of means of enabling the coverage to be provided by virtue of their own plans. It is false to theorize that there are no front-end costs of these items, or that they are in any circumstances "free." For example, surgical sterilization and several forms of contraception cost hundreds or thousands of dollars. The Mandate's underlying statute gives no authority to the government to force an insurer or a third party to provide coverage apart from the employer's own plan. Employers would necessarily be impacted when their insurers and third party administrators are forced to assume new and additional duties to cause the religiously objectionable coverage.

The NPRM's "accommodation" imposes its mandate on all employees and their families even if the employees and their families do not want coverage of these items. Some of those families are working at religiously-led entities precisely so that they can have morally acceptable health insurance, and the NPRM deprives them of that choice. This not only forces objecting employees to participate in problematic coverage, but it forces them to enable contraceptive coverage for their children over and against their religious objections. In the case of self-insured companies, the NPRM apparently compels the release of private employee health information to an outside insurance company without the employer's or the employees' consent, in order to impose the coverage of the objectionable items on the employees.

For these reasons we urge HHS (and the Departments of Labor and of the Treasury that jointly issued the Mandate and the NPRM) to *conform the Mandate to RFRA and the First Amendment*, by completely exempting *all* stakeholders with a religious or moral objection from being forced by the federal government to provide, offer, pay for or in *any way* participate in a health insurance plan that covers or specifically triggers coverage of "contraceptives" (including abortifacients as well as non-abortifacient mechanisms of action), sterilization, and related education and counseling. Religious freedom requires no less.

### <u>Interest of the Commenting Entities</u>

The Center for the Advancement of Catholic Higher Education is a program of The Cardinal Newman Society, a nonprofit organization established in 1993 for religious and educational purposes to help renew and strengthen the Catholic identity of Catholic colleges and universities. The Center collaborates with Catholic colleges and universities to share, formulate, recommend, and promote policies and programs that strengthen and preserve their Catholic identity according to the spirit and letter of the Vatican constitution on Catholic higher education, *Ex corde Ecclesiae*. The Center is located at Mount St. Mary's University in Emmitsburg, Maryland; The Cardinal Newman Society is headquartered in Manassas, Virginia.

Aquinas College in Nashville, Tennessee, is a Catholic college founded in 1961 and governed by the Dominican Sisters of the Congregation of Saint Cecilia, a Catholic religious congregation of sisters in the Order of St. Dominic.

Assumption College in Worcester, Massachusetts, is a Catholic college founded in 1904 by the Augustinians of the Assumption, a Catholic religious congregation of priests. It is currently governed by a board of trustees consisting of both religious and lay members.

Ave Maria University in Ave Maria, Florida, is a Catholic university founded in 2003 by lay Catholics in response to the call of Vatican II for greater lay witness in contemporary society. The board of trustees includes two bishops and a cardinal of the Catholic Church.

Benedictine College in Atchison, Kansas, is a Catholic college established in 1971 and affiliated with Mount St. Scholastica Monastery and St. Benedict's Abbey, Catholic religious communities of monks and sisters in the Order of St. Benedict.

Catholic Distance University in Hamilton, Virginia, is a Catholic, degree-granting online university founded in 1983. The board of trustees is chaired by Most Rev. Paul Loverde, Bishop of Arlington, and includes three additional bishops.

Christendom College in Front Royal, Virginia, is a Catholic college founded in 1977 by Catholic lay people to provide a faithful Catholic education.

The College of Saint Mary Magdalen in Warner, New Hampshire, is a Catholic college founded in 1973 by Catholic lay people to provide a faithful Catholic education.

The College of Saints John Fisher and Thomas More in Fort Worth, Texas, is a Catholic college founded in 1981 by Catholic lay people to provide a faithful Catholic education.

Holy Apostles College and Seminary in Cromwell, Connecticut, is a Catholic college for lay students and a seminary for men preparing for the priesthood. It was founded in 1972 and is affiliated with the Society of the Missionaries of the Holy Apostles, a Catholic religious society of priests and brothers.

The Ignatius-Angelicum Liberal Studies Program, headquartered in San Francisco, California, coordinates with home and distance learning programs to provide online, college-level, liberal arts courses from a Catholic perspective.

The Institute for the Psychological Sciences in Arlington, Virginia, is a Catholic graduate school of psychology founded in 1999 to base the scientific study of psychology on a Catholic understanding of the person, marriage and the family.

John Paul the Great Catholic University in San Diego, California, is a Catholic university founded in 2003 by Catholic lay people to provide a faithful Catholic education.

The Mexican American Catholic College in San Antonio, Texas, was founded in 1972 as the Mexican American Cultural Center. It provides a faithful Catholic education under a Board of Trustees including eight Catholic bishops and other clergy.

Mount St. Mary's University in Emmitsburg, Maryland, is a Catholic university for lay students and a seminary for men preparing for the priesthood. It was founded in 1808 and includes four bishops on its Board of Trustees.

St. Gregory's University in Shawnee, Oklahoma, is a Catholic university founded in 1875 and affiliated with St. Gregory's Abbey, a Catholic religious community of monks.

Thomas Aquinas College in Santa Paula, California, is a Catholic college founded in 1971 by Catholic lay people to provide a faithful Catholic education.

Thomas More College of Liberal Arts in Merrimack, New Hampshire, is a Catholic college founded in 1978 by Catholic lay people to provide a faithful Catholic education.

The University of Mary in Bismarck, North Dakota, is a Catholic university founded in 1955 and affiliated with the Benedictine Sisters of the Annunciation, a Catholic religious community of sisters in the Order of St. Benedict.

The University of St. Thomas in Houston, Texas, is a Catholic university founded in 1947 and affiliated with the Congregation of St. Basil, a Catholic religious congregation of priests and brothers.

Wyoming Catholic College in Lander, Wyoming, is a Catholic college founded in 2005 founded by lay Catholics in association with the Bishop of Cheyenne, who is *ex officio* chairman of the board of trustees, to provide a faithful Catholic education.

The Fellowship of Catholic Scholars headquartered in Bronx, New York, is an association of Catholic scholars in various disciplines who see their intellectual work as a service they owe to God.

The Society of Catholic Social Scientists, founded in 1992 and headquartered at the Franciscan University of Steubenville in Steubenville, Ohio, is an association of Catholic scholars, professors, researchers, practitioners, and writers that combines objective scholarly analysis in the social sciences with fidelity to Catholic teaching.

These entities on whose behalf this comment is submitted hold firmly to the teachings and practices of the Roman Catholic Church. All possess sincerely held religious beliefs protected by the First Amendment and RFRA.

The NPRM continues to represent a policy in which the federal government directly violates the religious liberty of organizations and individuals. Religious objections to the mandatory coverage imposed by the mandate violate the First Amendment and RFRA. They also

violate the right of individuals to act in accordance with their consciences and to fulfill meaningful vocations. These are summarized authoritatively in the *Catechism of the Catholic Church*:

> 2108  The right to religious liberty is neither a moral license to adhere to error, nor a supposed right to error, (Cf. Leo XIII, *Libertas praestantissimum* 18; Pius XII*, AAS* 1953, 799.) but rather a natural right of the human person to civil liberty, i.e., immunity, within just limits, from external constraint in religious matters by political authorities. This natural right ought to be acknowledged in the juridical order of society in such a way that it constitutes a civil right. (Cf. *Dignitatis Humanae 2*).

> 1907  First, the common good presupposes *respect for the person* as such. In the name of the common good, public authorities are bound to respect the fundamental and inalienable rights of the human person. Society should permit each of its members to fulfill his vocation. In particular, the common good resides in the conditions for the exercise of the natural freedoms indispensable for the development of the human vocation. Such as "the right to act according to a sound norm of conscience and to safeguard…privacy, and rightful freedom also in matters of religion." (*Gaudium et Spes* 26§2.)

> 1910  Each human community possesses a common good which permits it to be recognized as such; it is in the *political community* that its most complete realization is found. It is in the role of the state to defend and promote the common good of civil society, its citizens, and intermediate bodies.

Sterilization, abortion and artificial means of preventing pregnancy are gravely sinful according to the clear teachings of the Catholic Church.  These are summarized authoritatively in the *Catechism of the Catholic Church*:

> 2270  Human life must be respected and protected absolutely from the moment of conception.  From the first moment of his existence, a human being must be recognized as having the rights of a person—among which is the inviolable right of every innocent being to life.

> > Before I formed you in the womb I knew you, and before you were born I consecrated you. [*Jer.* 1:5]

> > My frame was not hidden from you, when I was being made in secret, intricately wrought in the depths of the earth. [*Ps.* 139:15]

> 2271  Since the first century the Church has affirmed the moral evil of every procured abortion. This teaching has not changed and remains unchangeable. Direct abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law:

You shall not kill the embryo by abortion and shall not cause the newborn to perish. [*Didache* 2, 2: *SCh* 248, 148]

God, the Lord of life, has entrusted to men the noble mission of safeguarding life, and men must carry it out in a manner worthy of themselves. Life must be protected with the utmost care from the moment of conception: abortion and infanticide are abominable crimes. [*Gaudium et Spes* 51 § 3]

2272  Formal cooperation in an abortion constitutes a grave offense. The Church attaches the canonical penalty of excommunication to this crime against human life. "A person who procures a completed abortion incurs excommunication *latae sententiae*," "by the very commission of the offense," and subject to the conditions provided by Canon Law. …

2370  Periodic continence, that is, the methods of birth regulation based on self-observation and the use of infertile periods, is in conformity with the objective criteria of morality. [*Humanae Vitae* 16] These methods respect the bodies of the spouses, encourage tenderness between them, and favor the education of an authentic freedom. In contrast, "every action which, whether in anticipation of the conjugal act, or in its accomplishment, or in the development of its natural consequences, proposes, whether as an end or as a means, to render procreation impossible" is intrinsically evil: [*Humanae Vitae* 14]

Thus the innate language that expresses the total reciprocal self-giving of husband and wife is overlaid, through contraception, by an objectively contradictory language, namely, that of not giving oneself totally to the other. This leads not only to a positive refusal to be open to life but also to a falsification of the inner truth of conjugal love, which is called upon to give itself in personal totality. . . . The difference, both anthropological and moral, between contraception and recourse to the rhythm of the cycle . . . involves in the final analysis two irreconcilable concepts of the human person and of human sexuality. [*Familiaris Consortio* 32]

In Catholic teaching, abortion (which includes causing the death of human embryos from their fertilization/conception) is as much a violation of justice as it is a violation of morality.  The Catholic Church teaches the equal right to life of all persons, a right that is fundamental to a free society:

As far as the right to life is concerned, every innocent human being is absolutely equal to all others. This equality is the basis of all authentic social relationships which, to be truly such, can only be founded on truth and justice, recognizing and protecting every man and woman as a person and not as an object to be used. Before the moral norm which prohibits the direct taking of the life of an innocent human being "there are no privileges or exceptions for anyone. It makes no

difference whether one is the master of the world or the 'poorest of the poor' on the face of the earth. Before the demands of morality we are all absolutely equal." [*Evangelium Vitae* 57]

Catholic Colleges and Universities are committed to these teachings according to the very nature of Catholic higher education.  That nature is defined by the Catholic Church's apostolic constitution *Ex corde Ecclesiae* and the United States Catholic bishops' *Application of Ex corde Ecclesiae for the United States*, which are binding under the Catholic Church's Canon Law for all institutions of higher learning not directly controlled or chartered by the Vatican.

*Ex corde Ecclesiae* cites four essential characteristics of the Catholic College or University, one of which is "Fidelity to the Christian message in conformity with the magisterium [the teaching office] of the Church."  (Para. 13.)  In the *Application of Ex corde Ecclesiae for the United States*, the United States Catholic bishops cite particular expectations of Catholic Colleges and Universities, including the following which relate to the provision of health insurance benefits to employees and students:

[1.]    Commitment to be faithful to the teachings of the Catholic Church;

[2.]    Commitment to Catholic ideals, principles and attitudes in carrying out research, teaching and all other university activities, including activities of officially-recognized student and faculty organizations and associations, and with due regard for academic freedom and the conscience of every individual;

[3.]    Commitment to serve others, particularly the poor, underprivileged and vulnerable members of society;

[4.]    Commitment of Catholic administrators and teachers to witness the Catholic faith, especially those who teach the theological disciplines, and acknowledgment and respect on the part of non-Catholic teachers and administrators of the university's Catholic identity and mission; …

[5.]    Commitment to provide personal services (health care, counseling and guidance) to students, as well as administration and faculty, in conformity with the Church's ethical and religious teaching and directives;[1] and

[6.]    Commitment to create a campus culture and environment that is expressive and supportive of a Catholic way of life.

---

[1] The United States Conference of Catholic Bishops has approved *Ethical and Religious Directives for Catholic Health Care Services* (2009) which notes, "The first right of the human person, the right to life, entails a right to the means for the proper development of life, such as adequate health care."  Also, "the biblical mandate to care for the poor requires us to express this in concrete action at all levels of Catholic health care. …In Catholic institutions, particular attention should be given to the health care needs of the poor, the uninsured, and the underinsured."

With regard to health insurance, all of the entities on whose behalf this document is submitted understand the Catholic mission in higher education to include the commitment to:

- provide adequate benefits to full-time employees, including health insurance, to ensure their well-being and physical health;

- ensure that students are protected financially and physically by adequate health insurance coverage;

- conform to Catholic teaching in all official actions and commitments, including the provision of health insurance coverage;

- encourage moral behavior among employees and students, according to the teachings of the Catholic Church; and

- promote a campus environment that is morally and physically healthy for students, including the expectation that students do not engage in sexual activity outside of marriage.

## The Mandate Is Illegal

The Mandate, with its inadequate "religious employer" exemption, violates multiple federal laws, including the Religious Freedom Restoration Act, the First Amendment to the U.S. Constitution, the Administrative Procedures Act, and the Patient Protection and Affordable Care Act ("PPACA") itself. The NPRM does not even propose to correct these inadequacies, because it does not propose to exempt all religious objectors.

- *The Mandate Violates RFRA*

The Mandate is an unquestionable violation of RFRA. That federal statute authorizes judicial relief against the federal government if it "substantially burden[s] a person's exercise of religion," (including an entity) unless the government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. 2000bb-1. To the extent that the Mandate imposes a burden on the religious or moral objections of *anyone*, it is illegal under RFRA.

- o *The Mandate Substantially Burdens Religious Beliefs*

The Mandate directly burdens the beliefs of many who object to causing coverage of abortifacients, contraception, sterilization, or education and counseling regarding the same. It requires them to facilitate coverage of objectionable items even though they have a religious belief against doing so. This is the very definition of a burden on religious beliefs: the government mandating that people violate their beliefs.

The NPRM fails to propose a correction that would conform the Mandate to federal law. To comply with RFRA, the Mandate would have to exempt all religiously objecting stakeholders. But the NPRM admits that it refuses to expand its exemption beyond houses of worship. It proposes only to "accommodate" some, but not many, stakeholders, and as discussed below, the accommodation does not address the religious objection that many stakeholders possess in the first place.

- ○ *The Mandate Fails to Protect Individuals, Insurance Companies, or Businesses Run by Religious Persons*

The Mandate and the NPRM leave entire categories of stakeholders unprotected. These include religious individuals, whom PPACA requires to enroll in health insurance and therefore forces to enroll in plans that cover items they object to covering. Likewise ignored are religious insurance providers whom the Mandate forces to violate their beliefs. The Mandate also does not exempt, and the NPRM does not propose to exempt, families that run for-profit companies and adhere to religious beliefs. Ironically, the Departments have been subject to 12 injunctions already for burdening the beliefs of religious families in business in violation of RFRA, yet the NPRM fails to take steps to remedy those violations. All employers with religious beliefs, whether they are for-profit or not, must be exempted entirely to conform the Mandate to RFRA.

- ○ *The Mandate's "Religious Employer" Exemption Is Disturbingly Narrow*

Regarding stakeholders whom the Mandate and the NPRM do acknowledge, the rules fall far short of the requirements of RFRA. The Mandate's "religious employer" exemption is so narrow that it fails to exempt most employers with religious beliefs. That "religious employer" exemption is, as many commenters have pointed out, offensive to religion itself, including to Catholic Colleges and Universities, because it proposes to define religion essentially as only including houses of worship. It defines an entity as *not* a "religious employer" if it is not a nonprofit as described in sections 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code. These subsections, used to establish requirements with regard to taxation, specifically include only "churches, their integrated auxiliaries, and conventions or associations of churches," or "the exclusively religious activities of any religious order." *Id.* at 46626.

Free exercise of religion as protected by RFRA applies to all Americans, not just to churches. Many Catholic or religious colleges and universities, not to mention vast other kinds of religious employers, are not themselves churches or religious orders, or the "exclusive" or "integrated" activities thereof. It violates RFRA to omit any Catholic College or University or other employer with religious objections.

Anyone not exempt by the Mandate's religious employer exemption is subject to its penalties for non-compliance. These penalties are intense, and because they are leveled for violating a legal command, they are by definition substantial burdens. The Mandate triggers heavy fines on entities that offer generous insurance but omit objectionable abortifacient, contraceptive, or sterilizing items. 26 U.S.C. § 4980D. It also imposes extreme fines if large employers drop insurance altogether in order to comply with their consciences. 26 U.S.C. § 4980H. Further, the Mandate triggers the ability of the Secretary of Labor, and of employees

themselves, to sue objecting entities and force them to offer coverage against their beliefs. 29 U.S.C. § 1132. The Mandate requires insurance companies to provide coverage of items even if the insurer, the contracting employer, or the insured, object. *See, e.g.,* 42 U.S.C. §300gg-22(b)(2)(C)(i). By this mechanism, the Mandate also compels objecting colleges and universities to include morally problematic items in their student health plans. Even if they self-insure, it is problematic.

o *The NPRM's Proposed "Accommodation" Is Likewise Illegal*

The NPRM's proposed "accommodation" fails to bring the Mandate into compliance with RFRA, for several reasons.

▪ *The "accommodation" still compels entities to facilitate objectionable coverage in violation of their beliefs*

Under the "accommodation," the NPRM proposes to force religiously objecting entities' insurance companies or third party administrators to provide insurance coverage of abortifacients, contraception, sterilization, and related education and counseling, to possessors of the religious entities' plans. The NPRM theorizes that in this arrangement the objecting employer will not be required to pay for or provide the coverage.

The accommodation fails to address the heart of many entities' religious objections. It attempts to resolve a religious and moral problem by using an accounting gimmick. The NPRM then adopts the government's own theological imprimatur to absolve its approach. Then it imposes that viewpoint on all non-exempt religious entities even if they disagree with the government's moral theology.

The accommodation's failure is reflected in the way it operates. It requires a religious entity to sign a certification asserting that it meets the required religious criteria, to keep the certification in its records "for examination upon request so that regulators, issuers, third party administrators, and plan participants and beneficiaries," and then to provide the certification to the insurance issuer(s) and/or its self-insurance plan administrator(s) that the group pays for their ordinary duties. Once the religious entity's insurer or administrator receives that certification, the insurer or administrator is required to "automatically" provide the religious entity's employees and plan beneficiaries with insurance covering the objectionable items.

If the religious entity uses an insurer, that insurer also becomes the insurer for the objectionable items. The NPRM calls this insurance coverage "separate" even though it comes from the same insurer, and goes to the same insureds, solely because they are insured by the religious entity buying the primary coverage. The NPRM claims that religious entities will not pay for the objectionable coverage, but it admits elsewhere that the items have up-front costs.

Under the NPRM's proposed accommodation, therefore, religious entities would still be causing objectionable coverage in several specific ways. They would be required to provide a health insurance plan for their employees, and that plan would be the *sine qua non* by which the entity's employees would be enrolled in the exact coverage that the religious entity objects to

enabling. The coverage would come from the same insurer that the religious entity has paid to provide its base plan, *because* the religious entity has paid that insurer to provide its base plan. Without the religious entity's provision of insurance to its employees, those employees would not receive the automatic coverage imposed in the accommodation. The religious entity's employees and their families would be "automatically" enrolled in the objectionable coverage, even if the employees object, or even if they work at a religious entity in part because they want to receive morally acceptable insurance coverage. The objectionable coverage would be triggered by the religious entity's required certification of beliefs and required submission of it to its insurer or administrator. And according to the NPRM, the "cost" of the abortifacients, contraception and sterilization for an insured religious entity is offset specifically by the base level of coverage that the religious entity is buying from its insurer.

Based on these concerns, many religious entities reasonably conclude that under the NPRM's accommodation they would still be specifically causing their employees to obtain abortifacients, contraception, sterilization and related education and counseling. Nor does the NPRM resolve a religious entity's moral quandary merely by declaring that the religious entity will not pay for these items. Payment is only one way that a moral actor helps someone else. There are other ways to facilitate evil, and it is the facilitation of these items to which many entities object. The NPRM would still force religious entities to cause the coverage in other, closely connected and specifically triggered ways.

It is fictional to deem abortifacients, contraception, and surgical sterilization to be "cost neutral," especially since many forms of them are very costly. And by going to great lengths to determine who would pay for these items when a religious entity is self-insured, the NPRM is tacitly admitting that these items have significant costs. These costs will inevitably be passed on to consumers. And although some supporters of the Mandate have contended that the accommodation proposal is no more objectionable than an employer's provision of salary, these triggers cause enrollment in particular objectionable coverage and are all more specific and less fungible than merely paying a monetary wage.

The misdirected character of the accommodation can be illustrated by an analogy. If the government forced a Catholic college to provide its students or employees with the benefit of cable television, and then declared that it would force each cable company to offer pornographic channels to those students or employees, the College's religious objection to facilitating access to pornography would not be mollified if the government merely declared that the channel is provided "for free," and that the mandate is against the cable company rather than being against the College. Such a College would still be forced to provide a student or employee a direct mechanism for him or her to access specifically provided objectionable items, at no student- or employee-cost, in violation of the College's beliefs.

The NPRM's "accommodation" proposal is the adoption of *moral theology* on the part of the government. The government has decided that lenient views of moral cooperation are acceptable, but more cautious theological views are subject to government coercion. This is a violation of the very idea of religious freedom. The fact that some religious entities and theologians, some of whom are political allies of the administration, might find this accommodation morally acceptable does not justify forcing all other religious entities to conform

their consciences to the consciences of those groups. RFRA does not allow the administration to favor lenient religious beliefs and punish all others.

The NPRM makes it clear that colleges and universities that provide student health insurance coverage must suffer under the Mandate to the same extent as they will for their employee plans, unless entities self-insure the student plans. But self-insurance of student plans is not cost-effective for many schools. In some instances colleges are required to provide student insurance, such as for participation in athletic conferences. The NPRM therefore would force many religiously objecting schools to choose between their beliefs against providing objectionable coverage and their beliefs in favor of the well-being of their students. RFRA allows for no such federally-coerced dilemma. It is shocking that in the name of "Patient Protection and Affordable Care," the administration is willing to cause college students to lose health insurance provided by religious schools.

- *The "accommodation" has no statutory authority*

The NPRM's theorized "accommodation" is also legally inadequate because the statutory basis for the Mandate gives the government no legal authority to compel insurers or third party administrators to provide preventive services coverage apart from the employer's plan. The statute only authorizes coverage to be included as part of the "plan" or "coverage" to which the statute applies. 42 U.S.C.A. § 300gg-13. There is no freestanding authority in the preventive services statute for the government to engage in roaming coercion of insurance companies, much less third party administrators, to provide coverage of contraception and other objectionable items.

Therefore only two possibilities exist regarding the NPRM's proposed "accommodation." If the objectionable coverage is being required as part of the employer's plan or coverage, then the NPRM does not alleviate what many religious employers morally object to covering. In contrast, if the coverage would be mandated on the insurer or third-party administrator "separate" from the employer's plan, it would be a lawless action of bureaucratic regulation wholly unauthorized by its underlying statute (and the employer would still be forced to facilitate that coverage). Thus the Mandate could not only be a burden on religious beliefs but also it could impose a coercion that Congress did not authorize.

- *The "accommodation" is a direct threat to self-insured entities*

For self-insured entities, the NPRM does not fully explain how costs will be offset, or whether those possible approaches will be either practical or legal. Independent of the cost issue, the accommodation for self-insured entities will impose unprecedented burdens and fiduciary duties on insurers and plan administrators with whom religious groups contract, and it will impose those burdens because religious groups wish to engage in that contract. These burdens will inevitably be reflected in the ability of and cost for self-insured religious groups to contract with plan administrators in the first place. Compelling coverage on third-party administrators necessarily increases the cost that religious entities will pay for those administrators, possibly pricing them out of the third-party administrator business altogether. Any compulsion of those administrators adds to their duties, and necessarily penalizes employers who contract with them.

The compulsion of coverage on self-insuring entities cannot be justified on the theory that they will have the option of dropping self-insurance and purchasing insurance from the market. This forced-choice is still a violation of religious freedom, because it conditions one's exercise of religious beliefs on giving up the financial and administrative benefit of self-insurance that other entities possess. Moreover, as described above, externally insured plans under the "accommodation" still subject non-exempt groups to burdens on their religious beliefs.

- *The "accommodation" creates a religious caste system*

The NPRM's accommodation additionally fails to satisfy RFRA because it creates a federally-imposed religious caste system. The most privileged members of this federally dictated system are houses of worship and their integrated auxiliaries. These entities, and these alone, receive the largesse of a complete exemption from the Mandate by means of its "religious employer" definition. The administration admits that it has the discretion to extend religious exemptions beyond this group to all objectors—or to not impose the Mandate at all. See 76 Fed. Reg. at 46623–24; 77 Fed. Reg. at 8726. But the NPRM refuses to universalize the religious employer exemption to all who exercise religious beliefs, as required by RFRA.

The NPRM then proposes to create a second caste level covering religious nonprofits. This semi-privileged "beta" caste of religious believers is given the "accommodation" but not an exemption from the Mandate. This caste must engage in what many of them consider a fictional idea that they are not really causing coverage of objectionable items. Yet under that accommodation they must still pay to provide their employees a plan that specifically causes their employees to be automatically enrolled in objectionable coverage.

Below this second caste are the federal government's new religious untouchables: every other believer in the country. The government treats these citizens as if they have no religious beliefs at all. Religious people who run businesses are subject to the full force of the Mandate, regardless of its violation of their beliefs. Ironically, the government has lost as many as fourteen different motions for injunctive relief against this Mandate for religious families in business. Yet the NPRM makes no effort whatsoever to resolve that illegal coercion against religious freedom. As mentioned above, stakeholders who are insurers or insured also bear the force of the Mandate.

Catholic colleges and universities particularly object to this determination that lay religious believers have no claim to religious freedom in the way they conduct their daily lives and business. The undersigned schools are committed to educating their students to incorporate their religious beliefs into every aspect of their lives. Students are taught that their values are relevant not only to philosophy and theology fields, but also, and in some ways especially, in business and other vocations. Business and economic decisions desperately need to incorporate religious and moral concerns so as to consider the common good of workers and their families, the community, the environment, and society at large. Yet the Departments have contended in litigation defending this Mandate that business activity is inherently "secular" in a way that excludes religion, and therefore that families in business are not even capable of religious exercise. This position is not only bad law and shoddy theology, it is terrible public policy.

Pope Benedict XVI, echoing the position of most Christians, pointed out that the view such as the government maintains in this case is one of "secularism" (not mere secularity), and explained the impossibility of a Christianity that is not exercised in areas of life such as business:

> Is it consistent to profess our beliefs in church on Sunday, and then during the week to promote business practices or medical procedures contrary to those beliefs? Is it consistent for practicing Catholics to ignore or exploit the poor and the marginalized, to promote sexual behavior contrary to Catholic moral teaching, or to adopt positions that contradict the right to life of every human being from conception to natural death? Any tendency to treat religion as a private matter must be resisted. Only when their faith permeates every aspect of their lives do Christians become truly open to the transforming power of the Gospel.[2]

The Mandate's absurd treatment of different religious believers' free exercise with different levels of allowance is illegal under RFRA, which mandates that all burdens on free exercise of religion in this regard be respected equally and fully. The NPRM's system is instead the establishment of a minimalistic theological dogma about what religion is, and about which kinds of cooperation in evil are morally acceptable.

- *The "accommodation" compels unwilling employees and their children to receive objectionable coverage*

The NPRM actually creates a new burden on religious beliefs of employers:  instead of letting employees individually opt-in to the mandated coverage by a mere "offer" of coverage to them, as was previously suggested in 77 Fed. Reg. at 8728, the NPRM declares that employees will "automatically" receive the coverage.

Employees of religious nonprofit groups who do not want free abortion-pill, contraception, sterilization and counseling coverage will be forced to receive that coverage. And perhaps most egregiously, because the NPRM proposes that the automatic coverage will apply to employee "beneficiaries," the NPRM forces religious employers to cause this objectionable coverage to the **minor children and college students** of employees who, as parents, object to offering that coverage. Under the NPRM, if an employer objects to providing such coverage and his employee shares that objection, they both are forced to enable the employee's children cost-free access to items to which they object, and which due to privacy they may never be allowed to know about or prevent.  Employees will be forced to cause coverage of objectionable items to their children against their will, and employers will be forced to provide plans that cause that same coverage.

This is not only an assault on parental rights, but it exacerbates the Mandate's burden on religious beliefs of objecting employers.  Morally acceptable health insurance coverage not only

---

[2] Celebration of Vespers and Meeting with the Bishops of the United States of America: Address of His Holiness Benedict XVI, Apr. 16, 2008, *available at* http://www.vatican.va/holy_father/benedict_xvi/speeches/2008/april/documents/hf_ben-xvi_spe_20080416_bishops-usa_en.html (last visited Feb. 22, 2013).

benefits the employer, but also provides a safe haven to employees who share those same beliefs. The Mandate destroys that safe haven.

o *The Mandate and NPRM Cannot Possibly Satisfy Strict Scrutiny*

The Mandate and NPRM have no hope of satisfying strict scrutiny due to their substantial burden on religious beliefs. RFRA imposes "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The government cannot show under 42 U.S.C. 2000bb-1 that its mandate is supported by a "compelling governmental interest," or that it is "the least restrictive means of furthering" the same. To date, seventeen federal court cases have issued injunctive relief, showing that plaintiffs are likely to succeed on the merits of their RFRA claim because the Mandate fails to satisfy strict scrutiny.

▪ *No compelling interest exists to justify the Mandate*

The government has no compelling interest to impose this wholly unprecedented national mandate that all health plans cover abortifacients, contraception, sterilization, and related counseling even if they have a religious objection. A "compelling" interest involves only "the gravest abuses, endangering paramount interests." *Thomas v. Collins*, 323 U.S. 516, 530 (1945). But Congress did not even propose that such an interest exists, because it did not require HHS to mandate these items in coverage. 42 U.S.C. §300gg-13.

Never in the history of the United States has the federal government forced religiously objecting employers to cover contraception and sterilization in their health plans. Yet a large majority of Americans seem to already have contraceptive coverage.[3] HHS Secretary Sebelius has admitted that "contraceptive services are available at sites such as community health centers, public clinics, and hospitals with income-based support."[4] Such "income-based support" is available through federal government subsidies in Title XIX/Medicaid and Title X/Family Planning Services, as well as through subsidies by state governments.[5] And the availability of contraceptive items for sale is ubiquitous, now reaching even vending machines on some public university campuses. The federal government cannot claim any grave interest in the alleged scarcity of contraception. But a merely *marginal* interest in increasing contraception access does not qualify as "compelling." *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2741 (2011).

---

[3] One report claims that nine out of ten employers, pre-Mandate, already provide a "full range" of contraceptive coverage. Guttmacher Institute, "Facts on Contraceptive Use in the United States," June 2010, *available at* http://www.guttmacher.org/pubs/fb_contr_use.html (last accessed Apr. 28, 2012).
[4] "A statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius," (Jan. 20, 2012), *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last accessed Apr. 28, 2012).
[5] Recently HHS showed that the administration itself does not believe a compelling interest exists to promote contraceptive access. In Texas, HHS has decided to cease providing 90% of funding of a $40 million Texas Women's Health family planning program. Texas had been using that funding to provide thousands of women with family planning, but Texas required funding providers to not, directly or indirectly, provide abortion. On this basis alone HHS withdrew federal funding, which Secretary Sebelius admitted would cause "a huge gap in family planning." HHS decided that protecting the interests of abortion providers is more important than providing contraception access. *See* CBS News "Feds to stop funding Texas women's health program" (Mar. 9, 2012), *available at* http://www.cbsnews.com/8301-501363_162-57394686/feds-to-stop-funding-texas- womens-health-program/ (last accessed Apr. 28, 2012).

The government cannot show, as it must, a compelling interest specific to employees of religious objectors. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–32 (2006). No scientific and compelling data about employees of religious objectors exists, much less is there data showing that grave harm threatens these employees. There is no rash of contraception-deprived deaths among employees of religiously devout employers. There is no pandemic of unwanted births causing catastrophic consequences among such employees. Defendants cannot connect the Mandate to *causation* of grave harm among religious objectors' employees. For all the government knows, it could be that employees of religious objectors have better health and well-being due to the generous benefits that their caring employers provide.

Even if evidence existed for the absurd notion that religious objectors' employees are gravely at-risk from contraceptive deprivation, the government cannot show that such outcomes are actually caused by the lack of insurance coverage, because it is possible that those fictitious employees all obtain the mandated items with their own money. The government possesses the legal burden to prove a compelling interest, and if the evidence is uncertain, the government's actions are illegal. *Brown*, 131 S. Ct. at 2739. The fact that no scientific evidence of causation of grave harm exists at all specific to religious objectors shows that the government's "evidence is not compelling." *Id.*

The most glaring flaw in the notion that a compelling interest exists for the Mandate is that the federal government itself has voluntarily omitted scores of millions of employees from the Mandate for secular and religious reasons, but the Mandate and the NPRM still refuse to exempt religious objectors universally, as required by RFRA. The Mandate, by its own terms, does not apply to thousands of plans that are "grandfathered" under PPACA. See Mandate, 76 Fed. Reg. at 46623 & n.4. Even by 2013, close to 100 million people will be in grandfathered plans *not* subject to the Mandate.[6] If a compelling interest really existed to mandate contraceptive coverage, it would not be possible to omit tens of millions of women. Other exemptions from the Mandate likewise add to its non-compelling character. The Mandate does not apply to members of a "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds. 26 U.S.C. §§ 5000A(d)(2)(a)(i) and (ii). And as discussed above, the Mandate exempts from its requirements "religious employers" limited generally to houses of worship.

These massive exemptions cannot coexist with a compelling interest. "[A] law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993). No compelling interest exists when the government "fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort." *Id.* at 546–47; *see also United States v. Friday*, 525 F.3d 938, 958 (10th Cir. 2008). The exemptions to the Mandate "fatally undermine[] the Government's broader

---

[6] HealthReform.gov, "Fact Sheet: Keeping the Health Plan You Have: The Affordable Care Act and "Grandfathered" Health Plans," *available at* http://www.healthreform.gov/newsroom/ keeping_the_health_plan_you_have.html (last accessed Apr. 28, 2012) (estimating that 55% of 113 million large-employer employees, and 34% of 43 million small-employer employees, will be in grandfathered plans in 2013).

contention that [its law] will be 'necessarily . . . undercut'" if religious objectors beyond the current "religious employer" definition are exempted, too.  *O Centro Espirita*, 546 U.S. at 434.

Notably, the immense grandfathering exemption has nothing to do with a determination that those nearly 100 million Americans do not "need" contraceptive coverage while employees of religious objectors somehow do.  There is no difference in physiology between human beings working for an entity with a grandfathered plan and human beings working for a Catholic College or University, such that a compelling interest exists to mandate contraceptive coverage for the latter but not for the former.  Instead, the grandfathering exemption was a political maneuver to garner votes for PPACA by letting the president claim, "If you like your health care plan, you can keep your health care plan."  By definition, pure political expediency is not a "paramount" or "grave" interest to justify coercing religious objectors.  *See O Centro Espirita*, 546 U.S. at 434 ("Nothing about the unique political status of the [exempted peoples] makes their members immune from the health risks the Government asserts").

The Mandate on its face also is inconsistent with any alleged compelling interest.  The government has used its discretion to write a "religious employer" exemption, and an "accommodation."  Thus the government admits that religious exemptions do not undermine its compelling interest.  There is therefore no reason not to expand the exemption to all religious objectors.  No nexus exists between the Mandate limit of its exemptions to churches and to the alleged compelling interest.  Instead the government has simply engaged in political line-drawing based on what the president believes his political base will accept, weighed against how much election-year resistance he thinks he may encounter.[7]  Religious objectors cannot be denied an exemption based on crass political calculation or litigation tactics.

In *O Centro Espirita* the Supreme Court held that no compelling interest existed behind a law that had a much more urgent goal—regulating extremely dangerous controlled substances—and that had many fewer exemptions than the broad swath of omissions from the Mandate.  But the Court held that the government could not meet its compelling interest burden even based on its interest to prevent illegal drug abuse.  546 U.S. at 433.  Halting the use of extremely dangerous drugs is far more urgent than forcing religious objectors to provide contraception coverage.  The government's grant of secular and religious exemptions for tens of millions of women in grandfathered plans betrays any alleged compelling interest they may have in refusing to exempt religious objectors under the Mandate or the NPRM.

> ▪ *The government could possibly pursue its interests by many alternatives that are less restrictive of religious beliefs.*

There are obviously less restrictive alternatives to burdening an objecting religious employer, insurer, entity, or individual under the Mandate or its "accommodation."  The fact that these alternatives exist completely invalidates the Mandate and the NPRM under RFRA.

---

[7] The New York Times describes in great detail the politically-driven deliberation that led to the Mandate.  "Rule Shift on Birth Control Is Concession to Obama Allies" (Feb. 10, 2012), *available at* http://www.nytimes.com/2012/02/11/health/policy/obama-to-offer- accommodation-on-birth-control-rule-officials-say.html?pagewanted=all (last accessed Apr. 28, 2012).

The federal government could, if the political will existed, simply provide women with the mandated items itself, rather than forcing objecting entities and persons to do so.[8] Rather than coerce religious objectors to provide problematic coverage in their plan, the government could pass a statute creating its own "contraception insurance" plan covering all the items the Mandate requires, and then allow free enrollment in that plan for whomever the government seeks to cover. The government might pass a law directly compensating providers of contraception or sterilization. The government could possibly legislate to offer tax credits or deductions for contraceptive purchases. Or the government might enact a statute that imposes a mandate on the contraception manufacturing industry to give its items away for free.[9]

The undersigned oppose all of these options, and the American people have never sent a majority of representatives to Congress to vote for them (which further illustrates the public's disbelief that the Mandate's interest is "compelling"). But under RFRA, the fact that these options and many others could theoretically be enacted to achieve the goal of universal free contraception is wholly dispositive against the government's Mandate. There is no essential need to coerce religious objectors to provide the mandated coverage themselves. Abortifacient drugs are not more effective when delivered through government coercion.

The government knows very well that it could achieve its goal through means less restrictive of religious beliefs than the Mandate. The very existence of the NPRM, and its proposals to create an "accommodation," prove that the Mandate is not the least restrictive means to achieve the government's goal. Moreover, the federal government and many states already directly subsidize birth control coverage for many citizens through Title XIX/Medicaid and Title X/Family Planning Services funding. The government cannot even show that the employees of religious entities could not otherwise obtain contraception on their own without any further government intervention, since low income women qualify for existing subsidies. Since many methods less restrictive of religious beliefs exist to advance the government's alleged interest in the Mandate, the Mandate is blatantly illegal under RFRA.

- *The Mandate Violates the U.S. Constitution*

The Mandate and NPRM also violate a variety of protections guaranteed by the First Amendment of the United States Constitution. Just a few of those are mentioned here.

The Mandate engages in illegal religious discrimination in violation of the free exercise and establishment clauses of the First Amendment. The Mandate violates the Free Exercise Clause because it is neither neutral nor generally applicable under *Employment Division v. Smith*, 494 U.S. 872, 884 (1990). This lack of neutrality and general applicability subjects the Mandate

---

[8] Of course, no such political will exists, which is why the Departments have attempted to impose this illegal Mandate by regulation rather than by statute. Since 1997, at least 21 bills have been introduced in Congress to mandate prescription contraceptive coverage in private health plans. No committee or subcommittee of Congress has ever reported out any of these bills.

[9] None of these options can be achieved by the Departments' bureaucracies without the enactment of additional statutory authority. But that is irrelevant to the analysis under RFRA that these options are all theoretically possible measures that Congress itself could pass.

to strict scrutiny, and as demonstrated above, strict scrutiny cannot possibly be satisfied to save the Mandate. As likewise explained above, the Mandate does not apply to scores of millions of women, and contains multiple secular and religious exceptions. This renders the law not generally applicable. The fact that the "religious employer" exemption is discretionary, yet the government applies it only narrowly based on arbitrary criteria and refuses to extend it to all objectors, further illustrates the Mandate's lack of general applicability.

Because the religious employer exemption favors some kinds of religious entities over others, and adopts a theological view favoring inward-focused religious exercise over socially-focused religious exercise, the Mandate is not neutral towards religion. The NPRM's religious caste system described above, applying different kinds of treatment for different kinds of religious beliefs and entities, is anathema to both religion clauses of the First Amendment. Furthermore, the Mandate disproportionately affects religious objectors since many other employers already cover contraception, and the "religious employer" definition was taken from the anti-religious ACLU's draft of a similar provision in California.[10] These characteristics illustrate the Mandate's discriminatory character which renders it unconstitutional. *See Lukumi*, 508 U.S. at 532, 535.

The Mandate and NPRM's privileging of some religious beliefs and entities over others also demonstrates its incompatibility with the Establishment Clause. The Mandate would unconstitutionally entangle the federal government in questions over an entity's "inculcation purpose," whether its hiring and its service are "primarily" focused on their own religion, what its relevant religious "tenets" are and to what extent they are "share[d]."

The government's discretion over exemptions (secular or religious) for specific entities renders the Mandate unconstitutional under the Fourteenth Amendment because it provides unfettered discretion and thereby risks discriminatory enforcement. And by compelling the coverage of education, counseling and information about and in favor of the Mandate's objectionable practices, the Mandate violates the freedom of speech, religion and expressive association of objecting entities.

- *The Mandate Violates the APA and Federal Laws Against Abortion Mandates*

The Mandate and NPRM also violate the Administrative Procedures Act ("APA"). 5 U.S.C. § 706 authorizes a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." As described above, the Mandate and NPRM are not in accordance with law. Furthermore, the Mandate and NPRM's selection of criteria for different kinds of religious objectors to receive different kinds of treatment are arbitrary and capricious under § 706.

---

[10] ACLU Press Release, "ACLU Applauds CA Supreme Court Decision Promoting Women's Health and Ending Gender Discrimination in Insurance Coverage" (Mar. 1, 2004) ("The ACLU crafted the statutory exemption [at issue]….")(available at http://www.aclu.org/reproductivefreedom/aclu-applauds-ca-supreme-court-decision-promoting-womens-health-and-ending-gend).

The Mandate also violated the APA when it rushed its rule forward with "interim final" status in August 2011 without giving the public *prior* notice and an opportunity to comment. 76 Fed. Reg. at 46624. The APA generally requires bureaucratic regulations to receive public notice and comment in advance of the rule's finalization, so that stakeholders threatened by a problematic rule might propose that it be fixed before it goes into effect, and because the agency is legally bound to answer their objections. The very fact that the administration has now issued an NPRM asking a myriad of unanswered questions proves that no "public interest" justified finalizing the rule in 2011 without prior public notice and comment.

Because the Mandate includes drugs that cause early abortions, it violates various federal laws. The Mandate includes any drug or device the FDA has chosen or will choose in the future to name as a "contraceptive," regardless of whether it actually and merely prevents conception. Already the FDA has approved in this category an abortion drug, ulipristal (HRP 2000, or Ella), which can cause abortions after an embryo implants in the womb (and therefore is a first trimester abortion by any definition) and is a close analogue to the abortion drug RU-486 (mifepristone).[11] Moreover, a variety of "contraceptives" function in part to prevent an already conceived embryo from implanting in the womb, including but not limited to IUDs.[12] These abortifacient effects are not "contraceptive" at all, despite the attempt by pro-abortion-choice advocates to unscientifically change the definition of when a human life begins from conception-fertilization to implantation.

By compelling coverage of present and future abortion and abortifacient drugs, the Mandate violates: the Weldon Amendment prohibiting any federal program from requiring entities to provide coverage for abortion[13]; PPACA § 1303(b)(1)(A) prohibiting the preventive services Mandate from requiring coverage of abortion; PPACA § 1303(c)(1) providing that PPACA does not preempt state laws regarding abortion coverage, and several of which restrict abortion coverage in various health plans; and President Obama's public assurances in conjunction with Executive Order 13535, 75 Fed. Reg. 15599, that PPACA would not be construed so as to require coverage of abortion.

Flying in the face of all these provisions, the Mandate writes the FDA a blank check to define any abortion drug as a "contraceptive," such as it has already done with "Ella," and thereby mandate its coverage in all health insurance plans.

---

[11] See A. Tarantal, et al., "Effects of Two Antiprogestins on Early Pregnancy in the Long-Tailed Macaque (Macaca fascicularis)," 54 Contraception 107-115 (1996), at 114 ("studies with mifepristone and HRP 2000 have shown both antiprogestins to have roughly comparable activity in terminating pregnancy when administered during the early stages of gestation"); G. Bernagiano & H. von Hertzen, "Towards more effective emergency contraception?", 375 The Lancet 527-28 (Feb. 13, 2010), at 527 ("Ulipristal has similar biological effects to mifepristone, the antiprogestin used in medical abortion").

[12] To the extent Mandate supporters object to this assertion, the objection is essentially a semantic dispute. The government itself admits that many of the Mandated items act by "inhibiting implantation" of a newly conceived/fertilized human embryo. U.S. Department of Justice, representing Kathleen Sebelius and U.S. Department of Health and Human Services, January 18, 2013, in "Brief for the Appellants," pages 4-5, in Newland v. Sebelius, No. 12-1380 (10th Cir.). Defendant Sebelius likewise insists that the Mandated items "are designed to prevent implantation." Interview, *available at* http://www.ivillage.com/kathleen-sebelius-guidelines-cover-contraception-not-abortion/4-a-369771 (last visited February 19, 2013).

[13] See Consolidated Appropriations Act, 2010, Pub. L. 111-117, Div. D, § 508(d) (Dec. 16, 2009).

- *The Mandate Should Protect Moral as Well as Religious Objections*

The Mandate breaks with practically universal statutory tradition in federal health law by not only compelling violations of religious beliefs but also by forcing the violation of moral convictions. Since 1973 Congress has repeatedly enshrined conscience protections in federal health law for "religious beliefs and moral convictions." These laws include:

➢ 42 U.S.C. § 300a-7 (1973 and years thereafter), containing multiple protections for "religious beliefs or moral convictions" for persons and entities in the health care field;

➢ 42 U.S.C. § 2996f(b) (1974), prohibiting the use of certain funds to compel a person or entity to assist abortions against "religious beliefs or moral convictions";

➢ Title III of Division I (Department of State, Foreign Operations, and Related Programs Appropriations Act) of the Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, which has been approved in appropriations bills since 1986, prohibiting discrimination in the provision of family planning funds against applicants due to their "religious or conscientious commitment to offer only natural family planning";

➢ 20 U.S.C. §1688 (1988), blocking a federal sex discrimination law from forcing anyone to participate in an abortion for any reason;

➢ 18 U.S.C. § 3597 (1994), protecting the "moral or religious convictions" of persons who object to participating in federal executions or prosecutions;

➢ In 1994, in an attempt to pass health care reform, Senator Daniel Patrick Moynihan (D-NY) gained committee approval for and brought to the Senate floor a "Health Security Act," which protected "any employer" and any insurance company from participating in a health plan that contained abortion "or other services," if they objected to "such services on the basis of a religious belief or moral conviction";

➢ 42 U.S.C. § 238n (1996), prohibiting government discrimination against persons or entities who object to participating in abortion for any reason;

➢ 8 U.S.C. § 1182(g) (1996), protecting aliens who object to vaccinations based on "religious beliefs or moral convictions";

➢ 42 U.S.C. § 1396u-2(b)(3) (1997), protects Medicaid managed care plans from being forced to provide counseling or referral services if they have "moral or religious grounds" for objecting;

- 42 U.S.C. § 1395w-22(j)(3)(B) (1997), protects Medicare+Choice managed care plans from being forced to provide counseling or referral services if they have "moral or religious grounds" for objecting;

- Also in 1997, Senator Edward Kennedy (D-MA) sponsored the Health Insurance Bill of Rights Act of 1997 (S. 353), which allowed insurance companies to limit coverage in their plans "based on the religious or moral convictions of the issuer."

- 48 C.F.R. § 1609.7001(c)(7) (1998), protects providers, health care workers, and health plan sponsoring organizations from being required to discuss treatment options if it violates their "professional judgment or ethical, moral or religious beliefs";

- Sec. 727 of Title VII of Division C (Financial Services and General Government Appropriations Act) of the Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, which has been approved in appropriations bills since 1999, protects religious health plans in the federal employees' health benefits program from being forced to provide contraceptive coverage, and prohibits any plan in the program from discriminating against individuals who refuse to provide for contraceptives if it is contrary to the individual's "religious beliefs or moral convictions";

- Sec. 808 of Title VIII of Division C (Financial Services and General Government Appropriations Act) of the Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, which has been approved in appropriations bills since 2000, affirming that the District of Columbia must respect the "religious beliefs and moral convictions" of those who object to providing contraceptive coverage in health plans;

- 22 U.S.C. §7631(d) (2003), protects recipients of funds to combat HIV/AIDS from being required to do so in ways that are contrary to their "religious or moral objection";

- Sec. 507 (d) of Title V of Division F (Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act) of the Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, which has been approved in appropriations bills since 2004, protects persons and entities from government discrimination due to their objection to abortion for any reason;

Even PPACA itself declares: that health plans cannot be required to cover abortion services no matter why they object (Sec. 1303(b)(1)(A)) (a provision that the Mandate itself violates by compelling coverage of post-implantation abortifacient drugs like "Ella"); that exchange plans cannot discriminate against persons or entities who object to being involved in abortion for any reason; that federal laws protecting conscience (see above) are not to be undermined; and that governments and PPACA fund recipients cannot discriminate against people who object to assisted suicide or euthanasia no matter why they object (Sec. 1553).

The Mandate sharply breaks from this bipartisan consensus in favor of respecting religious beliefs and moral convictions in federal health law. Its refusal to respect those deeply held beliefs is extremely troubling and unjustified, and raises grave concerns under the freedom of association and speech protected by the First Amendment.

- *Birth Control Should Not Be Defined as Mandatory Preventive Care*

Pregnancy is not a disease, and babies are not a punishment. Congress did not require, and could never have gotten the votes to require, that the federal government mandate such an objectionable view on all Americans. The federal government's official mandate that pregnancy be treated as a disease requiring coercively covered "preventive care" represents an unprecedented danger to human freedom.

The Mandate defining abortifacients, contraception and sterilization as necessary cost-free preventive care requires the health field and employers to treat pregnancy as (1) a health crisis, (2) that is financially destructive, and (3) that is subject to pure individual autonomy in its selection or prevention (disconnected from its natural relation to marriage and family). Mandating such an attitude towards fertility and child-bearing could lead such a coercive government to eventually treat pregnancy and fertility with disincentives and legal restrictions. Just like our society now applies financial and regulatory burdens to the expensive, freely-chosen health threat of smoking, the federal government has in this Mandate propelled itself down an anti-pregnancy path by officially mandating that pregnancy and fertility be viewed as an equally "compelling" health emergency.

When a coercive government defines healthy functions of human flourishing as constituting a health crisis worthy of public preventive mandates, it threatens human freedom itself because it imperils the ability of families to fulfill their lives through participation in those same activities. Moreover, the Mandate's attitude towards pregnancy was ideologically rather than medically selected, since it was made by a panel of biased "experts" from the Institute of Medicine, entirely representing Planned Parenthood and its allies who favor and promote abortifacient drugs and who declared in their recommendation that abortion is also preventive care for the same reasons.

As entities that respect human life, sexuality, and the freedom of citizens to pursue family life without governmentally mandated anti-natal attitudes in the health care field, Catholic Colleges and Universities urge the federal government to reverse its compulsory declaration that pregnancy is a disease for which employers must give cost-free preventive measures through abortifacients, contraception and sterilization.

## <u>The Final Rule Must Exempt All Religious or Moral Objectors of Any Status</u>

As a result of the requirements of RFRA, the U.S. Constitution, and other laws discussed above, and the Mandate's and NPRM's violations of the same, the undersigned urge the Departments of HHS, Labor and the Treasury to:

(1) provide a blanket, non-discretionary exemption from the Mandate for any employer, insurance company, payer, individual, or entity who in his or its own determination has any religious objection to providing, issuing, enrolling in, participating in, paying for or otherwise facilitating or cooperating in coverage of any required practice or of any required provision of information;

(2) consistent with bipartisan federal health law going back nearly 40 years, provide equal and comprehensive conscience protections for moral convictions as well as religious beliefs;

(3) omit all drugs that can cause the demise of conceived human embryos, including but not limited to "Ella," from the scope of what the Mandate requires for anyone; and

(4) since pregnancy is not a disease, rescind the underlying Health Resources and Services Administration guideline, which defines abortifacients, contraception, sterilization, and related education and counseling as part of required preventive care.

Sincerely,

Matthew S. Bowman
Senior Legal Counsel
Alliance Defense Fund
801 G Street NW
Washington, DC 20001

on behalf of:

The Center for the Advancement of Catholic Higher Education in Emmitsburg, Maryland, a division of The Cardinal Newman Society headquartered in Manassas, Virginia;

Aquinas College in Nashville, Tennessee;

Ave Maria University in Ave Maria, Florida;

Assumption College in Worcester, Massachusetts;

Benedictine College in Atchison, Kansas;

Catholic Distance University in Hamilton, Virginia;

Christendom College in Front Royal, Virginia;

College of Saint Mary Magdalen in Warner, New Hampshire;

College of Saints John Fisher and Thomas More in Fort Worth, Texas;

Holy Apostles College and Seminary in Cromwell, Connecticut;

Ignatius-Angelicum Liberal Studies Program, an online college program headquartered in San Francisco, California;

Institute for the Psychological Sciences in Arlington, Virginia;

John Paul the Great Catholic University in San Diego, California;

Mexican American Catholic College in San Antonio, Texas;

Mount St. Mary's University in Emmitsburg, Maryland;

St. Gregory's University in Shawnee, Oklahoma;

Thomas Aquinas College in Santa Paula, California;

Thomas More College of Liberal Arts in Merrimack, New Hampshire;

University of Mary in Bismarck, North Dakota;

University of St. Thomas in Houston, Texas;

Wyoming Catholic College in Lander, Wyoming; and

The Fellowship of Catholic Scholars, headquartered in Bronx, New York

The Society of Catholic Social Scientists, headquartered in Steubenville, Ohio.