## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| _____ ) | |
| AVE MARIA UNIVERSITY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Case No. 2:13-cv-00630-JSM-CM** |
| ) | |
| SYLVIA BURWELL, Secretary of ) | |
| the United States Department of Health ) | |
| and Human Services; UNITED STATES ) | |
| DEPARTMENT OF HEALTH AND ) | |
| HUMAN SERVICES; THOMAS ) | |
| PEREZ, Secretary of the United States ) | |
| Department of Labor; UNITED STATES ) | |
| DEPARTMENT OF LABOR; JACOB ) | |
| LEW, Secretary of the United States ) | |
| Department of Treasury; and UNITED ) | |
| STATES DEPARTMENT OF THE ) | |
| TREASURY, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 3

BACKGROUND ............................................................................................................. 4

STANDARD OF REVIEW ............................................................................................. 9

ARGUMENT .................................................................................................................. 9

    I.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ..... 9

        A.  Plaintiff's Religious Freedom Restoration Act Claim Fails ..................................... 9

            1. The Supreme Court's decision in *Hobby Lobby* and interim order in
               *Wheaton College* confirm the validity of the accommodations ......................... 11

            2. The regulations, which allow Plaintiff to opt out of providing
               contraceptive coverage, do not substantially burden Plaintiff's exercise of
               religion ............................................................................................................. 13

            3. Plaintiff's reasoning would deprive the government of the least restrictive
               means to advance its compelling interests in seamlessly providing
               contraceptive coverage ...................................................................................... 17

        B.  The Regulations Do Not Violate the Free Exercise Clause ................................... 26

        C.  The Regulations Do Not Violate the Establishment Clause .................................. 29

    II.   PLAINTIFF CANNOT ESTABLISH IRREPARABLE HARM, AND AN INJUNCTION
       WOULD INJURE THE GOVERNMENT AND THE PUBLIC ................................. 31

CONCLUSION ............................................................................................................. 32

## INTRODUCTION

The Affordable Care Act established additional minimum standards for group health plans, including coverage of certain preventive health services for women without cost-sharing. Regulations implementing this provision generally require group health plans to include coverage of contraceptive services as prescribed by a health care provider. The regulations contain accommodations, however, for plans established by non-profit organizations that hold themselves out as religious and that have a religious objection to providing contraceptive coverage. Such organizations may opt out of the contraceptive coverage requirement by notifying either their insurers or third-party administrators, or the Secretary of Health and Human Services (HHS), that they are eligible for an accommodation and are declining to provide contraceptive coverage. When an eligible organization declines to provide such coverage, the regulations generally require the insurer or third-party administrator to provide contraceptive coverage separately for the affected women, at no cost to the eligible organization.

Plaintiff Ave Maria University[1] is eligible for an accommodation. Plaintiff nevertheless claims that the regulations violate its rights under the Religious Freedom Restoration Act (RFRA). The implications of Plaintiff's argument are sweeping. It is one thing to urge that the government may not impose a requirement to provide contraceptive coverage on a religious organization that objects on religious grounds. It is quite another thing to urge that the government may not ensure that women have access to separate coverage through third parties after such an organization exercises its option not to provide such coverage. That latter argument, if accepted, would make access to contraceptive coverage for the female employees of eligible organizations dependent on the religious beliefs of their employers.

Plaintiff's theory—that it "triggers" the provision of coverage by opting out—is fundamentally mistaken. A number of courts, including the only courts of appeals to have addressed the merits of claims like Plaintiff's, have rejected it. *See Mich. Catholic Conf. v. Burwell*

---

[1] The government is filing a similar brief today in *Ave Maria School of Law v. Burwell*, No. 2:13-cv-795 (M.D. Fla.).

("*Mich. Catholic Conf. II*"), 755 F.3d 372, 387 (6th Cir. 2014), *reh'g en banc denied*, Nos. 13-2723, 13-6640 (Sept. 16, 2014); *Univ. of Notre Dame* v. *Sebelius* ("*Notre Dame II*"), 743 F.3d 547, 554 (7th Cir. 2014), *reh'g en banc denied*, No. 13-3853 (May 7, 2014).[2]

The infirmity of Plaintiff's position is further underscored by the Supreme Court's recent decision in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). The Supreme Court in that case held that the contraceptive coverage requirement violated RFRA with respect to closely held for-profit corporations that, unlike Plaintiff, could not opt out of the requirement. The existence of the opt-out regulations that Plaintiff challenges here was crucial to the Court's reasoning. The Court observed that the opt-out regulations "effectively exempt[]" organizations that are eligible for an accommodation. *Id.* at 2763. The Court expressly stated that the regulations "seek[] to respect the religious liberty of religious nonprofit corporations while ensuring that the employees of these entities have precisely the same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage." *Id.* at 2759.

The Supreme Court concluded that the opt-out regulations demonstrated that HHS "ha[d] at its disposal an approach that is less restrictive than requiring employers to fund contraceptive methods that violate their religious beliefs." *Id.* at 2782. The Court reasoned that the accommodations allowed under the regulations "serve[] HHS's stated interests equally well" because "female employees would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives, and they would continue to 'face minimal logistical and administrative obstacles'" in obtaining the coverage. *Id.* at 2782 (citation omitted). Indeed, "[t]he effect of the HHS-created accommodation on the women employed by Hobby Lobby and the other companies involved in these cases would be *precisely zero*." 134 S. Ct. at 2760 (emphasis added);

---

[2] *See also, e.g., Eternal World Television Network, Inc. v. Burwell* ("*EWTN*"), -- F. Supp. 2d --, 2014 WL 2739347, at *2-5 (S.D. Ala. 2014), *injunction pending appeal granted*, No. 14-12696 (11th Cir., June 30, 2014); *Diocese of Cheyenne v. Sebelius*, -- F. Supp. 2d --, 2014 WL 1911873, at *5-11 (D. Wyo. 2014), *injunction pending appeal granted*, No. 14-8040 (10th Cir., June 30, 2014); *Mich. Catholic Conf. v. Sebelius* ("*Mich. Catholic Conf. I*"), 989 F. Supp. 2d 577, 584-88 (W.D. Mich. 2013), and *Catholic Diocese of Nashville v. Sebelius*, No. 3:13-cv-1303, 2013 WL 6834375, at *4-5 (M.D. Tenn., Dec. 26, 2013), *aff'd sub nom. Mich. Catholic Conf. II*, 755 F.3d 372 (6th Cir. 2014); *Univ. of Notre Dame v. Sebelius* ("*Notre Dame I*"), 988 F. Supp. 2d 912, 920-27 (N.D. Ind. 2013), *aff'd*, 743 F.3d 547 (7th Cir. 2014); *Priests for Life v. HHS*, -- F. Supp. 2d --, 2013 WL 6672400, at *5-10 (D.D.C. 2013), *injunction pending appeal granted*, No. 13-5368 (D.C. Cir., Dec. 31, 2013).

*see also id.* at 2759 (explaining that the accommodation "ensur[es] that the employees of these entities have precisely the same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage").

On August 22, 2014, the Departments augmented the regulatory accommodation process in light of the Supreme Court's interim order in *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014). *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 79 Fed. Reg. 51,092 (Aug. 27, 2014) (interim final regulations). In its *Wheaton College* order, the Supreme Court identified an alternative form of accommodation that would neither affect "the ability of [Wheaton College's] employees and students to obtain, without cost, the full range of FDA approved contraceptives," nor preclude the government from relying on the notice it receives from Wheaton College "to facilitate the provision of full contraceptive coverage under the [Affordable Care] Act." 134 S. Ct. at 2807. The accommodation, as originally challenged in *Wheaton College* and in this case, contemplated that an eligible organization would notify its insurer or third-party administrator of its decision to opt out. Under the interim final regulations, an organization may also opt out by notifying HHS directly of its decision rather than by notifying its insurance issuer or third-party administrator. 79 Fed. Reg. at 51,094-95. This provides eligible organizations like Plaintiff with an alternative mechanism for opting out of the contraceptive coverage requirement.

Because Plaintiff is eligible for the accommodations, it is—in the words of the Supreme Court—"effectively exempt[]" from the contraceptive coverage requirement. *Hobby Lobby*, 134 S. Ct. at 2763. Plaintiff's argument goes beyond its own exemption from providing contraceptive coverage and would preclude the government from independently ensuring that its employees have the "same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage." *Id.* at 2759. That argument lacks support in precedent and contradicts the reasoning of *Hobby Lobby*.

Plaintiff's First Amendment claims are likewise meritless. Similar challenges to the regulations have been rejected by nearly every court to have considered them, including the Sixth Circuit. *See, e.g.*, *Mich. Catholic Conf. II*, 755 F.3d at 393-96.

The regulations that Plaintiff challenges accord with the Constitution and with federal law. Nor can Plaintiff cannot satisfy the remaining requirements for obtaining emergency relief. For these reasons, and those explained below, Defendants respectfully request that the Court deny Plaintiff's motion for preliminary injunction.

<u>**BACKGROUND**</u>

Congress has long regulated employer-sponsored group health plans. In 2010, the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119, established certain additional minimum standards for group health plans as well as health insurance issuers that offer coverage in the group and individual health insurance markets. The ACA requires non-grandfathered group health plans, and health insurance issuers offering non-grandfathered health insurance coverage, to cover four categories of recommended preventive-health services without cost-sharing—that is, without requiring plan participants and beneficiaries to make copayments or pay deductibles or coinsurance. 42 U.S.C. § 300gg-13. As relevant here, these services include preventive care and screenings for women as provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA, a component of HHS). *Id.* § 300gg-13(a)(4).

HHS requested the assistance of the Institute of Medicine (IOM) in developing such comprehensive guidelines for coverage of preventive services for women. 77 Fed. Reg. 8,725, 8,726 (Feb. 15, 2012). Experts, "including specialists in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines," developed a list of services "shown to improve well-being, and/or decrease the likelihood or delay the onset of a targeted disease or condition." *See* INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS (IOM REP.) 2-3 (2011). These include the "full range" of "contraceptive methods" approved by the Food and Drug Administration (FDA), *id.* at 10, which the IOM found can greatly decrease the risk of unwanted pregnancies, adverse pregnancy outcomes, and other adverse health consequences, and

vastly reduce medical expenses for women, *see id.* at 102-10.[3] FDA approved contraceptive methods include diaphragms, oral contraceptive pills, emergency contraceptives (such as Plan B and ella), and intrauterine devices (IUDs). *See id.* at 105.

Consistent with those recommendations, the HRSA Guidelines include coverage of "'all [FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity,' as prescribed" by a health care provider. 77 Fed. Reg. at 8,725 (quoting HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines, AR at 283-84 (HRSA Guidelines)). The relevant regulations adopted by the three Departments implementing this portion of the ACA (HHS, Labor, and Treasury) require coverage of, among other preventive services, the contraceptive services recommended in the HRSA Guidelines. 45 C.F.R. § 147.130(a)(1)(iv) (HHS); 29 C.F.R. § 2590.715-2713(a)(1)(iv) (Labor); 26 C.F.R. § 54.9815-2713(a)(1)(iv) (Treasury).

The implementing regulations authorize an exemption from the contraceptive coverage requirement for the group health plan of a "religious employer." 45 C.F.R. § 147.131(a). A religious employer is defined as a non-profit organization described in the Internal Revenue Code provision that refers to churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order. *Id.* (cross-referencing 26 U.S.C. § 6033(a)(3)(A)(i) and (iii)).

When the initial final regulations were issued, the Departments announced, in response to religious objections raised by some commenters, that they would develop "'changes to these final regulations that would meet two goals'—providing contraceptive coverage without cost-sharing to covered individuals and accommodating the religious objections of [additional] non-profit organizations." *Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) (per curiam) (quoting 77 Fed. Reg. at 8,727).

---

[3] The IOM, which was established by the National Academy of Sciences in 1970, is funded by Congress to provide expert advice to the federal government on matters of public health. IOM REP. at iv.

After notice and comment rulemaking, the Departments published the regulations that Plaintiff challenges in its complaint. 78 Fed. Reg. 39,869 (July 2, 2013) (the 2013 final rules). The 2013 final rules maintain the exemption for "religious employers," 45 C.F.R. § 147.131(a), and also provide accommodations for additional nonprofit religious organizations, *id.* § 147.131(b). The accommodations are available to group health plans established or maintained by "eligible organizations" (and group health insurance coverage provided in connection with such plans). *Id.* An "eligible organization" is an organization that satisfies the following criteria:

> (1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
>
> (2) The organization is organized and operates as a nonprofit entity.
>
> (3) The organization holds itself out as a religious organization.
>
> (4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation . . . applies.

45 C.F.R. § 147.131(b); *see* 78 Fed. Reg. at 39,874-75.

An eligible organization is not required "to contract, arrange, pay, or refer for contraceptive coverage" to which it has religious objections. *Id.* at 39,874. Under the 2013 final rules, to be relieved of any such obligations, the organization need only "self-certify" that it is an eligible organization that "opposes providing coverage for particular contraceptive services" and provide a copy of that self-certification to its insurance issuer or third-party administrator (TPA). *Hobby Lobby*, 134 S. Ct. at 2782; *see* 78 Fed. Reg. at 39,878-79; 29 C.F.R. § 2590.715-2713A(a)(4), (b)(1), (c)(1).

If an eligible organization opts out, individuals covered under its plan generally will "still have access to insurance coverage without cost-sharing for all FDA-approved contraceptives," but without involvement by the objecting organization. *Hobby Lobby*, 134 S. Ct. at 2759; *see* 78 Fed. Reg. at 39,847. Where, as here, the eligible organization is one that offers an insured plan, the insurance issuer is required to "provide separate payments for contraceptive services for plan participants without imposing any cost-sharing requirements on the eligible organization, its

insurance plan, or its employee beneficiaries." *Hobby Lobby*, 134 S. Ct. at 2763; *see* 45 C.F.R. § 147.131(c)(2).[4] Indeed, the accommodations are what enable eligible organizations' issuers to comply with their independent legal obligation to cover contraceptive services. *See id.* § 147.131(c)(2)(i) (cross-referencing 45 C.F.R. § 147.130(a)(1)(iv)); 78 Fed. Reg. at 39,876. The issuer must "[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the . . . plan," 45 C.F.R. § 147.131(c)(2)(i)(A), and "segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services," *id.* § 147.131(c)(2)(ii). The issuer must "not impose . . . any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization[ or] the group health plan." *Id.*[5]

In addition, the Departments have augmented the regulatory accommodation process in light of the Supreme Court's interim order in connection with an application for an injunction in *Wheaton College*. The interim order provided that, "[i]f [Wheaton College] informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services, the [Departments] are enjoined from enforcing against" Wheaton College provisions of the ACA and related regulations "pending final disposition of appellate review." *Wheaton Coll.*, 134 S. Ct. at 2807. The order stated that this relief neither affected "the ability of [Wheaton College's] employees and students to obtain, without cost, the full range of FDA approved contraceptives,"

---

[4] Where the eligible organization is one that offers a self-insured plan, its TPA ordinarily "must 'provide or arrange payments for contraceptive services' for the organization's employees without imposing any cost-sharing requirements on the eligible organization, its insurance plan, or its employee beneficiaries." *Hobby Lobby*, 134 S. Ct. at 2763 n.8 (quoting 78 Fed. Reg. at 39,893); *see* 29 C.F.R. § 2590.715-2713A(b)(2). (As discussed below, *see infra* n.13, these requirements do not apply when the TPA is administering a self-insured "church plan" that ERISA does not cover.) Any costs incurred by the TPA will be reimbursed through an adjustment to Federally-facilitated Exchange user fees. 78 Fed. Reg. at 39,880. Because Plaintiff has an insured group health plan, *e.g.*, Compl. ¶ 126; Pl.'s Mot. for Prelim. Inj. ("Pls.' Mot.") at 10-11, ECF No. 52, no claims involving self-insured plans or TPAs are before this Court.

[5] Plaintiff is therefore incorrect when it states that were it to avail itself of an accommodation it would "still pay[] for" coverage of contraceptives. Pl.'s Mot. at 19 (citing 78 Fed. Reg. at 39,878). As explained above, the regulations *specifically prohibit* Plaintiff's issuer from charging any premium or otherwise passing on any costs to Plaintiff with respect to the issuer's payments for contraceptive services. 45 C.F.R. § 147.131(c)(2)(ii); *see also infra* n.7.

nor precluded the government from relying on the notice it receives from Wheaton College "to facilitate the provision of full contraceptive coverage under the Act." *Id.*

The *Wheaton College* injunction does not reflect a final Supreme Court determination that RFRA requires the government to apply the accommodations in this manner. Nevertheless, the Departments issued regulations that augment the accommodation process in light of *Wheaton College* by "provid[ing] an alternative process for the sponsor of a group health plan or an institution of higher education to provide notice of its religious objection to coverage of all or a subset of contraceptive services." 79 Fed. Reg. at 51,094. Under the interim final regulations, an organization may opt out by notifying HHS of its decision directly rather than by notifying its insurance issuer or TPA. An organization need not use any particular form and need only indicate the basis on which it qualifies for an accommodation and its objection to providing some or all contraceptive services, as well as the type of plan and contact information for the plan's issuer. 45 C.F.R. § 147.131(c)(1)(ii).

If a group health plan notifies HHS that it is opting out, the Departments will then make the necessary communications to ensure that health insurance issuers or TPAs make or arrange separate payments for contraception. In the case of an "insured" group health plan, such as Plaintiff's, HHS "will send a separate notification to each of the plan's health insurance issuers informing the issuer" that HHS "has received a notice" that the group health plan is opting out of providing contraceptive coverage on religious grounds "and describing the obligations of the issuer" under the regulations. *Id.* An issuer that receives such a notice from HHS will "remain responsible for compliance with the statutory and regulatory requirement to provide coverage for contraceptive services to participants and beneficiaries," but the objecting organization "will not have to contract, arrange, pay, or refer for such coverage." 79 Fed. Reg. at 51,095.

In all cases, the eligible organization that opts out of providing contraceptive coverage has no obligation to inform plan participants or enrollees of the availability of these separate payments made by third parties. Instead, the health insurance issuer provides this notice, and does so "separate from" materials that are distributed in connection with the eligible organization's group

health coverage. 45 C.F.R. § 147.131(d). That notice must make clear that the eligible organization is neither administering nor funding the contraceptive benefits. *Id.*

The contraceptive coverage requirement generally applies to group health plans and health insurance issuers for plan years beginning on or after August 1, 2012, except that: (i) the amendment to the religious employer exemption applies to plan years beginning on or after August 1, 2013; and (ii) eligible organizations could qualify for a temporary enforcement safe harbor until their plan years beginning on or after January 1, 2014, when the accommodations became available. 78 Fed. Reg. at 39,870-72.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

## ARGUMENT

## I.     PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

### A.     Plaintiff's Religious Freedom Restoration Act Claim Fails

Under the regulations that Plaintiff challenges, nonprofit religious organizations—like Plaintiff—can opt out of the contraceptive coverage requirement. Plaintiff thus does not challenge any obligation to provide contraceptive coverage because it has none. If Plaintiff opts out, its insurer will be independently required under federal law to make or arrange separate payments for contraceptive coverage.

Plaintiff argues, however, that by declining to provide coverage itself it "triggers" the independent provision of contraceptive coverage, and that is what violates RFRA in its view. As the Sixth and Seventh circuits have explained in rejecting this contention, "[s]ubmitting the self-certification form to the insurance issuer . . . does not 'trigger' contraceptive coverage; it is federal

law that requires the insurance issuer . . . to provide this coverage." *Mich. Catholic Conf. II*, 755 F.3d at 387; *accord Notre Dame II*, 743 F.3d at 554. The Supreme Court has also suggested that the government may "rely[] on" a notice from objecting parties to "facilitate the provision of full contraceptive coverage under the Act." *Wheaton Coll.*, 134 S. Ct. at 2807. And in that scenario, Plaintiff's "health insurance issuer" would be "required by *federal law* to provide full contraceptive coverage." *Id.* (emphasis added). The Departments' interim final regulations provide alternative accommodations that allow eligible organizations to opt out by notifying HHS rather than their insurers. As with the preexisting regulations, after an organization informs HHS that it is opting out, federal law independently obligates the insurer to provide such coverage.

Plaintiff would transform RFRA from a shield into a sword by invoking its own religious beliefs to preclude women from receiving health coverage for recommended preventive health care services from third parties. That position finds no support in precedent and is sharply at odds with the Supreme Court's analysis in *Hobby Lobby*. There, the Supreme Court addressed a different group of employers not at issue in this case—for-profit employers not eligible for the accommodations—and contrasted their obligations to those of non-profit religious organizations such as Plaintiff. The Court explained that the opt-out regulations "effectively exempt[]" eligible non-profit religious organizations like Plaintiff. *Hobby Lobby*, 134 S. Ct. at 2763.

The regulations provide opt-out mechanisms that respect religious liberty while allowing the government to achieve its "compelling interest in providing insurance coverage that is necessary to protect the health of female employees, coverage that is significantly more costly than for a male employee." *Id.* at 2785-86 (Kennedy, J., concurring); *accord id.* at 2800 & n.23 (Ginsburg, J., dissenting). They offer an administrable way for organizations to state that they object and opt out—including without contacting their insurers directly—while ensuring that the government has the information needed to implement the independent obligation that third parties provide contraceptive coverage so that participants and beneficiaries can "obtain, without cost, the full range of FDA approved contraceptives." *Wheaton Coll.*, 134 S. Ct. at 2807.

Plaintiff's position ignores the Supreme Court's repeated admonition that, under RFRA, the interests of nonbeneficiaries of a requested accommodation count. *See Hobby Lobby*, 134 S. Ct. at 2781 n.37 (quoting *Cutter* v. *Wilkinson*, 544 U.S. 709, 720 (2005)). Simply put, the free exercise of religion protected by RFRA cannot "unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling." *Id.* at 2787 (Kennedy, J., concurring). Plaintiff's claim is incompatible with fundamental principles that inform the proper interpretation of RFRA and should be rejected.

### 1. The Supreme Court's decision in *Hobby Lobby* and interim order in *Wheaton College* confirm the validity of the accommodations

The Supreme Court's decision in *Hobby Lobby* confirms the validity of the regulatory accommodations, and its reasoning cannot be reconciled with Plaintiff's position. The Supreme Court held that application of the contraceptive coverage requirement to the plaintiffs in that case— closely held companies that were not eligible for the regulatory opt-out—violated their rights under RFRA. Central to the Court's reasoning was the existence of the opt-out alternative that the Departments afford to organizations such as Plaintiff. The Court explained that the opt-out regulations "effectively exempt[]" organizations that are eligible for an accommodation. *Id.* at 2763. This accommodation, the Supreme Court elaborated, "seeks to respect the religious liberty of religious nonprofit corporations while ensuring that the employees of these entities have precisely the same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage." *Id.* at 2759. Albeit without deciding whether the accommodations "compl[y] with RFRA for purposes of all religious claims," *id.* at 2782, the Court declared that the accommodations are "an alternative" that "achieves" the aim of seamlessly providing coverage of recommended health services to women "while providing greater respect for religious liberty," *id.* at 2759.

The Supreme Court did not suggest that employers could (or should be entitled to) prevent their employees from obtaining contraceptive coverage from third parties through the regulatory accommodations. To the contrary, the Court reiterated that "in applying RFRA 'courts must take

adequate account of the burdens a requested accommodation may impose on nonbeneficiaries.'" *Id.* at 2781 n.37 (quoting *Cutter*, 544 U.S. at 720). The free exercise of religion protected by RFRA cannot "unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling." *Id.* at 2787 (Kennedy, J., concurring).

The Supreme Court thus stressed that "[t]he effect of the HHS-created accommodation on the women employed by Hobby Lobby and the other companies involved in these cases would be precisely zero." *Id.* at 2760; *see id.* at 2782-2783. After employers opt out, employees "would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives, and they would continue to face minimal logistical and administrative obstacles because their employers' insurers would be responsible for providing information and coverage." *Id.* at 2782 (quotation omitted); *see id.* at 2786 (Kennedy, J., concurring) (explaining that the accommodation "works by requiring insurance companies" to provide contraceptive coverage and "equally furthers the [g]overnment's interest"). In responding to the dissent, the Court emphasized that the accommodations would not "impede women's receipt of benefits by requiring them to take steps to learn about, and to sign up for, a new government funded and administered health benefit." *Id.* at 2783 (quotation and brackets omitted); *see* 78 Fed. Reg. at 39,888.

The Supreme Court's interim order in connection with an application for an injunction in *Wheaton College* underscores the validity of the alternative method of opting out promulgated in the interim final regulations. The Supreme Court's interim order provided that, "[i]f [Wheaton College] informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services, the [Departments] are enjoined from enforcing against" Wheaton College provisions of the ACA and related regulations requiring coverage without cost-sharing of certain contraceptive services "pending final disposition of appellate review." *Wheaton Coll.*, 134 S. Ct. at 2807. The order stated that Wheaton College need not use the self-certification form prescribed by the government or send a copy of the executed form to its health insurance issuers or TPAs to meet the condition for this injunctive relief. The order also stated that this relief neither affected "the

ability of [Wheaton College's] employees and students to obtain, without cost, the full range of FDA approved contraceptives," nor precluded the government from relying on the notice it receives from Wheaton College "to facilitate the provision of full contraceptive coverage under the Act." *Id.*

The *Wheaton College* injunction does not reflect a final Supreme Court determination that RFRA requires the government to apply the accommodations in this manner. Nevertheless, the Departments have augmented the existing accommodations. 79 Fed. Reg. at 51,094-95. Plaintiff now has an alternative means by which it may opt out of providing contraceptive coverage, and one that, like the Supreme Court's *Wheaton College* interim order, provides for notice to the government, rather than to Plaintiff's insurer.

### 2. The regulations, which allow Plaintiff to opt out of providing contraceptive coverage, do not substantially burden Plaintiff's exercise of religion

RFRA's compelling interest test applies only where government action "substantially burden[s]" a person's exercise of religion. 42 U.S.C. § 2000bb-1(a); *see, e.g.*, *Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) ("only *substantial* burdens on the exercise of religion trigger the compelling interest requirement" (emphasis added)).[6] Whether a burden is "substantial" under RFRA is a question of law, not a "question[] of fact, proven by the credibility of the claimant." *Mich. Catholic Conf. II*, 755 F.3d at 385 (quoting *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011)); *accord Notre Dame II*, 743 F.3d at 558 ("substantiality—like compelling governmental interest—is for the court to decide"); *Kaemmerling v. Lappin*, 553 F.3d 669, 673-674, 678-679 (D.C. Cir. 2008); *see also Bowen v. Roy*, 476 U.S. 693, 701 n.6 (1986) ("Roy's religious views may not accept this distinction between individual and governmental conduct," but the law "recognize[s] such a distinction."); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448 (1988) (similar).

---

[6] The initial version of RFRA applied where government action resulted in any "burden" on religious exercise. Congress added the word "substantially" "to make it clear that the compelling interest standards set forth in the act" apply "only to Government actions [that] place a substantial burden on the exercise of" religion, as contemplated by the case law leading up to *Employment Division v. Smith*, 494 U.S. 872 (1990). *See* 139 Cong. Rec. S14350, S14352 (daily ed. Oct. 26, 1993) (statement of Sen. Kennedy); *id.* (statement of Sen. Hatch). Consistent with RFRA's restorative purpose, Congress expected courts considering RFRA claims to "look to free exercise cases decided prior to *Smith* for guidance." S. Rep. No. 111, 103d Cong., 1st Sess. 8-9 (1993) (Senate Report); *see* H.R. Rep. No. 88, 103d Cong., 1st Sess. 6-7 (1993) (same).

In determining whether a law imposes a substantial burden on a plaintiff's religious exercise under RFRA, courts must determine (1) whether the plaintiff's religious objection to the challenged law is sincere, (2) whether the law applies significant pressure to comply, and (3) whether the challenged regulations actually require plaintiff to modify its behavior in a significant—or more than *de minimis*—way. *See, e.g.*, *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004); *Mich. Catholic Conf. II*, 755 F.3d at 384 (citing *Lyng*, 485 U.S. at 449); *Kaemmerling*, 553 F.3d at 678 (citing *Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). "An inconsequential or *de minimis* burden on religious practice does not rise to this level, nor does a burden on activity unimportant to the adherent's religious scheme." *Id.*

Defendants "do[] not dispute that [Plaintiff's] desire not to participate in the provision of contraception is a sincere religious belief," but do argue that the challenged regulations "do[] not impose a substantial burden on the [Plaintiff's] exercise of religion." *Mich. Catholic Conf. II*, 755 F.3d at 384. Plaintiff concedes that it satisfies the criteria for the religious accommodations, under which it does not have to provide coverage for contraceptives. Thus, were Plaintiff to avail itself of the accommodations, Plaintiff—unlike the for-profit plaintiffs in *Hobby Lobby*—would *not* be "required to directly provide the [contraceptive] coverage,'" Pl.'s Mot. at 14 (discussing *Hobby Lobb*). It would not pay for any such coverage, and the separate payments for contraceptive services would *not* be provided through the "vehicle" of "Ave Maria's plan." *Id.* at 16; *see* 45 C.F.R. § 147.131(c)(2)(i)(A) (directing issuers to "[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the . . . plan" of an eligible organization).

Plaintiff does not object to declaring its intention to exclude contraceptive coverage from its plan. Plaintiff has done so in the past and would presumably continue to do so even if it obtained the injunctions that it seeks. Nor can Plaintiff argue that it is required in any way to subsidize the provision of contraceptive coverage under the accommodations. The regulations bar an insurance issuer from charging the eligible organization, directly or indirectly, with respect to payments for contraceptive services. *See* 45 C.F.R. § 147.131(c)(2)(ii) ("With respect to payments for

contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.").[7]

Plaintiff objects instead to the fact that after it opts out of providing contraceptive coverage, the government requires its insurance issuer to make or arrange separate payments for contraceptive services for the plan participants and beneficiaries. The crux of Plaintiff's theory is that opting out of the coverage requirement "triggers" or "facilitates" the provision of contraceptive coverage by third parties, *e.g.*, Compl. ¶¶ 55, 112, 127, because if an insured employer opts out the government requires its issuer to make or arrange separate payments for contraceptives.

The Seventh Circuit noted that the "novelty" of this claim "deserves emphasis." *Notre Dame II*, 743 F.3d at 557. The court explained that "United States law and public policy have a history of accommodating religious beliefs, as by allowing conscientious objection to the military draft—and now exempting churches and religious institutions from the Affordable Care Act's requirements of coverage of contraceptive services." *Id.* The court stressed that "[w]hat makes this

---

[7] Plaintiff wrongly insists that, were it to avail itself of the accommodations, it would effectively still be paying for contraceptives because its insurance issuer may adjust its claims costs to account for any separate payments for covered contraceptives, thereby reducing any rebate the issuer would otherwise owe to the Plaintiff under the ACA's "medical loss ratio" rule. Pl.'s Mot. at 19-20. Plaintiff's assertion reflects a misunderstanding of the medical loss ratio rule requirements. Most significantly, the medical loss ratio is calculated by an issuer on a collective basis across *all* of its customers in the relevant market (*e.g.*, individual, small group, or large group) in the state for a given year. *See* 75 Fed. Reg. 74,864, 74,869 (Dec. 1, 2010). Therefore, in the large group market (as relevant here), an issuer's medical loss ratio is calculated on an aggregate basis for all of its large group market employers in the state. Specifically, the medical loss ratio is generally calculated by the issuer using a fraction that divides all incurred claim costs—including separate contraceptive coverage payments—for all of the issuer's large group employers in the state  plus the issuer's expenditures for activities that improve health care quality (the numerator) divided by all premium revenues for those employers, excluding the issuer's federal and state taxes and licensing and regulatory fees and after certain other adjustments to account for payments or receipts related to the ACA's risk adjustment, risk corridors, and reinsurance programs (the denominator). *See* 45 C.F.R. § 158.221. If the issuer's incurred claims costs (plus quality improvement activities) are not at least 85% of the premium revenues for all of the issuer's large employer business in the state, the issuer will owe a rebate back to all of its large employer policyholders. *See id.* Part 158. The portion of the total rebate allocated to a given employer reflects the relative portion of premium revenue paid by that employer. *See id.* § 158.220. The medical loss ratio does not evaluate what claim costs (relating to contraceptive coverage or otherwise) are paid on behalf of an individual employer relative to premium revenue generated on behalf of that employer. Thus, a given employer's entitlement to a rebate does not stem from the claims and premiums paid on behalf of that employer; rather, the entitlement stems from the collective claims paid relative to collective premiums collected from all employers in the state market. In any event, Plaintiff has not even alleged that its issuer will owe rebates to its large group employer policyholders at all.

case and others like it involving the contraception exemption paradoxical and virtually unprecedented is that the beneficiaries of the religious exemption are claiming that the exemption process itself imposes a substantial burden on their religious faiths." *Id.* Indeed, Plaintiff is "effectively exempt[]" from the contraceptive coverage requirement. *Hobby Lobby*, 134 S. Ct. at 2763. And "'[w]hile a religious institution has broad immunity from being required to engage in acts that violate the tenets of its faith, it has no right to prevent other institutions, whether the government or a health insurance company, from engaging in acts that merely offend the institution.'" *Mich. Catholic Conf. II*, 755 F.3d at 388 (quoting *Notre Dame II*, 743 F.3d at 552).

The Sixth and Seventh circuits specifically rejected the trigger theory. "The purpose of the [self-certification] is to enable the provision of the very contraceptive services to the organization's employees that the organization finds abhorrent.'" *Notre Dame II*, 743 F.3d at 554 (quotation and emphasis omitted); *accord Mich. Catholic Conf. II*, 755 F.3d at 387. "Submitting the self-certification form to the insurance issuer . . . does not 'trigger' contraceptive coverage; it is federal law that requires the insurance issuer . . . to provide this coverage." *Id.*; *accord Notre Dame II*, 743 F.3d at 554 ("Federal law, not the religious organization's signing and mailing the form, requires health-care insurers . . . to cover contraceptive services.").

Plaintiff's view—that its opt out can constitute a "substantial burden" under RFRA—is at odds with our nation's long history of allowing religious objectors to opt out and the government then requiring others to fill the objectors' shoes. *See, e.g., Thomas*, 450 U.S. at 716-18; *cf.* EEOC Compliance Manual § 12-IV.C. (Example 43) (July 22, 2008) (explaining that reasonable accommodations of workplace religious objections can include requiring the objecting employee to transfer objectionable tasks to co-workers).[8] On Plaintiff's reasoning, a conscientious objector could object not only to his own military service, but also to opting out, on the theory that his opt-out would "'trigger' the drafting of a replacement who was not a conscientious objector." *Notre Dame II*, 743 F.3d at 556 ("That seems a fantastic suggestion."). Similarly, the claimant in *Thomas*

---

[8] *Available at* http://www.eeoc.gov/policy/docs/religion.html#_Toc203359529.

could have demanded not only that he not make weapons but also that he not be required to *opt out* of doing so, because his opt out would cause someone else to take his place on the assembly line. Thus, as the Seventh Circuit explained, plaintiffs like Notre Dame and Ave Maria "can derive no support from" decisions like *Hobby Lobby* because the accommodations authorize non-profit religious employers to refuse to comply with the contraceptive regulation. *Notre Dame II*, 743 F.3d at 558.[9]

In sum, Plaintiff is "effectively exempt[]," *Hobby Lobby*, 134 S. Ct. at 2763, and its attempt to collapse the provision of contraceptive coverage by a third party with its own decision not to provide such coverage fails. If the employees of organizations that have opted out of providing contraceptive coverage nonetheless receive such coverage, they will do so "*despite* [Plaintiff's] religious objections, not *because* of them." *Mich. Catholic Conf. II*, 755 F.3d at 389 (emphasis added; quotation omitted). Plaintiff "has failed to demonstrate a substantial burden." *Notre Dame II*, 743 F.3d at 559.[10]

### 3. Plaintiff's reasoning would deprive the government of the least restrictive means to advance its compelling interests in seamlessly providing contraceptive coverage

---

[9] The Sixth Circuit indicated its agreement with this principle when, days ago, it denied the plaintiffs' petition for rehearing en banc in *Michigan Catholic Conference II*, Nos. 13-2723, 13-6640, ECF No. 63 (Sept. 16, 2014), which argued primarily that the panel's decision conflicted with the Supreme Court's decision in *Hobby Lobby*, *see* Pls.-Appellants' Pet. for Reh'g/Reh'g En Banc at 3-13, *Mich. Catholic Conf. II*, 755 F.3d 372 (2014) (Nos. 13-2723, 13-6640), ECF No. 59.

[10] In support of its substantial burden argument, Plaintiff asserts that Defendants lacked statutory authority to enact a part of the regulations, *see* Pl.'s Mot. at 20, evidently based on allegations in the complaint related to Plaintiff's Administrative Procedure Act ("APA") claim (Compl. ¶¶ 293-298), which is not raised in Plaintiff's motion for preliminary injunction. But even if Plaintiff's APA claim were before the Court, Plaintiff attempts to challenge the government's regulation of third parties—rather than of Plaintiff itself—and therefore runs afoul of the "general rule that a party 'must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties.'" *Hinck v. United States*, 550 U.S. 501, 510 n.3 (2007) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004)). Plaintiff's allegation raises the claim of issuers. *See* Compl. ¶ 295 (alleging "Defendants lack statutory authority to coerce *insurance issuers* to pay for" contraceptive services (emphasis added)). It is undisputed, however, that Plaintiff is not an issuer, and Plaintiff fails to allege any reason why issuers are unable to assert their own claims if they so desire. Plaintiff lacks standing to raise its statutory authority claim.

Regardless, on the merits, the relevant authority is provided by Section 2713 of the Public Health Services Act, which requires "group health plan[s]" and "health insurance issuers offering group or individual health coverage" to provide coverage without cost-sharing for recommended preventive services. 42 U.S.C. § 300gg-13. The regulations thus do not coerce insurers to do anything that they are not already directly required to do; instead, the accommodations simply give insurers another means of fulfilling their statutory obligation, which HHS is may do as an exercise of its general rulemaking authority. *Id.* § 300gg-92.

Plaintiff's claims would fail even if the accommodations were subject to RFRA's compelling interest test.

**a.** As the Supreme Court acknowledged in *Hobby Lobby*, the challenged accommodations serve interrelated and compelling interests. Five members of the Court endorsed the position that providing contraceptive coverage to employees "serves the [g]overnment's compelling interest in providing insurance coverage that is necessary to protect the health of female employees, coverage that is significantly more costly than for a male employee." *Hobby Lobby*, 134 S. Ct. at 2785-86 (Kennedy, J., concurring); *accord id.* at 2799-800 & n.23 (Ginsburg, J., dissenting). The remaining Justices assumed without deciding that the contraceptive coverage requirement furthers compelling interests, *id.* at 2780, and emphasized that, under the accommodations for eligible non-profit organizations, employees "would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives, and they would continue to face minimal logistical and administrative obstacles because their employers' insurers would be responsible for providing information and coverage," *id.* at 2782 (quotation omitted); *see id.* at 2760, 2783; *id.* at 2786 (Kennedy, J., concurring).

As an initial matter, the government's ability to accommodate religious concerns in this and other areas depends on the government's ability to fill the gaps created by the accommodations. Plaintiff, by contrast, asserts that it is insufficient to permit an objector to opt out of an objectionable requirement; in Plaintiff's view, the government's filling each gap must itself be subject to compelling-interest analysis and thus the government often may not shift Plaintiff's obligations to a third party but must instead fundamentally restructure its operations.

*Hobby Lobby* confirms that, when religious objectors opt out of their legal obligations, the government may fill those gaps and do so as seamlessly as possible. *See* 134 S. Ct. at 2782-83. In our diverse nation, many requirements may give rise to religious objections. But government programs, and particularly national systems promoting health and welfare, need not vary from point to point or, for example, be based around what, if any, method of provision of medical coverage can be agreed upon by all parties, including those who object. The challenged accommodations provide

an administrable way for organizations to state that they object and opt out, and for the government to require third parties to provide contraceptive coverage. The Supreme Court admonished in its pre-*Smith* decisions that "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen*, 476 U.S. at 699.

The government's requirement that insurance issuers provide contraceptive coverage after employers decline to do so furthers compelling interests by directly and substantially reducing the incidence of unintended pregnancies, improving birth spacing, protecting women with certain health conditions for whom pregnancy is contraindicated, and otherwise preventing adverse health conditions. The promotion of public health is unquestionably a compelling governmental interest. *Mead v. Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011); *see also, e.g.*, *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 498 (10th Cir. 1998); *Dickerson v. Stuart*, 877 F. Supp. 1556, 1559 (M.D. Fla. 1995). The challenged regulations further this compelling interest by "expanding access to and utilization of recommended preventive services for women." 78 Fed. Reg. at 39,887; *see id.* at 39,872; IOM REP. at 103-07; *see also Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring) ("There are many medical conditions for which pregnancy is contraindicated," and "[i]t is important to confirm that a premise of the Court's opinion is its assumption that the HHS regulation here at issue furthers a legitimate and compelling interest in the health of female employees.").

Unintended pregnancies pose special health risks because a woman with an unintended pregnancy "may not immediately be aware that [she is] pregnant, and thus delay prenatal care." 78 Fed. Reg. at 39,872; *see* IOM REP. at 103. As IOM concluded in identifying services recommended to "prevent conditions harmful to women's health and well-being," unintended pregnancies prolong "behaviors that present risks for the developing fetus," and cause "depression, anxiety, or other conditions." *Id.* at 20, 103-04. As a result, "[s]tudies show a greater risk of preterm birth and low birth weight among unintended pregnancies." *Id.* at 103.

The use of contraceptives reduces the incidence of unintended pregnancies, *id.* at 102-04, and therefore also "the number of women seeking abortions," 78 Fed. Reg. at 39,872. Thus, the

primary predicted benefit of the preventive services coverage regulations is that "individuals will experience improved health as a result of reduced transmission, prevention or delayed onset, and earlier treatment of disease." 75 Fed. Reg. 41,726, 41,733 (July 19, 2010). "By expanding coverage and eliminating cost sharing for recommended preventive services, [the regulations are] expected to increase access to and utilization of these services, which are not used at optimal levels today." *Id.*; *see* 78 Fed. Reg. at 39,873 ("Research . . . shows that cost sharing can be a significant barrier to access to contraception." (citation omitted)).

In addition, contraceptive coverage helps to avoid "the increased risk of adverse pregnancy outcomes for pregnancies that are too closely spaced." IOM REP. at 103; *see* 78 Fed. Reg. at 39,872 ("Short interpregnancy intervals in particular have been associated with low birth weight, prematurity, and small-for-gestational age births." (citing studies)). Finally, "[c]ontraceptives also have medical benefits for women who are contraindicated for pregnancy, and there are demonstrative preventive health benefits from contraceptives relating to conditions other than pregnancy (for example, prevention of certain cancers, menstrual disorders, and acne)." 78 Fed. Reg. at 39,872.

Physician and public health organizations, such as the American Medical Association, the American Academy of Pediatrics, and the March of Dimes accordingly "recommend the use of family planning services as part of preventive care for women." IOM REP. at 104. This is not a "broadly formulated interest[] justifying the general applicability of government mandates," *Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006), but rather a concrete and specific one, supported by a wealth of empirical evidence.

The contraceptive coverage regulations, including the religious accommodations, also advance the government's related compelling interest in assuring that women have equal access to recommended health care services. 78 Fed. Reg. at 39,872, 39,887. As the Supreme Court has explained, there is a fundamental "importance, both to the individual and to society, of removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women." *Roberts v. U.S. Jaycees*, 468 U.S. 609,

626 (1984). Thus, "[a]ssuring women equal access to . . . goods, privileges, and advantages clearly furthers compelling . . . interests." *Id.*

Congress enacted the women's preventive-services coverage provision because "women have different health needs than men, and these needs often generate additional costs." 155 Cong. Rec. 29,070 (2009) (statement of Sen. Feinstein); *see* IOM REP. at 18. Prior to the ACA, "[w]omen of childbearing age spen[t] 68 percent more in out-of-pocket health care costs than men." 155 Cong. Rec. at 29,070 (statement of Sen. Feinstein); *see* Ctrs. for Medicare & Medicaid Servs., *National Health Care Spending By Gender and Age: 2004 Highlights.*[11] These disproportionately high costs had a tangible impact: Women often found that copayments and other cost-sharing for important preventive services "[were] so high that they avoid[ed] getting [the services] in the first place." 155 Cong. Rec. 29,302 (2009) (statement of Sen. Mikulski). Studies have demonstrated that "even moderate copayments for preventive services" can "deter patients from receiving those services." IOM REP. at 19. These costs thus placed women in the workforce at a disadvantage compared to their male coworkers. *See, e.g.*, *id.* at 20; 78 Fed. Reg. at 39,887; 155 Cong. Rec. S12265-02, S12274 (daily ed. Dec. 3, 2009) (statement of Sen. Murray). Congress's attempt to equalize access to preventive health care services, and therefore to enable women to contribute to the same degree as men as healthy and productive members of society, furthers a compelling governmental interest. *Cf. Catholic Charities of Sacramento v. Superior Court*, 85 P.3d 67, 92-93 (Cal. 2004).[12]

Plaintiff has identified no sound reason to doubt that these interests are compelling. Contrary to Plaintiff's claim, *see* Pl.'s Mot. at 23-24, the fact that religious employers are exempt

---

[11] *Available at* http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/downloads/2004GenderandAgeHighlights.pdf.

[12] To the extent Plaintiff suggests these interests are too broadly formulated to be characterized as compelling, Pl.'s Mot. at 23, Plaintiff ignores that the regulations promote these interests even with respect to Plaintiff's approximately 160 employees who have elected to be covered by its insurance plan, Second Towey Decl. ¶ 44, ECF No. 52-1, by ensuring that they (and their covered dependents) have access to the clinically recommended contraceptive services to which Plaintiff—but not necessarily its employees—objects. The government has shown with "particularity," therefore, that these interests "would be adversely affected by granting an exemption," *Wisconsin v. Yoder*, 406 U.S. 205, 236 (1972), as Plaintiff's employees would not enjoy the full range of recommended preventive services coverage if not for the challenged regulations.

from the challenged regulations does not undercut the government's position because this is not a case where allegedly underinclusive enforcement of a law suggests that the government's "supposedly vital interest" is not really compelling. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546-47 (1993) (stating that an exemption undermines a compelling interest only if "it leaves appreciable damage to that supposedly vital interest unprohibited").[13] To the contrary, the exemption for religious employers reflects the government's attempts to balance the compelling interests underlying the challenged regulations against other significant interests supporting the complex scheme created by the ACA. 78 Fed. Reg. at 39,887; *see Lee*, 455 U.S. at 259 ("The Court has long recognized that balance must be struck between the values of the comprehensive social security system . . . and the consequences of allowing religiously based exemptions.").

Indeed, there is a rational distinction between the narrow religious employer exemption and the expansion of that exemption that Plaintiff seeks. Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are, as a group, more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan. *See* 78 Fed. Reg. at 39,874, 39,877. In any event, it would be perverse to hold that the government's provision of a limited religious exemption eliminates its

---

[13] Plaintiff points to the grandfathering of certain health plans with respect to certain provisions of the ACA, Pl.'s Mot. at 25, but grandfathering is not specifically limited to the preventive services coverage regulations, *see* 42 U.S.C. § 18011; 45 C.F.R. § 147.140, and the effect of grandfathering is not a permanent "exemption" but rather, over the long term, a transition in the marketplace with respect to several provisions of the ACA. Fewer and fewer group health plans will be grandfathered over time. *See* 78 Fed. Reg. at 39,887 n.49; 75 Fed. Reg. at 34,552; Kaiser Family Foundation and Health Research & Educational Trust, Employer Health Benefits 2013 Annual Survey at 7, 196, *available at* http://kaiserfamilyfoundation.files.wordpress.com/2013/08/8465-employer-health-benefits-20132.pdf (showing that the percentage of employees in grandfathered plans is steadily declining, having dropped from 56 percent in 2011 to 48 percent in 2012 to 36 percent in 2013). This incremental transition does not call into question the compelling interests furthered by the preventive services coverage regulations. Furthermore, Plaintiff cites no authority to suggest that, in order for an interest to be compelling, the government must achieve its goals immediately or by statute as opposed to regulation. To the contrary, such a holding would undermine any attempt to phase in important and large-scale government programs over time, perversely encouraging Congress in the future to require immediate and draconian enforcement of all provisions of major laws, without regard to pragmatic considerations, in order to preserve compelling interest status. *Cf. Heckler v. Mathews*, 465 U.S. 728, 746-48 (1984) (noting that "protection of reasonable reliance interests is . . . a legitimate governmental objective" that Congress may permissibly advance through phased implementation of regulatory requirements).

compelling interest in the regulation, thus effectively extending the same exemption to anyone else who wants it. Such a reading of RFRA would *discourage* the government from accommodating religion, the exact opposite of what Congress intended to accomplish in enacting the statute.

Granting Plaintiff the much broader, permanent exemption it requests would undermine Defendants' ability to enforce the regulations in a rational manner. *See O Centro*, 546 U.S. at 435. We are a "cosmopolitan nation made up of people of almost every conceivable religious preference," *Braunfeld*, 366 U.S. at 606, and many people object to various medical services. If any organization with a religious objection could claim an exemption from the operation of the preventive services coverage regulations—even where the regulations permit the organization to opt-out—it is difficult to see how Defendants could administer the regulations in a manner that would achieve Congress's goals of improving the health of women and newborn children and equalizing the coverage of preventive services for women. *See United States v. Israel*, 317 F.3d 768, 772 (7th Cir. 2003) (recognizing that plaintiff's RFRA logic "would lead to significant administrative problems for the [government] and open the door to a . . . proliferation of claims"). Indeed, women who receive health coverage through employers like Plaintiff would face negative health and other outcomes because they had obtained employment with an organization that objects to its employees' use of contraceptive services, even when those services are paid for, administered, and otherwise provided by a third party. *See id.* (noting consequences "for the public and the government"); *see also* 77 Fed. Reg. at 8,728; 78 Fed. Reg. at 39,887.

**b.** As the Supreme Court emphasized in *Hobby Lobby*, the accommodations ensure that women "continue to receive contraceptive coverage without cost-sharing for all FDA-approved contraceptives," and "face minimal logistical and administrative obstacles because their employers' insurers would be responsible for providing information and coverage." 134 S. Ct. at 2782 (quotation omitted); *see also id.* at 2760, 2783. The accommodations do not "impede women's receipt of benefits by requiring them to take steps to learn about, and to sign up for, a new government funded and administered health benefit." *Id.* at 2783 (quotation and brackets omitted).

Instead, they "work[] by requiring insurance companies" to provide contraceptive coverage, and they "equally further[] the [g]overnment's interest." *Id.* at 2786 (Kennedy, J., concurring).

The accommodations established by the 2013 final rules offer Plaintiff a way to opt out by notifying its insurance issuer that it does not wish to provide contraceptive coverage, while requiring its issuer—a third party—to make or arrange separate payments for contraception. The augmented regulatory accommodation process established by the interim final regulations offers Plaintiff an alternative but still administrable way to state that it objects and opt out, without contacting its issuer, while providing the government with the information needed to implement the requirement that a third party provide contraceptive coverage so that participants and beneficiaries can "obtain, without cost, the full range of FDA approved contraceptives." *Wheaton Coll.*, 134 S. Ct. at 2807; *see* 79 Fed. Reg. at 51,095. Under both methods of opting out, the effect on participants and beneficiaries is "precisely zero." *Hobby Lobby*, 134 S. Ct. at 2760.

Plaintiff's alternative schemes, by contrast, would not "equally further[] the [g]overnment's interest," *id.* at 2786 (Kennedy, J., concurring), by ensuring that women can seamlessly obtain contraceptive coverage without additional burden—the very point of requiring that health coverage include coverage of contraceptives without cost-sharing. *See* 78 Fed. Reg. at 39,888; IOM REP. at 18-19. *See generally Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997) (question under free speech strict scrutiny is whether "less restrictive alternatives would be *at least as effective* in achieving the legitimate purpose that the statute was enacted to serve") (emphasis added). Plaintiff suggests that the government should provide contraceptive services to women directly, such as by creating new contraceptives-only policies on the Exchanges or expanding a pre-existing family-planning programs, Pl.'s Mot. at 27-28, or providing a tax credit to individuals who purchase contraceptives, *id.* at 29. But Plaintiff's alternatives are not equally effective alternative means.

In the ACA, Congress determined that the best way to achieve its goals, including expanding coverage for preventive services, was to build on the existing employer-based system rather than adopt a single-payer system financed through taxes. *See* H.R. Rep. No. 111-443, pt. II, at 984-86 (2010). The anticipated benefits of the regulations are attributable not only to the fact that

recommended preventative services will be available to women with no cost-sharing, but also to the fact that these services will be available through the existing employer-based system of health coverage, such that women will face minimal logistical and administrative obstacles in receiving coverage. The same cannot be said of the alternatives that Plaintiff proposes.

Moreover, in implementing the preventive services coverage provision of the ACA, Defendants were required to work within the statutory framework established by Congress. Thus, even if Plaintiff's alternatives *were* equally effective, Defendants could not have considered them because they are beyond Defendants' statutory authority. Plaintiff's proposed alternatives are not "workable," and therefore do not constitute a less restrictive means. *Fisher v. Univ. of Tex.*, 133 S. Ct. 2411, 2420 (2013); *see also, e.g.*, *New Life Baptist Church Acad. v. Town of E. Longmeadow*, 885 F.2d 940, 947 (1st Cir. 1989) (Breyer, J.).

Plaintiff's alternatives fail for an additional, and perhaps more fundamental, reason: RFRA does not require the government to create entirely new programs or dramatically expand existing ones to accommodate religious objections. As Justice Kennedy stated in his *Hobby Lobby* concurrence:

> [T]he Court does not address whether the proper response to a legitimate claim for freedom in the health care arena is for the [g]overnment to create an additional program. The Court properly does not resolve whether one freedom should be protected by creating incentives for additional government constraints. In these cases, it is the Court's understanding that an accommodation may be made to the employers without imposition of a whole new program or burden on the [g]overnment.

134 S. Ct. at 2786. An employer with a religious objection to paying the minimum wage to female employees, for example, cannot simply demand that the government make up the difference with tax credits or direct provision of financial aid.[14]

---

[14] Plaintiff attacks a straw man when it suggests that the government has stated an unwillingness to pay for contraceptive services. Pl.'s Mot. at 29. The government has not objected to providing resources for such services—under the regulations at issue here or under the family planning programs that Plaintiff itself identifies, *id.* at 27 n.8, making Plaintiff's argument contradictory at best. But those resources are finite and it is not for Plaintiff to demand that the government undertake additional financial burdens when it has already addressed Plaintiff's religious objections by providing accommodations.

The government is not required "to do the impossible—refute each and every conceivable alternative regulation scheme." *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011). Instead, the government need only "refute the alternative schemes offered by the challenger." *Id.* Yet Plaintiff's view about what types of action (or inaction) can be said to "trigger" or "facilitate" contraceptive coverage—and thereby, in its view, impose a "substantial burden" for purposes of its RFRA claim—makes it difficult to assess how one accommodation might be less restrictive than another under Plaintiff's theory of the case. Even assuming Defendants could provide contraceptive services directly to Plaintiff's employees, for example, by Plaintiff's logic that action would violate Plaintiff's religious beliefs because Plaintiff's refusal to provide coverage for such services would still "trigger" or "facilitate" their provision. Plaintiff cannot have it both ways, claiming that Defendants should have taken a different approach while also suggesting that the proposed alternative is just as objectionable. *New Life Baptist Church Acad.*, 885 F.2d at 950-51.

The Supreme Court repeatedly explained in *Hobby Lobby* that the regulatory accommodations challenged by Plaintiff "ensur[e] that the employees of these entities have precisely the same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage." 134 S. Ct. at 2759; *see id.* at 2760, 2783; *id.* at 2786 (Kennedy, J., concurring) (explaining that the accommodation "works by requiring insurance companies" to provide contraceptive coverage and "equally furthers the Government's interest"). The regulatory accommodation process is the least restrictive means of ensuring that women seamlessly obtain coverage for contraception without cost-sharing alongside their other health coverage.

### B. The Regulations Do Not Violate the Free Exercise Clause

Nearly every court to have addressed a free exercise challenge to the regulations, including the only court of appeals to have considered such a claim on the merits, has rejected it.[15] This Court

---

[15] *See, e.g.*, *Mich. Catholic Conf. II*, 755 F.3d at 393-94, *aff'g Mich. Catholic Conf. I*, 989 F. Supp. 2d at 588-89, and *Catholic Diocese of Nashville v. Sebelius*, 2013 WL 6834375, at *5-7; *EWTN*, 2014 WL 2739347 at *5-6; *Catholic Charities of the Archdiocese of Phila. v. Burwell*, No. 14-cv-3096, 2014 WL 2892502, at *7-8 (E.D. Pa., June 26, 2014); *Roman Catholic Archdiocese of Atlanta v. Sebelius*, No. 1:12-cv-3489, 2014 WL 1256373, at *23-26 (N.D. Ga., May 30, 2014); *Roman Catholic Archbishop of Wash. v. Sebelius*, -- F. Supp. 2d --, 2013 WL 6729515, at *27-31

(Footnote continued on next page.)

should do the same in response to Plaintiffs' terse suggestion that the regulations violate the Free Exercise Clause. *See* Pl.'s Mot. at 31.

The Supreme Court has made clear that a law that is neutral and generally applicable does not run afoul of the Free Exercise Clause even if it prescribes conduct that an individual's religion proscribes or has the incidental effect of burdening a particular religious practice. *Smith*, 494 U.S. at 879; *see Lukumi*, 508 U.S. at 531-32. "Neutrality and general applicability are interrelated." *Id.* at 531. A law is neutral if it does not target religiously motivated conduct either on its face or as applied, *id.* at 533, and has as its purpose something other than the disapproval of a particular religion, or of religion in general, *id.* at 545. A law is generally applicable so long as it does not selectively impose burdens only on conduct motivated by religious belief. *Id.* Unlike such selective laws, the contraceptive coverage requirement is neutral and generally applicable.

The Sixth Circuit's decision is illustrative. *Mich. Catholic Conf. II*, 755 F.3d at 393-94. There, the court concluded that the contraceptive coverage requirement "is a neutral law":

> Neither the text nor the history of the statute and regulations promulgated pursuant to the statute demonstrate that the requirement was targeted at a particular religious practice. There is no evidence that Congress and the executive branch agencies "had as their object the suppression of religion." [*Lukumi*, 508 U.S. at 542]. The record does not "disclose [] animosity" toward[] the [religious] practice of refusing to support access to contraception, the framework does not "by [its] own terms target this religious exercise," the program was not "gerrymandered with care to proscribe" [this] exercise of religion with respect to contraception but not secular opposition to contraception; and the arrangement does not "suppress much more religious conduct than is necessary in order to achieve the legitimate ends asserted in their defense." *Id.* . . . .

*Mich. Catholic Conf. II*, 755 F.3d at 393-94 (some alterations in the original). In other words, it is "abundantly clear" that the regulations are neutral. *Notre Dame I*, 988 F. Supp. 2d at 930. Contrary to Plaintiff's suggestion, Pl.'s Mot. at 31 (claiming "impermissibl[e] discriminati[on]"), there is simply "no evidence that the [challenged regulations] constitute[] a religious 'gerrymander,'" and "[t]his is not a case where [a] 'pattern of exemptions [is carefully designed] to parallel the pattern of

---

(D.D.C. 2013); *Priests for Life*, 2013 WL 6672400, at *10-12; *Notre Dame I*, 988 F. Supp. 2d at 927-30. *But see Geneva Coll. v. Sebelius*, 929 F. Supp. 2d 402, 437 (W.D. Penn., Mar. 6, 2013); *Sharpe Holdings v. HHS*, No. 2:12-CV-92-DDN, 2012 WL 6738489, at *5 (E.D. Mo., Dec. 31, 2012).

narrow prohibitions' targeted at [Plaintiff's] religious beliefs." *Roman Catholic Archdiocese of Atlanta*, 2014 WL 1256373, at *26 (quoting *Lukumi*, 508 U.S. at 537).

Rejecting the claim that Plaintiff briefly presses here, the Sixth Circuit also concluded that the contraceptive coverage requirement is generally applicable:

> [Plaintiffs] argue that the requirement is not generally applicable because grandfathered plans . . . and religious employers that obtain an exemption need not comply with [it]. This argument misunderstands the meaning of general applicability under our Free Exercise jurisprudence. "General applicability does not mean absolute universality." *See Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008). A law need not apply to every person or business in America to be generally applicable. A law is generally applicable if it does not make distinctions based on religion. To determine this, we consider whether the "legislature decide[d] that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." [*Lukumi*, 508 U.S. at 542-43.] The requirement at issue here does not pursue the governmental interest in contraceptive coverage only against entities with a religiously motivated objection to providing such coverage; that interest is pursued uniformly against all [employers] that are not grandfathered . . . . This includes entities that have no objection to the requirement, entities that object for non-religious reasons such as general opposition to government dictating healthcare requirements, and entities that object to the requirement for religious reasons. . . . Accordingly, the program is generally applicable.

*Mich. Catholic Conf. II*, 755 F.3d at 394.

The contraceptive coverage requirement reflects expert medical recommendations about the medical necessity of contraceptive services, without regard to any religious motivations for or against such services. It applies to all non-grandfathered health plans that do not qualify for the religious employer exemption or the accommodations for eligible organizations. Thus, "it is just not true . . . that the burdens of the [regulations] fall on religious organizations 'but almost no others.'" *Am. Family Ass'n v. FCC*, 365 F.3d 1156, 1171 (D.C. Cir. 2004) (quoting *Lukumi*, 508 U.S. at 536). And "the availability of the exemption and the accommodation means that the law imposes a *lesser* burden on those who object for religious reasons. *Mich. Catholic Conf. II*, 755 F.3d at 394. "To hold that any religious exemption that is not all-inclusive renders a statute non-neutral would be to discourage the enactment of any such exemptions—and thus to restrict, rather than promote, freedom of religion." *Priests for Life*, 2013 WL 6672400, at *10 (quotation omitted).

Furthermore, even if the regulations were not neutral or generally applicable, Plaintiff's free exercise challenge still would fail because the regulations satisfy strict scrutiny. *See supra* Section I(A)(3). For these reasons, Plaintiff is not likely to succeed on the merits of its Free Exercise claim.

## C.    The Regulations Do Not Violate the Establishment Clause

Every court to have considered an Establishment Clause challenge to the regulations on the merits, including the only two courts of appeal to have done so, has rejected it.[16] Plaintiff has provided no reason for this Court to decide the question differently.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). A law that discriminates among religions by "aid[ing] one religion" or "prefer[ring] one religion over another" is subject to strict scrutiny. *Id.* at 246 (internal quotation marks and citations omitted). Thus, for example, the Supreme Court has struck down on Establishment Clause grounds a state statute that was "drafted with the explicit intention" of requiring "particular religious denominations" to comply with registration and reporting requirements while excluding other religious denominations. *Id.* at 254. The Court, on the other hand, has upheld a statute that provided an exemption from military service for persons who had a conscientious objection to all wars, but not those who objected to only a particular war. *Gillette v. United States*, 401 U.S. 437 (1971). The Court explained that the statute did not discriminate among religions because "no particular sectarian affiliation" was required to qualify for conscientious objector status. *Id.* at 450-51; *see also Cutter*, 544 U.S. at 724 (upholding RLUIPA against Establishment Clause challenge because it did not "confer[] . . . privileged status on any particular religious sect" or "single[] out [any] bona fide faith for disadvantageous treatment").

---

[16] *See Mich. Catholic Conf. II*, 755 F.3d at 394-95, *aff'g Mich. Catholic Conf. I*, 989 F. Supp. 2d at 591-93, and *Catholic Diocese of Nashville*, 2013 WL 6834375, at *8-10; *Notre Dame II*, 743 F.3d at 560, *aff'g Notre Dame I*, 988 F. Supp. 2d at 931-32; *Priests for Life*, 2013 WL 6672400, at *14; *Roman Catholic Archbishop of Wash.*, 2013 WL 6729515, at *39-43; *see also Liberty Univ. v. Lew*, 733 F.3d 72, 100-02 (4th Cir. 2013) (upholding another religious exemption contained in the ACA against an Establishment Clause challenge because the exemption "makes no explicit and deliberate distinctions between sects" (quotation omitted)).

Like the statutes at issue in *Gillette* and *Cutter*, the preventive services coverage regulations do not grant any denominational preference or otherwise discriminate among religions. It is of no moment that the religious employer exemption and accommodations for eligible organizations apply to some employers but not others. The Establishment Clause "does not require the government to equalize the burdens (or the benefits) that laws of general applicability impose on religious institutions." *Notre Dame II*, 743 F.3d at 560. Nor does it prohibit the government from differentiating between organizations based on their structure and purpose when granting religious accommodations as long as the distinctions drawn by the regulations are not based on religious affiliation. "The line that the exemption and accommodation framework draws between eligibility for the exemption and for the accommodation is based on organizational form and purpose, not religious denomination." *Mich. Catholic Conf. II*, 755 F.3d at 395.[17] "This kind of distinction—not between denominations, but between religious organizations based on the nature of their activities—is not what *Larson* condemns." *Catholic Charities of Diocese of Albany v. Serio*, 859 N.E.2d 653, 468-69 (N.Y. 2006). The regulations thus do not violate the Establishment Clause.[18]

As the Supreme Court has repeatedly "reaffirmed," "'there is room for play in the joints between' the Free Exercise and Establishment [c]lauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause,'" even where no accommodation is required. *Cutter*, 544 U.S. at 713 (quoting *Locke v. Davey*, 540 U.S. 712, 718 (2004)); *see, e.g.*, *Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970). Accommodations of

---

[17] In upholding the preventive services coverage regulations against an Establishment Clause challenge like Plaintiff's, the Sixth Circuit distinguished the Tenth Circuit's decision in *Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir. 2008), cited by Plaintiff. *See* Pl.'s Mot. at 33. Plaintiff's reliance on *Weaver* is "misplaced" because the state law that *Weaver* considered "did not make distinctions based on organizational form, as here; the Colorado law violated the Establishment Clause because it discriminated based on the nature of religious belief and practice at the university." *Mich. Catholic Conf. II*, 755 F.3d at 395. "Accordingly, that case provides no support for [Plaintiff's] argument." *Id.*

[18] Plaintiffs' assertion that the "religious employer" exemption creates "irrational" results fails for reasons explained already. *Supra* at 22-23.

religion are possible because the very type of line-drawing to which Plaintiff objects is constitutionally permissible. Plaintiff's Establishment Clause challenge fails.[19]

## II. PLAINTIFF CANNOT ESTABLISH IRREPARABLE HARM, AND AN INJUNCTION WOULD INJURE THE GOVERNMENT AND THE PUBLIC

Plaintiff has not established that it is likely to suffer irreparable harm in the absence of preliminary relief because, as explained above, it has not shown a likelihood of success on the merits of its claims. Although "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), in this case, Plaintiff has not shown that the regulations intrude upon its First Amendment rights, so there has been no "loss of First Amendment freedoms" for any period of time. *See, e.g.*, *Mich. Catholic Conf. II*, 755 F.3d at 398 (explaining that, in the First Amendment context, the merits and irreparable injury prongs merge). Moreover, contrary to Plaintiff's assertion, Pl.'s Mot. at 34, any showing of a likelihood of success on the merits of Plaintiff's RFRA claim—which Plaintiff in any event has not made—would not automatically establish irreparable injury; under *Elrod*, only the loss of *First Amendment* freedoms is tantamount to irreparable harm. 427 U.S. at 373.

As to the balance of equities and the public interest, "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). Enjoining the regulations as to Plaintiff would undermine the government's ability to achieve Congress's goals of improving the health of women and newborn children and equalizing the coverage of preventive services for women and men.

It would also be contrary to the public interest to deny Plaintiff's employees (and their families) the benefits of the preventive services coverage regulations. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) ("[C]ourts . . . should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). Many women do not use

---

[19] Even if the regulations discriminate among religions (which they do not), they are valid under the Establishment Clause because they satisfy strict scrutiny. *See supra* Section I(A)(3).

contraceptive services because they are not covered by their health plan or require costly copayments, coinsurance, or deductibles. IOM REP. at 19-20, 109; 77 Fed. Reg. at 8,727; 78 Fed. Reg. at 39,887. As a result, in many cases, both women and developing fetuses suffer negative health consequences. *See* IOM REP. at 20, 102-04; 77 Fed. Reg. at 8,728. And women are put at a competitive disadvantage due to their lost productivity and the disproportionate financial burden they bear in regard to preventive health services. 155 Cong. Rec. S12106-02, S12114 (daily ed. Dec. 2, 2009); *see* IOM REP. at 20.

Enjoining Defendants from enforcing, as to Plaintiff, the preventive services coverage regulations—the purpose of which is to eliminate these burdens, 75 Fed. Reg. at 41,733; *see* 77 Fed. Reg. at 8,728—would thus inflict a very real harm on the public and on a readily identifiable group of individuals. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (vacating preliminary injunction and noting that "[t]here is a general public interest in ensuring that all citizens have timely access to lawfully prescribed medications"). Plaintiff's health plans approximately 160 employees. Second Towey Decl. ¶ 44, ECF No. 52-1. Even assuming Plaintiff was likely to succeed on the merits (which it is not, as explained above), any potential harm to Plaintiff would be outweighed by the significant harm an injunction would cause these employees and their families.

## CONCLUSION

The Court should deny Plaintiff's motion for preliminary injunction.

Dated: September 22, 2014                    Respectfully Submitted,

                                             JOYCE R. BRANDA
                                             Acting Assistant Attorney General

                                             KATHLEEN R. HARTNETT
                                             Deputy Assistant Attorney General

                                             A. LEE BENTLEY, III
                                             United States Attorney

                                             JENNIFER RICKETTS
                                             Director, Federal Programs Branch

SHEILA M. LIEBER
Deputy Director

/s/ Jacek Pruski
JACEK PRUSKI
California Bar No. 277211
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20530
Tel: (202) 616-2035
Fax: (202) 616-8470
jacek.pruski@usdoj.gov

*Attorneys for Defendants*